## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### Springfield Division

| | | |
|---|---|---|
| ACUITY OPTICAL | ) | |
| LABORATORIES, LLC | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No: 14-cv-3231 |
| vs. | ) | |
| | ) | |
| DAVIS VISION, INC. | ) | |
| | ) | |
| Respondent. | ) | |

_____

## VERIFIED PETITION FOR PRELIMINARY INJUNCTION, DECLARATORY JUDGMENT, DAMAGES, AND PERMANENT INJUNCTIVE RELIEF

Petitioner Acuity Optical Laboratories, LLC ("AO" or "Petitioner") brings this civil action alleging violations of federal and state antitrust laws, and seeking damages, as well as preliminary and permanent injunctive relief, declaring Respondent Davis Vision, Inc. ("DV" or "Respondent") is enjoined from enforcing, entering into, or maintaining contracts with Illinois optometrists and opticians ("Providers") requiring said Providers to exclusively use DV's ophthalmic lens manufacturing laboratories for all of DV's members' ("Members") manufacturing orders of prescription eyeglass lens sales, such practice being a violation of Sections 1 & 2 of the Sherman Antitrust Act, and Sections 2 and 3 of the Clayton Act, Sections 1, 2, & 3 of the Illinois Antitrust Act, and Sections 215 ILCS 5/364.2 and 215 ILCS 5/370i(a) of the Illinois Insurance Code.  Petitioner alleges as follows:

### I.    NATURE OF THE ACTION

1.    Respondent DV has obtained monopoly power/market power in the relevant product market of the City of Chicago, Illinois ("Relevant Market"), specifically in the area of

ophthalmic lens manufacturing, for Members of DV's vision benefits program.  Petitioner, and other similarly situated ophthalmic lens manufacturers, face irreparable harm, which has already resulted in many private ophthalmic lens manufacturers being forced to close down, if DV's unlawful anti-competitive practices are not stopped by this Court.  Likewise, the public is in significant danger as their right to receive health benefits are seriously impacted in an unlawful manner by DV's practices, including but not limited to a resulting *supra* market pricing for ophthalmic lenses for DV Members, which impacts pricing on the market as a whole.

2.      DV operates as a vertically integrated insurance and manufacturing enterprise, which, through commonly owned and legally and economically distinct entities, both sells vision insurance benefits to the national and Relevant Market, and through contract and conspiracy, holds monopoly power/market power over all orders for the manufacture of these same ophthalmic lenses they are providing health benefits for.

3.      DV maintains monopoly power in the Relevant Market by operating a provider network whereby Providers are required to execute a provider agreement ("Provider Agreement") with DV in order to be able to bill DV for vision related services, such as eye exams.  On information and belief, common to all of these Provider Agreements is a provision requiring all Providers to send any eyeglass manufacturing orders for a DV Member to an ophthalmic lens laboratory owned by DV ("Mandatory Policy").  All of said ophthalmic lens laboratories are located outside of the State of Illinois, resulting in significant interstate activity.

4.      DV is considered a "must have" vision benefits program to all optometrists and opticians in the Relevant Market.  DV is the sole vision benefits provider for all City of Chicago employees, which number more than 85,000.  When adding City of Chicago employees' family members who are also insured by DV to this figure, the amount of DV Members in Chicago

grows exponentially.  When adding other DV Members living in the Relevant Market to these figures, DV maintains sufficient control of ophthalmic lens manufacturing business in the Relevant Market to constitute market power/monopoly power in the Relevant Market.

5.      DV advertises a member network of 55 million Members, yielding DV market power/ monopoly power in both the Relevant Market and the national market.  Due to the Mandatory Policy found in the Provider Agreements, on information and belief, DV's associated ophthalmic lens laboratories have monopoly power/market power over ophthalmic lens manufacturing orders for these 55 million members.  These DV affiliated laboratories still rely primarily on dated conventional lens manufacturing technology, and offers only a fraction of lens choices utilizing the new digital freeform lens manufacturing technology used by Petitioner and many other privately owned lens manufacturers.

6.      Providers are forced to either accept the Mandatory Policy as part of the Provider Agreement, or be refused access to DV's benefits network.  Because DV Members make up a majority of the vision services consumers in the Relevant Market, optometrists and opticians in the Relevant Market must agree to the Mandatory Policy or forfeit the business of DV's Members all together, a financially crippling decision.

7.      The Provider Agreements operate as exclusionary contracts that prevent Providers from ordering ophthalmic lenses from any manufacturing facility other than the ophthalmic lens laboratories owned by an affiliate of DV.  These Provider Agreements totally foreclose third party ophthalmic lens manufacturers from even the opportunity to compete for DV's Members' ophthalmic lens business, granting the DV affiliated labs Most Favored Nation status.

8.      DV and DV's ophthalmic lens laboratories are therefore free to fix eyeglass prices at a *supra* market rate without fear of losing consumers' business as neither DV Members nor

Providers are free to even consider using the services of third party ophthalmic lens manufacturing laboratories.

9.     DV's exclusionary contracts constitute *per se* violations of state and federal antitrust laws, and have destroyed all competition for DV Members' ophthalmic lens needs in the Relevant Market, and the majority of all ophthalmic lens business in both the Relevant Market and national market, by disallowing third party ophthalmic lens manufacturing laboratories even the opportunity to compete, which is a detriment to the market and the public.

10.     DV's exclusionary contracts further act a "tying" agreement between DV and Providers, preventing Providers access to the tying product they want, DV in network provider status, unless they agree to purchase the tied product they do not want, compulsory use of DV's affiliated ophthalmic lens laboratory via the Mandatory Policy.

11.     Because virtually all Providers in the Relevant Market are compelled to use DV's affiliated ophthalmic lens laboratory for many of their ophthalmic lens orders, third party lens manufacturers face further unlawful barriers to acquiring accounts for even non-DV Members' business in the Relevant Market as Providers in that area are reticent to add yet another laboratory to their daily use.

12.     DV and its affiliated ophthalmic lens laboratories are separate and distinct legal entities, and would normally be in competition with each other in the following manner:

a.   DV, as a vision benefits provider, would normally negotiate for the lowest price possible for reimbursement of claims made for the purchase of ophthalmic lenses made by its Members;

4

b. DV's affiliated ophthalmic lens laboratory would likewise negotiate for the highest possible reimbursement price for the sale of ophthalmic lenses to DV Members;

c. In a normal market condition, these two entities would be in competition. Since the Mandatory Policy removes any potential third party lens manufacturers from bidding for any of DV Members' lens manufacturing business, DV and DV's affiliated ophthalmic lens laboratory can charge whatever amount it wants for ophthalmic lenses, and will not risk losing market share;

d. This conspiracy between DV and its affiliated laboratories results in a *supra* market amount charged for ophthalmic lenses in the Relevant Market and the national market;

e. Because DV and its affiliated ophthalmic lens laboratory are separate and distinct legal entities that are in competition with each other, this arrangement operates as a horizontal price fixing conspiracy between competitors to fix prices and limit output amongst competitors.


## II. <u>PARTIES, JURISDICTION, VENUE, AND INTERSTATE COMMERCE</u>

13. Petitioner is a registered Illinois Limited Liability Company, and is headquartered in Normal, Illinois, McLean County. Petitioner's primary business function is the manufacture of ophthalmic goods, including digitally manufactured freeform ophthalmic lenses.

14.    Petitioner attempts to conduct sales within the Relevant Market under the moniker of Identity Optical, Petitioner's outside sales division.  These sales are conducted from Petitioner's headquarters in Normal, Illinois.

15.    Respondent DV is a New York corporation registered as a foreign corporation under the laws of Illinois, and as a Preferred Provider Administrator with the Illinois Department of Insurance in Springfield, Illinois.

16.    Petitioner brings this action pursuant to Section 4 of the Sherman Antitrust Act, Section 26 of the Clayton Act, and Section 10/7(2) of the Illinois Antitrust Act, enabling Petitioner to initiate a private cause of action in the District Courts.

17.    This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Antitrust Act, Section 16 of the Clayton Act, and original and/or diversity jurisdiction granted under 28 U.S.C. Sections 1331, 1332, and 1337(a).

18.    This Court has venue to hear this cause of action pursuant to 28 U.S.C. 1391(d), as DV is a corporate entity, and is therefore deemed to be a resident of the Central District in the Springfield Division as DV conducts significant, systematic, and ongoing business in Springfield, Illinois.  Venue is also proper in the Central District under Section 22 of the Clayton Act for this reason.

19.    DV's business activities substantially affect interstate trade and commerce.  DV advertises that it has 55 million Members, and that the Members are located in most or all states. Additionally, DV's ophthalmic lens laboratories are located outside of the State of Illinois, meaning all eyeglass manufacturing orders placed in the Relevant Market must be fulfilled by out of state manufacturers.

### III.    **RELEVANT MARKET**

#### a.  **Geographic Market - Chicago**

20.     The manufacture and sale of ophthalmic lenses is a recognized market of an ascertainable good that is in high demand in the City of Chicago and the national market.

21.     According to a September 17, 2013 report by the Bureau of Economic Analysis under the U.S. Department of Commerce, Chicago, the Relevant Market, is the third largest commercial market by real GDP in the United States.

22.     DV maintains unlawful control over the Relevant Market by forcing Providers to either agree to exclusively order ophthalmic lenses for DV Members from DV's affiliated ophthalmic lens laboratory located out of state, or be refused access to DV's benefits network.

23.     DV is the vision benefits provider for more than 85,000 City of Chicago employees, plus all of their family members.  On information and belief, DV is also the vision benefits provider for a number of other employers in the Relevant Market.

24.     The amount of business conducted in the Relevant Market is sufficient to grant DV market power/monopoly power in the Relevant Market.

25.     Because City of Chicago employees represents a large demographic group with attractive salaries that businesses target, Providers are effectively forced to take whatever steps necessary to become in-network with DV.  Failure to become in-network with DV would result in the loss of a commercially significant amount of business in the Relevant Market.

26.     Providers in the Relevant Market are commercially compelled to become in-network with DV, and by extension agree to the Mandatory Policy.  Failing to do so by entering

into the Provider Agreements would result in Providers forfeiting a pool of potential consumers so large that it is unlikely that said Providers would be able to survive financially in the Relevant Market.

27.     Because DV's conspiracy with its affiliated laboratory constitutes a horizontal price fixing scheme, no geographic relevant market analysis is necessary as such practice is deemed a *per se* violation of antitrust laws.

### b.  Product Market – Ophthalmic Lenses by Reimbursement Type

28.     The DV Members' market for ophthalmic lenses is sufficient to establish its own unique market on both a national scale and within the Relevant Market.  On information and belief, DV's affiliated laboratories possess near exclusive manufacturing power of all of the ophthalmic lens demand for DV's 55 million Members, constituting an unlawful monopoly.

29.     The market for the sale of ophthalmic lenses in the Relevant Market consists of insurance based lens sales, and non-insurance based lens sales.

> i.  Insurance Based Lens Sales include orders by consumers who have a vision benefits policy with DV, or other vision benefits entities.  As indicated above, the Mandatory Policy prevents third party lens manufacturers from even attempting to compete for DV Members' business as the exclusory Provider Agreements require such sales to automatically be awarded to DV's affiliated out of state laboratories.

30.     Petitioner's salesmen have been informed on a consistent and significant number of occasions by Providers in the national and Relevant Market that said Providers would order

Insurance Based Lenses from Petitioner if they were not obligated to exclusively order

ophthalmic lenses for DV Members from the DV affiliated laboratory.

        ii.   Non-Insurance Based Lens Sales include orders by consumers who do not

            have vision benefits policies with DV.  Because virtually all Providers in

            the Relevant Market are contractually coerced into ordering all DV

            Members' ophthalmic lenses from the DV affiliated laboratory, the

            Providers are less likely to agree to work with an additional third party

            laboratory as it only adds more work for Providers to order from multiple

            laboratories.

31.    Petitioner's salesmen regularly are denied potential business because Providers in

the national and Relevant Market do not wish to add another laboratory to their ordering system.

32.    Petitioner's salesmen have been informed on a consistent and significant number

of occasions by Providers in the national and Relevant Market that said Providers would order

Non-Insurance Based Lenses from Petitioner if they were not obligated to already work with the

DV affiliated laboratories.  Said Providers typically indicate they "Do not want to add another

lab to their daily use, as they are already forced to use labs like DV due to their contracts".

33.    Because DV's conspiracy with its affiliated laboratory constitutes a horizontal

price fixing scheme, no product relevant market analysis is necessary as such practice is deemed

a *per se* violation of antitrust laws.


    **IV.**    **THE RELATIONSHIP BETWEEN DV AND ITS AFFILIATED LABS**

34.    DV and its related laboratories are legally distinct entities operating in the vision

benefits management and medical device manufacturing industries, respectively.

35.     Any claimed relationship between the entities would constitute a relationship by form, and not of substance, as each company engages in remarkably different industries that are in fact in competition with each other.

36.     DV and its laboratories do not constitute a single entity, but instead the relationship between the entities operates as a vehicle by which a group of competitors use to conduct ongoing and concerted restraint of trade activities.

37.     The agreement between DV and its associated laboratories joins together separate economic actors, pursuing separate economic interests, that deprives the marketplace of independent centers of decision making, and therefore diversity of entrepreneurial interests.

38.     DV and its associated laboratories do not hold themselves out to DV Members as a single or joint enterprise with a unity of interests, and effectively conceals any relationship between DV and its affiliated laboratories from its Members.

39.     DV and its associated laboratories are constituted of separate and distinct executive officers, working at separate and distinct locations, operating under separate and distinct corporate policies, with separate and distinct corporate goals, and maintain distinct, competing interests.


**V.      DV WILLFULLY MAINTAINS ITS UNLAWFUL MONOPOLY POWER BY PLAN AND DESIGN THROUGH THE USE OF ANTICOMPETITIVE EXCLUSIONARY CONTRACTS**

**a.    The Exclusory Provider Agreements and Their Unlawful Tying**

40.     On information and belief, virtually each Provider Agreement executed with a Provider in the Relevant Market contains the Mandatory Policy.

41.     DV has improperly and unlawfully tied the ability for Providers to enjoy the benefits of in-network status with DV with the Mandatory Policy requiring said Providers to order all ophthalmic lens sales for DV members from the DV affiliated ophthalmic lens manufacturing laboratory.

42.     DV's Mandatory Policy found in the Provider Agreements precludes Providers from even considering sending orders for the manufacture of ophthalmic lenses for DV Members to any lens laboratory other than the DV affiliated laboratory.

43.     Regardless of what third party ophthalmic lens manufacturing laboratories like Petitioner offer in the terms of price, quality, turn-around times, warranties, or customer service, Providers are absolutely precluded from utilizing the manufacturing services from any ophthalmic lens laboratory other than the DV affiliated laboratory.

44.     DV adopted the Mandatory Policy in order to unlawfully prevent third parties from ever competing for its Members business, and to unlawfully increase its own profits.

45.     DV made the Mandatory Policy pervasive to every Provider Agreement in order to establish a monopoly over DV members' ophthalmic lens orders, and uses said Mandatory Policy to continue to unlawfully hold monopoly power over said market.

46.     DV's affiliated lab did not earn or otherwise acquire monopoly power over DV Members by producing superior products, providing superior customer service, or performing any of the other typical market functions that earn consumer business.  The DV affiliated laboratories were merely awarded such business as a byproduct of the unlawful exclusionary Provider Agreements containing the Mandatory Policy.

47.     The resulting market effect is that DV and its affiliated laboratories may charge *supra* market prices for ophthalmic lenses, without the fear of losing business, due to any third

party manufacturer's inability to compete for such business pursuant to the express provisions of the exclusory Provider Agreements.

48.     Such an arrangement offers no legitimate market or public benefit, and only operates to unlawfully award DV and its competing affiliated lens laboratory an unmerited monopoly over the ophthalmic lens demand of DV's Members.

49.     Such arrangement has resulted in substantial anticompetitive effects, resulting in numerous independent ophthalmic lens laboratories being forced to shut down because of insufficient available business.  The Mandatory Policy also inhibits new potential ophthalmic lens laboratories from opening, as the potential ophthalmic lens sales are significantly limited by exclusionary contracts such as the Mandatory Policy.

50.     Absent the Mandatory Policy, Providers would cease to use the DV affiliated laboratories and would patronize Petitioner and other private ophthalmic lens laboratories.

### b.  DV's Coercion of Providers Into Acceptance of the Mandatory Policy Constitutes a Horizontal Price Fixing Conspiracy Amongst Competitors

51.     DV has improperly and unlawfully fixed the price of ophthalmic lens sales by conspiring with Providers in the Relevant Market, thereby resulting in *supra* market prices for ophthalmic lenses in the Relevant Market.  DV does not risk losing any of this business despite the higher pricing due to its coercion of the Providers to require them to order ophthalmic lenses from DV's affiliated laboratory via the Mandatory Policy.  This practice constitutes a horizontal price fixing scheme as DV and the Providers are competitors.

52.     Petitioner does not allege that Providers desire to participate in this conspiracy.  In fact, the opposite appears to be true, and Providers desire to be free to order ophthalmic lenses

from sources outside of the DV affiliated laboratory.  Unless Providers agree to the Mandatory Policy however, they are foreclosed access to DV's benefits network, resulting in their inability to access one of the largest vision benefits provider in the Relevant Market and national market.

53.     Many Providers own and operate their own ophthalmic lens laboratories. Equipment for finishing an ophthalmic lens by cutting it into the proper shape to fit into a pair of eyeglass frames is relatively inexpensive, and many Providers own such equipment.  Absent the Mandatory Policy, many Providers would conduct portions of the lens manufacturing process for their own DV Member patients, resulting in increased profits for the Providers, and faster turn-around time to consumers.

54.     Many Providers desire to do business with ophthalmic lens laboratories in their region in order to take advantage of faster turn-around times such proximity naturally grants. DV's affiliated ophthalmic lens laboratories are not located near the Relevant Market, resulting in delays before the lenses can be manufactured and shipped to Providers in the Relevant Market.

55.     DV's conspiracy with Providers results in a price fix above the typical market cost for ophthalmic lenses.  Because Providers must order ophthalmic lenses for DV Members from the DV affiliated laboratory, DV's associated laboratories are free to set the price of eyeglasses to whatever amount it desires without fear of loss of business.

56.     DV enjoys the payment of annual premiums by its Members, a co-pay by the Member for lenses at the time of sale, and a co-pay by the Member for eyeglass frames at the time of sale.  The resulting cost to the consumer is substantially higher than the typical market cost of a pair of eyeglasses.

57.     Typically, a Provider would be in competition with a vision benefits provider. The Provider would seek the maximum amount of reimbursement for ophthalmic lenses

possible, and then seek a lower price on the open market with a third party ophthalmic lens

manufacturer, or the Provider would seek to manufacture the ophthalmic lenses itself to

maximize profit.  The vision benefits provider would likewise negotiate for the lowest price of

reimbursement.  Because this arrangement is a conspiracy between competitors resulting in

*supra* market prices for ophthalmic lenses, it constitutes a horizontal price fixing scheme, and

therefore a *per se* violation of antitrust laws.

### c.  DV's Conspiracy with its Affiliated Ophthalmic Lens Laboratory Constitutes a Horizontal Price Fixing Scheme

58.     DV has improperly and unlawfully fixed the price of ophthalmic lens sales by

conspiring with its affiliated ophthalmic lens laboratories, thereby resulting in *supra* market

prices for ophthalmic lenses in the Relevant Market.  DV does not risk losing any of this

business despite the higher pricing due to its Members being unable to select third party

ophthalmic lens manufacturers to purchase from due to the Mandatory Policy found in the

Provider Agreements.  This practice constitutes a horizontal price fixing scheme as DV and a

manufacturing laboratory should be market competitors.

59.     The manufacture of ophthalmic lenses is a highly profitable portion of the optical

industry.  The purchase of digital freeform manufacturing technology, an investment Petitioner

and a few other ophthalmic lens laboratories have made, allows for even greater profitability in

the manufacture of ophthalmic lenses.

60.     Digital freeform technology is drastically superior to the now dated

"conventional" lens generation technology still be utilized to a large degree by DV's affiliated

laboratories.  On information and belief, based upon the review of a document entitled

"Progressive Addition (PAL) and Intermediate Lens Formulary", which describes all of the

progressive lens choices available to DV members that DV's laboratories can manufacture, DV's

laboratories only offer two fully digital freeform designs (from Shamir Insight, Inc.), with the

rest of the progressive lenses manufactured using dated conventional technology. Petitioner's

laboratory offers the full digital lens catalogue offered by Shamir Insight, Inc. of Israel, as well

as the full digital lens catalogue of Carl Zeiss Vision, Inc. of Germany, and Indizen Optical

Technologies, Inc. of Spain. Petitioner's own digital freeform catalogue of lens choices numbers

more than twenty. DV cannot adequately provide ophthalmic lenses to its Members with only its

very limited selection.

61.     DV therefore controls the cost of the manufacture of ophthalmic lenses for its

Members. Because DV is able to unlawfully control the cost of ophthalmic lenses, it is able to

enjoy a significant profit margin, while its affiliated labs who should be in competition with DV,

enjoys guaranteed manufacturing work via its Most Favored Nation status unlawfully awarded to

it by the Provider Agreements. This margin further includes copayment amounts made by its

Members at the point of sale, which further exacerbates DV and its laboratories *supra* market

ophthalmic lens prices.

62.     A DV Member is forced to pay considerably higher than market average for a pair

of ophthalmic lenses under this conspiracy between DV and its affiliated laboratory. Not only

does a DV Member pay their annual premiums, but said Member must also pay a co-pay,

generally $25.00 for frames, and $25.00 for ophthalmic lenses. If the DV Member selects higher

performance lenses, or otherwise more expenses components to the eyeglasses, the copayment

price increases, resulting in yet another ill-gotten windfall to DV.

63.     The resulting cost of premiums, plus co-pays, yields a cost for ophthalmic lenses

higher than what the DV Member would otherwise pay on average on the open market, if the

Member's Provider were able to order from a non-DV affiliated ophthalmic lens manufacturing laboratory.

64.     The cost of these ophthalmic lenses manufactured by a DV affiliated laboratory is considerably higher than market average for DV Members for another reason as well.  According to data published by Jobson Research, most consumers only utilize vision insurance benefits once every two years.  In years that DV Members do not use their benefits, they still pay premiums, but without enjoying the benefit of using optical services.  When a DV Member only uses optical services every other year, as is the average for the industry, the price paid for a pair of ophthalmic lenses is effectively doubled, because the DV Member was forced to pay two full years of premiums for the single pair of ophthalmic lenses.

65.     Typically, an ophthalmic lens laboratory would be in competition with a vision benefits provider as the benefits provider would seek to reimburse the manufacturer the least amount of money possible for the lenses, and the laboratory would seek the highest amount of reimbursement.  Because this arrangement is a conspiracy between competitors resulting in *supra* market prices for ophthalmic lenses, it constitutes a horizontal price fixing scheme, and therefore a *per se* violation of antitrust laws.


### d.  The Exclusionary Provider Agreements Operate as a Output Limitation

66.     DV has limited ophthalmic lens output in the Relevant Market by refusing to allow any third party lens manufacturers the opportunity to even compete for DV Members ophthalmic lens orders.  DV has therefore established a monopoly over the ophthalmic lens manufacturing demand of all DV Members, a distinct market containing over 55 million advertised members.

67.     The Mandatory Policy limits the output of any and all third party manufacturers of ophthalmic lenses for DV Members to 0.

68.     Because of the Mandatory Policy found in the Provider Agreements, no third party ophthalmic lens manufacturers can produce lenses for DV Members, other than DV affiliated laboratories.

### e.   <u>The Exclusionary Provider Agreements Prevent New Market Entry</u>

69.     Virtually no new ophthalmic lens manufacturers enter the market due to the stranglehold DV, and other vision benefits entities similar to DV, have on the production demand of their own members.

70.     Many privately owned ophthalmic lens laboratories have either been forced to close their doors, or to sell to larger market players.  The result is a year over year net *decrease* in private competition in the ophthalmic lens market.  The primary reason for this decrease in competition is DV, and vision benefits companies like DV, acquiring monopoly power over production of the very product they are supposedly providing benefits for, and excluding potential competition via the Mandatory Policy in the Provider Agreements before the opportunity for third parties in the market to compete for this business even arises.

71.     As DV continues to grow its Member network, it will continue to unlawfully hedge out any competitors for the ophthalmic lens manufacturing demands of its Members, destroying private competition in the ophthalmic lens market.  Such a practice is axiomatically against the basic tenets of American capitalism, and is akin to a medical insurance company informing its insureds that it will only pay for medication produced by laboratories owned by that medical insurance company.  Such a practice would never be tolerated in the United States,

and DV should not be allowed to accomplish this very same feat under the cloak of a

Machiavellian "the end justifies the means" mentality.

### f.   The Exclusionary Provider Agreements Have Reduced Quality

72.    Because the DV affiliated ophthalmic lens laboratories are automatically awarded

all of DV's Members lens manufacturing business, the DV affiliated labs do not face market

pressure to outperform potential competitors.  This lack of concern over potential competition

has resulted in the following reduction in product and service quality:

  a.   Slower Turn-Around Times.  Because DV Members are forced to use a DV

  affiliated laboratory, said Members face increased wait times on obtaining their

  glasses.  Because a Member must wait on his or her frame being ground shipped

  from the point of sale to an out of region DV lab, the lenses must then be

  manufactured and assembled into those frames, and then ground shipped back to

  the point of sale, DV Members in the Relevant Market are deprived of the much

  faster turn-around time local firms like Petitioner offers.  On information and

  belief, the only two DV affiliated labs authorized to produce ophthalmic lenses

  for DV Members are located in Maryland and in Texas.

  b.   Inferior Product Selection.  Because DV affiliated laboratories do not possess the

  full spectrum of ophthalmic lens designs as described above, DV Members are

  forced to accept the products that a DV affiliated laboratory can manufacture,

  even if the Member desires other lens products, or the Member's doctor

  recommends lens a certain lens product not available from a DV affiliated

  laboratory.  One such example is the industry leading ophthalmic lens designs of

Carl Zeiss Vision, Inc.  Because DV's affiliated laboratory is not enabled to manufacture Carl Zeiss Vision, Inc. digital freeform lens products, a DV Member is simply precluded from receiving any digital freeform lenses designed by Carl Zeiss Vision, Inc., a highly sought after product in the Relevant Market.

c.    Inferior Product Warranty.  Petitioner and many lens laboratories like Petitioner offer warranties on lens products superior to DV affiliated labs.  Because DV affiliated labs are awarded manufacturing business irrespective to price, quality of work, quality or product, or quality of service, DV affiliated labs do not need to bend to consumer pressures to provide the optimum in customer service.  As such, DV affiliated lab's remake and warranty policies are far more rigid than those offered by Petitioner and other privately owned ophthalmic lens laboratories.

### g.    The Exclusionary Provider Agreements Lack Valid Business Justification

73.    There are no valid business justifications for DV's exclusionary Provider Agreements.  DV does not achieve economy of scale efficiencies, nor do such Provider Agreements result in faster, superior, or in any way more beneficial results for DV Members.  DV's laboratory does not offer the full spectrum of digital freeform lens designs, and still manufactures many lens products using dated conventional technology.

74.    DV Members are actually forced to pay *supra* market prices for ophthalmic lenses manufactured by a DV affiliated lab, as cheaper prices are available on the open market.  When the context of use of benefits for the purchase of lenses generally occurs only every two years is introduced to the equation, then the costs of such lenses effectively doubles above an already *supra* market price.

## COUNT I
## SECTION I OF THE SHERMAN ANTITRUST ACT
## ILLEGAL RESRAINT OF TRADE

75.     Petitioner realleges and incorporates by reference paragraphs 1-74 of this Petition

as paragraphs 1-74 of this Count I.

76.     The Provider Agreements executed between DV and Illinois Providers constitute

a conspiracy between DV and Illinois Providers to restrain trade.  Illinois Providers do not wish

to engage in this conspiracy, but are forced to due to the Mandatory Policy.

77.     DV's Mandatory Policy constitutes a forced boycott of all third party

manufacturers, and functions as and organized and designed conspiracy by contract to restrain

trade.

78.     The two above alleged conspiracies result in *supra* market pricing of ophthalmic

lenses in the Relevant Market and the national market.

79.     The two above alleged conspiracies result in Petitioner, and all other non DV

affiliated laboratories, from being totally precluded from even an opportunity to compete in the

DV members ophthalmic lens demand manufacturing market.

80.     Petitioner, and similarly situated firms, have experienced significant financial

damages as a result.  Such firms are being culled from the marketplace because of the Mandatory

Policy, and few if any new firms are able to even enter the market and enrich competition.

81.     Both the market and consumers are damaged by DV's monopolistic and

exclusionary practices, as such practices result in inferior products and services being forced

upon the market and consumers, without their choice to consider alternate vendors.  The injury is

further complicated because DV has caused by design to create a system where the *supra* market

cost of ophthalmic lenses purchased from its affiliated laboratory can be maintained without the chance of losing business.

82.     DV's practices constitute a *per se* violation of federal antitrust laws.

83.     DV maintains monopoly power/market power in the Relevant Market.

84.     DV has monopoly power/market power over DV Members' ophthalmic lens needs, and controls the manufacturing of nearly 100% of all such lenses.  Such a market, that being the lens market for the 55 million advertised members of DV's network, constitutes a distinct and unique market in and of itself, irrespective of any geographic boundary.

85.     The manufacturing of ophthalmic lenses constitutes a trade involving a product that crosses state lines, and has a substantial effect on interstate commerce.

## COUNT II
## SECTION II OF THE SHERMAN ANTITRUST ACT
## ILLEGAL MONOPOLIZING OF TRADE

86.     Petitioner realleges and incorporates by reference paragraphs 1-85 of Count I as paragraphs 1-85 of this Count II.

87.     DV Mandatory Policy constitutes an organized plan or design to monopolize the manufacturing demand for DV insured ophthalmic lenses.

88.     DV forces Illinois Providers to accept the exclusionary provisions found in the Provider Agreements, resulting in a conspiracy to monopolize such above referenced lens business.  DV's affiliated laboratories would not obtain this manufacturing business outside of these unlawful exclusionary contracts.

89.     DV has conspired with its associated ophthalmic lens laboratories to effectuate this monopolistic plan and design, resulting in DV and its associated laboratories gaining the following trade monopolies:

a.  Monopoly power/market power in the Relevant Market, as DV holds the sole right to manufacture ophthalmic lenses for an economically significant portion of the eyeglass wearers in the City of Chicago, thereby restraining free competition in the Relevant Market; and

b.  Monopoly power/market power in the market for DV Members' ophthalmic lens manufacturing demand, a market that consists of over 55 million individuals.

## COUNT III
## SECTION I & II OF THE SHERMAN ANTITRUST ACT
## TYING AGREEMENTS

90.     Petitioner realleges and incorporates by reference paragraphs 1-89 of Count II as paragraphs 1-89 of this Count III.

91.     Illinois Providers in the Relevant Market strongly desire the ability to attract optical customers by offering the acceptance of Davis Vision benefits.  Without this ability, Providers in the Relevant Market will be effectively precluded from doing business with the 85,000 plus City of Chicago employees, their families, and any and all other DV Members.

92.     DV refuses to allow Providers access to its benefits unless the Provider executes a Provider Agreement containing the Mandatory Policy.

93.     The "in-network" status is the tying product.

94.     The requirement to purchase ophthalmic lenses from DV affiliated laboratories is the tied product.

95.     Illinois Providers would strongly prefer to use local manufacturers in order to obtain more favorable prices, customer service, lens design choices, and faster turn-around times. Without the Mandatory Policy, Illinois Providers would purchase ophthalmic lenses elsewhere in the market on more favorable terms, better benefiting Illinois eyecare patients in a significant capacity.

96.     DV's monopolistic control over the market demand for all DV Members' ophthalmic lens manufacturing business is a significant and economically sufficient to allow DV to restrain free competition in the ophthalmic lens manufacturing market in the Relevant Market and the national market.

97.     DV's monopolistic control over its advertised 55 million members, including the more than 85,000 City of Chicago employees, plus their families, in the Relevant Market, constitutes significant and sufficient market power to restrain free competition in the ophthalmic lens market.

98.     The tying scheme affects a substantial amount of interstate commerce as all of DV's affiliated manufacturing laboratories are located outside of the State of Illinois.

99.     DV has economic interest in the sale of the ophthalmic lenses in the following capacities:

   a.  By exercising a monopoly over DV Members' ophthalmic lens manufacturing demands, DV is never required to reimburse third party manufacturers at a reasonable market price; and

   b.  DV's affiliated laboratories, business entities that are in competition with DV, are awarded monopoly power/market power over DV Members' business, resulting in

guaranteed *supra* market profits to the labs, without any necessity to actually earn business via normal modes of competition.

c.  DV's affiliated laboratories actually increase DV's profitability as DV Members are forced to pay additional monies, on top of their premiums, for many ophthalmic lenses.  DV therefore generates additional income from such lens sales, in addition to ensuring that it never has to pay out claims to a third party manufacturer by disallowing any such competition via the Mandatory Policy.

**COUNT IV**
**SECTION III OF THE CLAYTON ANTITRUST ACT**
**AGREED BOYCOTT**

100.    Petitioner realleges and incorporates by reference paragraphs 1-99 of Count III as paragraphs 1-99 of this Count IV.

101.    DV requires Providers execute Provider Agreements containing the Mandatory Policy in order to gain "in-network" status with DV.

102.    The Mandatory Policy requires that Providers boycott any and all third party ophthalmic lens manufacturers, and requires all ophthalmic lens orders to be placed in labs affiliated with DV.

103.    The Mandatory Policy substantially lessens competition in the Relevant Market and national market, creating a monopoly in favor of DV's affiliated laboratories in the ophthalmic lens market.

104.    Ophthalmic lenses constitute goods as defined by the Clayton Act.

105.     Illinois Providers would purchase ophthalmic lenses from Petitioner and other firms similarly situated to Petitioner absent the Mandatory Policy requiring Providers to boycott all non DV affiliated manufacturing competition.

## COUNT V
## SECTION 10/3(1) OF THE ILLINOIS ANTITRUST ACT
## RESTRAINT OF TRADE

106.     Petitioner realleges and incorporates by reference paragraphs 1-105 of Count IV as paragraphs 1-105 of this Count V.

107.     The Provider Agreements containing the Mandatory Policy unlawfully restrain trade and commerce within the State of Illinois by automatically awarding DV Members' ophthalmic lens manufacturing business to laboratories affiliated with DV.

108.     DV conspires with Illinois Providers as well as its affiliated laboratories, in a manner defined above and incorporated into this Count V by reference, to fix, control, and maintain the price of ophthalmic lenses in the Relevant Market and national market.

109.     DV conspires with Illinois Providers as well as DV's affiliated laboratories, in a manner defined above and incorporated into this Count V by reference, to control, limit, and boycott the manufacture of ophthalmic lenses for DV members in the Relevant Market and national market by any laboratory other than the DV affiliated laboratories.

110.     DV has established, or is attempting to establish, monopoly power/market power over a substantial part of the ophthalmic lens manufacturing trade of the State of Illinois, by excluding ophthalmic lens manufacturing competition for DV Members, and by controlling, fixing, and maintaining prices in the ophthalmic lens trade.

111.     The Provider Agreements have the effect of hampering growth of commerce and industry in the State of Illinois as it requires all ophthalmic lens manufacturing for DV Members to be conducted outside of the State of Illinois, unlawfully prohibits and restrains trade in the ophthalmic lens manufacturing industry in Illinois, and constitutes an unlawful monopolistic practice that damages for-profit pursuits in the Illinois ophthalmic lens manufacturing industry.

**COUNT VI**
**SECTION 10/3(2) OF THE ILLINOIS ANTITRUST ACT**
**RESTRAINT OF TRADE**

112.     Petitioner realleges and incorporates by reference paragraphs 1-111 of Count V as paragraphs 1-111 of this Count VI.

113.     The Provider Agreements between DV and Illinois Providers containing the Mandatory Policy excludes any and all competition for DV members ophthalmic lens manufacturing demand, automatically awarding such business to a DV affiliated out of state ophthalmic lens laboratory, and constitutes an unreasonable restraint of trade or commerce.

**COUNT VII**
**SECTION 10/3(3) OF THE ILLINOIS ANTITRUST ACT**
**RESTRAINT OF TRADE**

114.     Petitioner realleges and incorporates by reference paragraphs 1-113 of Count VI as paragraphs 1-113 of this Count VII.

115.     DV's Mandatory Policy found in the Provider Agreements establishes monopoly power/ market power over a substantial portion of the ophthalmic lens trade of Illinois,

specifically in the Relevant Market, by excluding all competition for its members' ophthalmic lens demands.

116.    DV's Mandatory Policy found in the Provider Agreements establishes monopoly power/ market power over a substantial portion of the ophthalmic lens trade of Illinois, specifically in the Relevant Market, by controlling, fixing, and maintaining prices in that trade.

**COUNT VIII**
**SECTION 10/3(4) OF THE ILLINOIS ANTITRUST ACT**
**RESTRAINT OF TRADE**

117.    Petitioner realleges and incorporates by reference paragraphs 1-116 of Count VII as paragraphs 1-116 of this Count VIII.

118.    The Mandatory Policy found in the Provider Agreements constitutes an express contractual provision totally prohibiting Illinois Providers from purchasing ophthalmic lens goods from any other ophthalmic lens laboratory.

119.    The Mandatory Policy totally destroys competition for DV Members' ophthalmic lens manufacturing demand, and automatically awards such business to a DV affiliated laboratory located outside of the State of Illinois, creating a monopoly in favor of DV and its own affiliated laboratories.

**COUNT IX**
**SECTION 215 ILCS 5/364.2**
**ILLINOIS INSURANCE CODE**

120.    Petitioner realleges and incorporates by reference paragraphs 1-119 of Count VIII as paragraphs 1-119 of this Count IX.

121. The Provider Agreements containing the Mandatory Policy are uniform, and apply to every DV Members' order of ophthalmic lenses, regardless of quantity ordered or the dollar amount of that order.

122. Providers are required to submit to the Mandatory Policy in order to obtain in-network status with DV. Providers would not otherwise agree to the Mandatory Policy.

123. This Mandatory Policy is unlawfully compulsory, and violates the prohibition contained in 215 ILCS 5/364.2.

## COUNT X
## SECTION 215 ILCS 5/370i(a)
## ILLINOIS INSURANCE CODE

124. Petitioner realleges and incorporates by reference paragraphs 1-123 of Count IX as paragraphs 1-123 of this Count X.

125. The Mandatory Policy contains terms and conditions that unreasonably restricts DV Members access to healthcare by:

   a. Causing DV Members to wait extended periods of time due to DV's ophthalmic lens manufacturing laboratories being located in other states; and

   b. Causing DV Members to be saddled with inferior warranties and remake policies that are otherwise available on the open market; and

   c. Causing DV Members, as well as Illinois Providers, to be forced to deal with the inferior customer service levels of DV's laboratory. As all work is mandated to be sent to DV's lab, they have no incentive to please their market and offer superior levels of customer service.

d.  Causing DV Members to be forced to select from a commercially unreasonably
limited amount of digital freeform lens products, restricting patients' right to
sufficient access of healthcare.


**COUNT XI**
**TORTIOUS INTERFERENCE**
**WITH A PROSPECTIVE BUSINESS ADVANTAGE**

126.    Petitioner realleges and incorporates by reference paragraphs 1-125 of Count X as
paragraphs 1-125 of this Count XI.

127.    Petitioner has a reasonable expectation of entering into a valid business
relationship with a number of Illinois Providers for the manufacture of ophthalmic lenses.  A
significant number of Illinois Providers have in fact informed Petitioner that they wish to do
business with Petitioner, but may not due so due to the Mandatory Policy.

128.    DV is aware that many Providers would prefer to do business with local
ophthalmic lens manufacturers, as said Providers have informed DV on numerous occasions that
they do not desire to be bound by the Mandatory Policy.

129.    DV has enacted the Mandatory Policy solely to interfere with the Providers desire
to do business with Illinois based ophthalmic lens laboratories, and to award its own affiliated
laboratories a monopoly on ophthalmic lens manufacturing for DV Members.

130.    Petitioner is damaged in the following ways:

a.  Petitioner is totally precluded from even competing for DV Members' ophthalmic
lens manufacturing business.  This seriously damages Petitioner's ability to
compete nationally, as DV has an advertised member network of 55 million
Members, and within the State of Illinois, and within the Relevant Market, as

29

minimally 85,000 plus City of Chicago employees, plus all of their family

members are DV Members.

b.  Providers are reticent to even allow Petitioner to perform non DV related

ophthalmic lens manufacturing.  Because DV's Mandatory Policy requires the

Provider to use DV's affiliated laboratories, Illinois Providers are reticent to use

multiple laboratories as it adds to the complexity of daily business, as said

Providers are forced to keep track of orders from multiple lens laboratories.


## SPECIFIC ALLEGATION SUPPORTING PRELIMINARY AND PERMANENT INJUNCTION

131.    Petitioner realleges and incorporates by reference paragraphs 1-130 of Count XI

as paragraphs 1-130 of this Section.

132.    Petitioner requests that this Court return the parties to the *status quo*, the last

peaceable uncontested status prior to this suit.  The *status quo* was the time prior to DV's

implementation of the Mandatory Policy on Providers, whereby Providers could choose to work

with whatever ophthalmic lens laboratory they believed best suited their patients.

133.    Petitioner, and firms similarly situated to Petitioner, continue to lose business

opportunities they would otherwise capture on a daily basis.  Many Providers strongly desire to

work with Petitioner, and other privately owned ophthalmic lens manufacturing firms, but are

totally precluded from doing so by the Provider Agreements.  This practice is causing irreparable

damages to Petitioner and similarly situated firms, forcing such businesses into closing their

doors, or even bankruptcy, on a consistent and systematic basis.  No adequate remedy to cure

this violation of Petitioner's rights exist at law.

134.    By issuing a preliminary injunction with the terms requested in the Prayer for Relief, the Court will be allowing the natural market forces to infiltrate DV's Member benefits network, and Petitioner and firms similarly situated will be able to capture business Providers already seek to give them, thereby providing better products and services to meet DV Memebrs' healthcare needs.

135.    Petitioner is likely to prevail on the merits of the permanent injunction.  DV's unlawful business practices constitute a horizontal price fixing scheme involving multiple parties in one contractually bound conspiracy between distinct legal entities that results in a *supra market* commodity price, benefitting DV and its affiliated laboratory.  This constitutes a *per se* violation of American and Illinois antitrust business practices, meaning little no analysis need even take place.  At worst, the *quick look* analysis should be employed here, which again heavily favors Petitioner.

136.    As DV advertises a member network of over 55 million Members, even a rule of reason market analysis must find that such staggering numbers, specifically its concentration in the Relevant Market, is sufficient to meet market power/ monopoly power tests.

137.    DV will continue to make substantial profits without forcing Providers to order ophthalmic lenses from their affiliated laboratories.  Petitioner, and firms similarly situated, will be allowed to compete on the open market for the business of their trade, a right that they currently possess under numerous state and federal laws; a right that is being trampled upon by DV's unlawful anticompetitive business practices.

138.    It is in the public's benefit for preliminary injunction to be granted.  DV Members are largely unaware that they are being forced to purchase ophthalmic lenses from their own vision benefits company, and that their medical services and medical product selection is limited

31

to whatever DV's affiliated laboratories decide to offer.  By opening up DV's laboratory network, their Members will have immediate access to the full spectrum of healthcare services and products they are already overpaying for.

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioner humbly requests that this Honorable Court:

1. Pending a final hearing on this matter, the Court to schedule an immediate hearing on Petitioner's request for preliminary injunction against the Mandatory Policy's coercion of Illinois Providers into using the DV affiliated laboratories.

2. Following this immediate hearing, in light of the irreparable harm to Petitioner and firms in a similar situation as Petitioner, and Petitioner's lack of an alternative remedy at law, the Court to issue a preliminary injunction:

   a. Directing DV to cease and desist enforcement of the Mandatory Policy found in the Provider Agreements it has executed with Illinois Providers.

   b. Directing DV to send written notice to all Illinois Providers in its network informing said Providers that the Mandatory Policy has been suspended pending a final determination on the merits of a permanent injunction.

c.  Directing DV to include a reimbursement schedule, with reimbursement fees consistent with market averages as indicated on the attached proposed schedule, for payment DV will make to Providers for all ophthalmic lens manufacturing costs, including lens fees, coating fees, frame fees, and materials fees.

d.  Immediate effectuate an online billing mechanism allowing Providers the ability to bill DV for claims.

e.  Preventing DV from dropping any Illinois Provider, or otherwise interfering with said Providers ability to use, accept, or otherwise take advantage of DV's member benefits network, during the pendency of this action.

3.  Following the final hearing, the Court to issue a declaratory judgment finding:

a.  DV's use of the Mandatory Policy in its Provider Agreements constitutes an unlawful interference with the ophthalmic lens market both in the Relevant Market and in the national market.

b.  DV's use of the Mandatory Policy in its Provider Agreements constitutes a conspiracy by contract that results in horizontal price fixing, allowing DV to set prices at a *supra* market rate, for which DV benefits.

    c. DV's use of the Mandatory Policy in its Provider Agreements precludes market competition in the ophthalmic lens market, resulting in patients receiving inferior products and services.

    d. DV's use of the Mandatory Policy in its Provider Agreements constitutes a *per se* violation of American and Illinois anticompetition laws.

    e. DV's use of the Mandatory Policy in its Provider Agreements constitutes a violation of the Illinois Insurance Code.

4. Following the final hearing, the Court to issue a permanent injunction ordering:

    a. The Mandatory Policy to be stricken from each Provider Agreement, severing only that section of the contract, and leaving the rest of the document operative and enforceable.

    b. DV to permanently open its network to the market, allowing third party ophthalmic lens laboratories to compete for DV members' ophthalmic lens demand.

    c. DV to develop a robust third party laboratory network, including multiple ophthalmic lens manufacturing firms for Providers to choose to order from, with Petitioner

being admitted as the first independent laboratory in

said network.

5.  Award Petitioner the following damages:

   a.  Compensatory damages recognizing the significant

       amount of business Petitioner would have acquired

       absent DV's anticompetitive practices.

   b.  Treble compensatory damages.

   c.  Attorney's fees and costs of suit.

   d.  Any other relief this Honorable Court deems necessary

       or appropriate.

## JURY DEMAND

Petitioner respectfully demands TRIAL BY JURY on all issues presented in this Petition that are

triable as such.

Respectfully submitted on July 29, 2014.


/s/ NICHOLAS T. WILLIAMS
Attorney for Petitioner/Lead Counsel
Chief Staff Counsel
Illinois Bar #6297966
2221 W. College Ave.
Normal, IL 61761
P:  (618) 698-5625
F:  (312) 244-3272
n.williams@hwholdings.com

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
Springfield Division**

| | | |
|---|---|---|
| ACUITY OPTICAL | ) | |
| LABORATORIES, LLC | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No: 14-cv-3231 |
| vs. | ) | |
| | ) | |
| DAVIS VISION, INC. | ) | |
| | ) | |
| Defendant. | ) | |

_____

**PETITIONER'S DISCLOSURE STATEMENT
AND CERTIFICATE OF INTERESTED PARTIES**

Pursuant to the Federal Rules of Civil Procedure, Petitioner Acuity Optical Laboratories,

LLC ("Petitioner"), by and through its undersigned counsel, hereby provides the following

corporate disclosures and list of any and all known persons, associated persons, firms,

partnerships and/or corporations that have a financial interest in the outcome of this case,

including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal

entities related to the parties:

1. **Affiliated Entities of Petitioner**.  Petitioner is a closely held, Member owned,

    limited liability company organized under Illinois law.  The following entities are

    affiliated with Petitioner:

    a. **HW Holdings, LLC of Illinois**

    b. **HHCW Properties, LLC of Illinois**

2. **Public Holdings.**  Petitioner is not publically traded, nor is any affiliated entity.

**3. Other Interested Parties.**  The following additional parties are known to have

interest in this case:

  **a.**  Nicholas T. Williams, Counsel for Petitioner

  **b.**  All named Defendants/Respondents

  **c.**  Reed Smith, Counsel for Defendants/Respondents


<div style="margin-left:40%">

/s/ NICHOLAS T. WILLIAMS
Attorney for Petitioner/Lead Counsel
Chief Staff Counsel
Illinois Bar #6297966
2221 W. College Ave.
Normal, IL 61761
P:  (618) 698-5625
F:  (312) 244-3272
n.williams@hwholdings.com

</div>

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**Springfield Division**

| | | |
|---|---|---|
| ACUITY OPTICAL | ) | |
| LABORATORIES, LLC | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No: 14-cv-3231 |
| vs. | ) | |
| | ) | |
| DAVIS VISION, INC. | ) | |
| | ) | |
| Defendant. | ) | |

_____

**AFFIDAVIT OF DAMAGES**

I, Nicholas T. Williams, attorney for the Petitioner, do declare and swear under oath that based on my understanding of the Petitioner's damages received as a result of Respondent's conduct, the damages in this case are greater than Fifty Thousand and No/100 Dollars ($50,000.00).

/s/ NICHOLAS T. WILLIAMS
**Attorney for Petitioner/Lead Counsel**
**Chief Staff Counsel**
Illinois Bar #6297966
2221 W. College Ave.
Normal, IL 61761
P:  (618) 698-5625
F:  (312) 244-3272
n.williams@hwholdings.com

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**Springfield Division**

ACUITY OPTICAL                    )
LABORATORIES, LLC                 )
                                  )
            Petitioner,           )
                                  )       Case No: 14-cv-3231
      vs.                         )
                                  )
DAVIS VISION, INC.                )
                                  )
            Defendant.            )
_____

**VERIFICATION OF PLEADINGS**

I, Adam P. Rosengren, declare:

1.  I am the Vice-President of the Petitioner in the above captioned case.

2.  I have read the foregoing Petition, and am familiar with its contents.

3.  I am familiar with the underlying facts of this case.

4.  I hereby verify that the facts asserted in the foregoing Petition are true to the best of my knowledge, and made in good faith.

Executed on July 29 2014 in McLean County, Illinois.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

            _____/s/Adam Rosengren_____

                        Adam P. Rosengren