## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### Springfield Division

| | | |
|---|---|---|
| ACUITY OPTICAL | ) | |
| LABORATORIES, LLC | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No: 14-cv-3231 |
| vs. | ) | |
| | ) | |
| DAVIS VISION, INC. | ) | |
| | ) | |
| Respondent. | ) | |

_____

### FIRST AMENDED PETITION FOR DECLARATORY
### JUDGMENT, DAMAGES, AND PERMANENT INJUNCTIVE RELIEF

Petitioner Acuity Optical Laboratories, LLC of Illinois ("Petitioner") brings this civil

action alleging violations of federal and state laws, and seeking damages, as well as declaratory

and permanent injunctive relief, declaring Respondent Davis Vision, Inc. of New York ("DV" or

"Respondent") is enjoined from enforcing, entering into, or maintaining contracts with any and

all optometrists and opticians ("Providers") requiring said Providers to exclusively use DV's

ophthalmic lens manufacturing laboratories for the manufacturing of all of DV's fully insured

members' ("Members") orders of ophthalmic eyeglass lenses, and boycott other ophthalmic lens

manufacturers/suppliers like Petitioner, such practice being a violation of Sections 1 & 2 of the

Sherman Antitrust Act, Sections 2 and 3 of the Clayton Act, Sections 1, 2, & 3 of the Illinois

Antitrust Act, Section 43(a) of the Lanham Act, an implicit violation of 16 CFR Part 456.2(b)

(the "Eyeglass Rule"), Section 5 of the Federal Trade Commission Act (not at issue in this filing)

and Sections 215 ILCS 5/364.2 and 215 ILCS 5/370i(a) of the Illinois State Insurance Code.

Petitioner alleges as follows:

## I.     NATURE OF THE ACTION

1.     Respondent DV has obtained market power/monopoly power over the ophthalmic lens manufacturing/supply demand of more than 18 million of its advertised 55 million members. These 18 million Members are fully insured by DV, with their policies/benefits packages containing a provision that covers the purchase of ophthalmic lenses.  Petitioner and other similarly situated ophthalmic lens manufacturers/suppliers face irreparable harm, and will face extinction if DV's monopolistic control of this ophthalmic lens market is not stopped.

2.     Evidence exists that DV's business practices have already caused significant economic damages to the optical industry in at least one region in this country*[1].  If DV's unlawful anti-competitive practices are not stopped by this Court, competition in the ophthalmic lens manufacturing market will be destroyed, and Petitioner will join the already robust list of lens manufacturing laboratories forced to close due to business practices like DV's.

3.     More importantly, the public is already experiencing the harmful effects of reduced competition in the ophthalmic lens manufacturing/supply market.  The public's right to receive health benefits is seriously negatively impacted by DV's unlawful practices, including but not limited to a resulting *supra* market pricing for ophthalmic lenses for DV Members, which impacts pricing on the market as a whole.

4.     DV operates as a vertically integrated insurance and ophthalmic lens manufacturing/supply enterprise, which both sells vision insurance benefits to the national market, and through contract and conspiracy, holds monopoly power/market power over all

---

[1] *Towson University's RESI Division authored a Report in approximately 2004 describing the catastrophic economic effects of a sole sourcing lens manufacturing policy then practiced by an affiliate of Davis Vision on the Maryland, Northern Virginia, and Washington D.C. area.*

orders for the manufacture/supply of these same ophthalmic lenses they are providing health benefits for.

5.      DV maintains monopoly power/market power over the ophthalmic lens supply needs of its Members by operating a provider network whereby Providers are required to execute a provider agreement ("Provider Agreement") with DV in order to be able to bill DV for vision related services, such as eye exams.  Common to essentially all of these Provider Agreements is a provision requiring these Providers to send any ophthalmic lens manufacturing orders for a DV Member to an ophthalmic lens laboratory owned by DV ("Mandatory Policy").  DV's wholly owned ophthalmic lens manufacturing laboratories are located in the States of New York and Pennsylvania, respectively.

6.      Business realities effectively force most Providers to become in-network with DV and execute the Provider Agreements containing the Mandatory Policy.  In regions where DV enjoys significant market penetration and saturation, Providers are all but required to accept DV insurance in order to remain financially viable in the marketplace.  Failure to accept DV benefits means that the Provider will not be advertised as in-network with DV in media available to DV Members, and more importantly, consumers will clearly not patronize a business where the benefits that they pay for are not accepted.  To substantiate this allegation, Utilization Reviews of DV's contract with the City of Chicago reports a 97% in-network benefits utilization by City of Chicago Members for both the year of 2013 and 2014.

7.      Some regions of the country are more drastically affected DV's Mandatory Policy than other regions.  In the case of Illinois, DV is the sole vision benefits provider many municipal employers, including the City of Chicago and many other public employers.  In a July 11, 2008 Memorandum authored by the City of Chicago Department of Finance, Davis Vision

reported that its "book of business in the state of Illinois includes 3.3 million lives and 1.7 million in Cook County and City of Chicago".  Given that Chicago, the third largest city in the United States, has an approximate population of 2.7 million, DV there maintains sufficient control of the ophthalmic lens manufacturing/supplying business in Chicago to constitute market power/monopoly power in that geographic region.

8.     DV's 18 million fully insured Members are effectively forced to boycott third party ophthalmic lens manufacturers/suppliers due to the functionality of the Mandatory Policy. This business practice therefore yields DV market power/ monopoly power over each of its 18 million Members whose policies are functionally subject to the Mandatory Policy found in the third party Provider Agreements.  Therefore, DV's wholly owned ophthalmic lens laboratories located in New York and Pennsylvania have monopoly power/market power over ophthalmic lens manufacturing orders for these 18 million Members, with few, but notable, exceptions.

9.     To further illustrate the damages the public suffers due to the Mandatory Policy, these DV affiliated laboratories still rely primarily on dated conventional lens manufacturing technology, which is objectively inferior in every capacity to the fully digital ophthalmic lens manufacturing technology Petitioner offers on every lens generated in its laboratory. Furthermore, DV offers only a fraction of lens design choices available in the national market that utilizes the new digital freeform lens manufacturing technology used by Petitioner and many other privately owned lens manufacturers.  To substantiate this point, the Utilization Review of the City of Chicago Members ordering of ophthalmic lenses between 2012 and 2014 reveals that 0.0% of the lenses provided to these Members were DV's "Ultra Progressive" lenses, whereas all ophthalmic lenses generated by Petitioner are digitally surfaced and fully position of wear compensated using the state of the art ophthalmic lens manufacturing technology.

10.     Providers are forced to either accept the Mandatory Policy as part of the Provider Agreement, or be refused access to DV's vision benefits network.  Because DV Members make up an economically significant amount of potential vision services customers available to Providers, optometrists and opticians must agree to the Mandatory Policy or forfeit the business of DV's Members all together, a potentially financially crippling decision.

11.     The Provider Agreements operate as exclusionary contracts that prevent Providers from ordering ophthalmic lenses from any ophthalmic lens manufacturing/supply facility other than the ophthalmic lens laboratories owned by DV.  These Provider Agreements totally foreclose third party ophthalmic lens manufacturers/suppliers from even the opportunity to compete for DV's Members' ophthalmic lens business, granting the DV labs an effective total monopoly over its 18 million fully insured Members.

12.     These exclusionary agreements also function as an express boycott agreement made between DV and the Providers, whereby the Providers are refused access to the potential business of DV's 18 million Members unless they agree to totally foreclose all third party ophthalmic lens manufacturers/suppliers for these lens orders, and solely order these lens products from laboratories owned by DV.

13.     DV is therefore free to fix ophthalmic lens prices at a *supra* market rate without fear of losing consumers' business as neither DV Members nor Providers are free to even consider using the services of third party ophthalmic lens manufacturing laboratories.  DV's pricing for at least its progressive ophthalmic lenses is in fact well above market average, which constitutes a harm to its Members, and the market in general.  Because DV further limits the amount of times that its Members can use their benefits to purchase ophthalmic lenses, DV is

able to reduce output of ophthalmic lenses manufactured, and simultaneously increase profit, the hallmark of successful antitrust practices.

14.     DV's exclusionary contracts constitute *per se* violations of state and federal antitrust laws, and have destroyed all competition for DV Members' ophthalmic lens needs in the market by disallowing third party ophthalmic lens manufacturing laboratories even the opportunity to compete for this business.  This constitutes a clear anticompetitive behavior that is a detriment to the market, the public, and business competition in the optical goods industry.

15.     DV's exclusionary contracts further act as a "tying" agreement between DV and Providers, preventing Providers access to the tying product they want, DV in-network provider status, unless they agree to purchase the tied product they do not want, the compulsory use of DV's ophthalmic lens laboratory via the Mandatory Policy.

16.     Because an economically significant amount of Providers are compelled to use DV's ophthalmic lens laboratory for many of their ophthalmic lens orders via the Mandatory Policy, third party lens manufacturers face further unlawful barriers to acquiring accounts for even non-DV Members' business as Providers are reticent to add yet another laboratory to their daily use due to increased logistical costs of such multi-vendor use.

17.     DV and its ophthalmic lens laboratories operate as a vertically integrated insurer/manufacturer/supplier, and a general summary of its conspiracy with Providers to exclude competition for ophthalmic lens manufacturing/supply competition for its 18 million Members, and thereby damage competition, can be described in the following manner:

> a.   DV, as a vision benefits provider, provides group vision benefits coverage to groups of individuals, typically employer groups;

b.  As common to typical insurance/benefits plans, third party professionals are then utilized by the insureds, of which a portion of the services are covered by the insurance/benefits.  In the vision industry, this explicitly includes the manufacture/supply of ophthalmic lenses as a medical professional is required to prescribe a lens prescription before ophthalmic lenses can be manufactured/supplied and dispensed;

c.  Competition amongst ophthalmic lens manufacturers/suppliers would then act as a control on price for the optical goods, preventing any single entity from controlling prices and setting a *supra* market price.

d.  Ophthalmic lens manufacturers/suppliers like Petitioner are foreclosed from even bidding on this manufacturing work for DV Members however, because of the Mandatory Policy excluding third parties from this market.

e.  Petitioner and other third party ophthalmic lens manufacturers/suppliers are injured because they cannot access this market and compete for these sales because of the expressly exclusionary Provider Agreements that forces Providers to boycott third party ophthalmic lens suppliers.

f.  DV Members are injured because they are forced to pay a *supra* market price for many ophthalmic lenses as copays at the time of purchase, and in many cases for inferior lens technology.

g.  The general public is injured because DV's maintenance of *supra* market prices for its 18 million Members influences the lens market price as a whole, resulting in higher average prices for the public in general.

## II.     PARTIES, JURISDICTION, VENUE, AND INTERSTATE COMMERCE

18.     Petitioner is a registered Illinois Limited Liability Company, and is headquartered in Normal, Illinois, McLean County.  Petitioner's primary business function is the manufacture and supply of ophthalmic goods to Providers, including digitally manufactured freeform ophthalmic lenses.

19.     Petitioner conducts business in the market under the moniker of Identity Optical Labs, a federally trademarked division of Acuity Optical Laboratories.  This petition refers to Acuity Optical Laboratories, LLC as the Petitioner, which necessarily includes and is meant to entail its wholesale division Identity Optical Labs.

20.     Petitioner conducts sales to Providers in the entire contiguous forty-eight states of the American market.  These sales are conducted largely via telephone from Petitioner's headquarters in Normal, Illinois.

21.     Respondent DV is a New York corporation registered as a foreign corporation under the laws of Illinois, and as a Preferred Provider Administrator with the Illinois Department of Insurance in Springfield, Illinois.  Respondent DV's ophthalmic lens laboratories are wholly owned by DV.

22.     Petitioner brings this action pursuant to Section 4 of the Sherman Antitrust Act, Section 26 of the Clayton Act, and Section 10/7(2) of the Illinois Antitrust Act, enabling Petitioner to initiate a private cause of action in the District Courts.

23.     This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Antitrust Act, Section 16 of the Clayton Act, and original and/or diversity jurisdiction granted under 28 U.S.C. Sections 1331, 1332, and 1337(a).

24.     This Court has venue to hear this cause of action pursuant to 28 U.S.C. 1391(d), as DV is a corporate entity, and is therefore deemed to be a resident of the Central District in the Springfield Division as DV conducts significant, systematic, and ongoing business in Springfield, Illinois.  Venue is also proper in the Central District under Section 22 of the Clayton Act for this reason.

25.     DV's business activities substantially affect interstate trade and commerce.  DV advertises that it has 55 million members, and that the members are located in most or all states. Additionally, DV's ophthalmic lens laboratories are located in New York and Pennsylvania, meaning an economically significant number of lens manufacturing orders must involve the interstates shipping of goods.

### III.    **RELEVANT MARKET**

26.     DV's 18 million Members meet the definition of a relevant market pursuant to antitrust requirements under a number of different acceptable theories.  Petitioner therefore alleges four relevant markets in which DV holds market power/monopoly power.

#### a.    **Primary Market – DV Members**

27.     A relevant market is a product market that encompasses the product at issue, as well as all economic substitutes for the product.

28.     A relevant market is determined by the reasonable interchangeability of use of the product at issue and these substitutes.

29.     Therefore a relevant product market by definition may only include competitors that have an actual or potential ability to deprive each other of significant business.

30. The DV Members ophthalmic lens market is a primary product market that is legally cognizable as a relevant market.

31. Because of the exclusionary business policies practiced by DV, Providers are foreclosed from ordering ophthalmic lenses from third party manufacturers/suppliers. This Mandatory Policy is a contractual boycott of businesses like Petitioner.

32. Because virtually no third party manufacturers/suppliers are allowed to produce ophthalmic lenses for DV Members, there is virtually zero product interchangeability or product substitution in this market. Said another way, DV Members can use their benefits to buy ophthalmic lenses from DV, or they cannot use their benefits to buy lenses at all*[2].

33. DV Members obtain these benefits under group policies, typically set by their employers. DV Members therefore have no ability to "switch benefits" in order to obtain a benefits package that would allow for them to purchase the less expensive, technologically superior lenses produced by Petitioner and some other private lens laboratories.

34. Because there is virtually no product substitution or product interchangeability in the DV Members ophthalmic lens market, the DV Members market constitutes a cognizable and legally sufficient relevant market.

35. Because DV's conspiracy with Providers via the Mandatory Policy constitutes a horizontal price fixing scheme, no product relevant market analysis is necessary as such practice is deemed a *per se* violation of antitrust laws.

36. Because DV's conspiracy with Providers via the Mandatory Policy constitutes a horizontal "Toys R Us" style group boycott agreement, with DV as the ringmaster of said

---

[2] *DV apparently exempts a limited few large national retailers from the Mandatory Policy. DV also exempts its sister company Visionworks from this policy. This is discussed in depth below.*

boycott, no product relevant market analysis is necessary as such practice is deemed a *per se* violation of antitrust laws.

### b.  Derivative Market/Aftermarket/Submarket/Brand Market

37.     Antitrust allegations may be premised upon a derivative market.  This economic theory of market is referenced by a number of different names, such as a derivative market, an aftermarket, a submarket, or under certain circumstances, a single brand market.  For ease of reference, Petitioner uses the term "derivative market" to describe the DV market in this alternative market theory.

38.     A derivative market is a secondary market that exists as a consequence of activity in a primary market.

39.     Should vision benefits in general be deemed the proper relevant market, the derivative market of ophthalmic lens manufacturing becomes a legally cognizable relevant market derived from the primary vision benefits market.

40.     The ophthalmic lens manufacturing/supply market is legally distinct from the vision benefits market.  The vision benefits market is a market for the coverage of optometric services and optical goods.  The ophthalmic lens manufacturing/supply market is the fabrication of ophthalmic lenses by digitally or conventionally grinding a piece of plastic, plastic like substance, or glass lens blank to insert a medical prescription upon one or more of its surfaces, and then the shaping of the lens blank into dimensions to fit into a pair of spectacle frames.

41.     The American public certainly recognizes the insurance or health benefits markets as distinct and separate from the ophthalmic lens manufacturing/supply markets.

42.     Ophthalmic lens manufacturing is a separate industry to the insurance benefits industry, as ophthalmic lenses are medical devices prescribed by a medical professional used to correct eye sight, and vision insurance is the sale of benefits to cover eye care services and fabrication of ophthalmic lenses.

43.     Ophthalmic lenses require unique production facilities, including generators, polishers, edgers, and coaters.  Insurance benefits require no production facilities, and are effectively an amorphous insurance product.

44.     Ophthalmic lenses are sold by Providers and vision insurance benefits are sold by vision insurance companies.

45.     DV Members do not execute any agreement whatsoever acknowledging or acceding to the Mandatory Lab Policy.

46.     DV Members are in fact not informed of the Mandatory Policy as said policy is contained in contracts legally unavailable for their inspection.

47.     DV Members therefore do not knowingly enter into an agreement with DV voluntarily awarding DV's labs the exclusive right to manufacture and supply the ophthalmic lenses available to these same Members under their vision benefits policy.

48.     The simple purchase of DV vision insurance benefits by DV Members does not constitute a binding contractual agreement by those Members to only consume ophthalmic lenses manufactured and supplied by DV's own labs in the ophthalmic lens purchasing market.

49.     DV Members become subjected to the Mandatory Policy via the third party Provider Agreements which contain the Mandatory Lab Policy.

50.     The Mandatory Policy, an agreement never shown to the DV Members and never agreed to by the DV Members, thereby forces a purchasing decision upon said DV Members.

This results in DV acquiring monopoly power/market power over its more than 18 million Members with lens coverage in their vision benefits package.

51.     Petitioner's salesmen have been informed on a consistent and significant number of occasions by Providers that said Providers desire to order ophthalmic lenses for DV Members from Petitioner, and would do so if they were not obligated to exclusively order ophthalmic lenses for DV Members from the DV laboratory.

52.     Petitioner's salesmen regularly are denied potential business because Providers have further indicated that they do not wish to add another laboratory to their ordering system. These Providers indicate that their compulsory use of the DV labs causes additional logistic work for themselves and their staff, and that adding a new third party lab would only increase that logistical work.

53.     Because DV's conspiracy with Providers via the Mandatory Policy constitutes a horizontal price fixing scheme, no product relevant market analysis is necessary as such practice is deemed a *per se* violation of antitrust laws.

54.     Because DV's conspiracy with Providers via the Mandatory Policy constitutes a horizontal "Toys R Us" style group boycott agreement, with DV as the ringmaster of said boycott, no product relevant market analysis is necessary as such practice is deemed a *per se* violation of antitrust laws.


            c.   **Geographic Market - Chicago**

55.     The manufacture and sale of ophthalmic lenses is a recognized market of an ascertainable product that is in high demand in the Greater Chicago Area.

56.     According to a September 17, 2013 report by the Bureau of Economic Analysis under the U.S. Department of Commerce, Chicago is the third largest commercial market by real GDP in the United States.

57.     DV maintains unlawful control over DV Members within City of Chicago by forcing Providers to either agree to exclusively order ophthalmic lenses for DV Members from DV's ophthalmic lens laboratories located in New York or Pennsylvania, or be refused access to DV's benefits network.

58.     The above referenced July 11, 2008 memorandum indicates that DV's Chicago book of business includes more than 1.7 million lives, resulting in DV gaining significant influence over the optical market as a whole in this geographic region.

59.     Because City of Chicago employees represents a large demographic group with the kind of attractive salaries that businesses target, Providers are effectively forced to take whatever steps necessary to become in-network with DV as a business reality. Failure to become in-network with DV would result in the loss of a commercially significant amount of business in the Greater Chicago Area as it would effectively remove all City of Chicago employees from the Providers' potential customer pool, severely limit the financial viability of said Providers.

60.     Providers in the Greater Chicago Area are commercially compelled to become in-network with DV, and by extension commercially compelled to agree to the Mandatory Policy.

61.     Petitioner conducts significant business in the Greater Chicago Area, and its manufacturing headquarters is located near Chicago.

62.     DV has been successful in reducing output of the number of ophthalmic lenses manufactured in the Greater Chicago Area for its Members. Simultaneously, DV has been able to increase its profits derived from this geographic region.

63.     Petitioner, a lens manufacturer/supplier located nearby, and able to ship ophthalmic lenses the next day to the Greater Chicago Market, should be able to increase output in this geographic location by selling to these potential customers.

64.     Petitioner, and similar lens manufacturers/suppliers are totally foreclosed from even competing for this work in this market. Instead, DV Members are forced to pay higher prices for inferior and limited technology, with longer wait times than offered by Petitioner as their ophthalmic lenses must be manufactured in New York or Pennsylvania.

65.     There are no substitutions for DV's ophthalmic lenses for DV Members in the Greater Chicago Area market. Petitioner is therefore totally excluded from this market due to the Mandatory Policy.

66.     Because DV's conspiracy with Providers via the Mandatory Policy constitutes a horizontal price fixing scheme, no product relevant market analysis is necessary as such practice is deemed a *per se* violation of antitrust laws.

67.     Because DV's conspiracy with Providers via the Mandatory Policy constitutes a horizontal "Toys R Us" style group boycott agreement, with DV as the ringmaster of said boycott, no product relevant market analysis is necessary as such practice is deemed a *per se* violation of antitrust laws.


### d.  Cluster Market

68.     DV is largely unique in its business model as it operates a totally closed lab network, utterly free of any and all competition. Of all of its competitors, only Spectera, Inc. operates under the same business model; that business model being one that offers no third party ophthalmic lens laboratories in-network whatsoever.

69.     Both DV and Spectera "cluster" or bundle their vision insurance benefits products together with ophthalmic goods.  No other vision insurance benefits providers bundle their products in this capacity, as effectively all other vision benefits providers have some kind of open lab network where third party ophthalmic lens manufacturers/suppliers like Petitioner can be included in the network for the Providers selection of lens vendors.

70.     A relevant market can entail a combination of goods clustered or bundled together where that combination reflects a commercial reality.

71.     DV is many times larger than Spectera, Inc., and possesses far more than 50% of the market in this described cluster market.

72.     DV's market power in this cluster market grants it the ability to control prices and to exclude competition from the market via the Mandatory Policy found in the Provider Agreements.

73.     Because DV's conspiracy with Providers via the Mandatory Policy constitutes a horizontal price fixing scheme, no product relevant market analysis is necessary as such practice is deemed a *per se* violation of antitrust laws.

74.     Because DV's conspiracy with Providers via the Mandatory Policy constitutes a horizontal "Toys R Us" style group boycott agreement with DV as the ringmaster of said boycott, no product relevant market analysis is necessary as such practice is deemed a *per se* violation of antitrust laws.


**IV.     THE RELATIONSHIP BETWEEN DV AND VISIONWORKS**

75.     Visionworks is a retail optical chain with a self-reported 652 retail locations in the United States.

76.    Visionworks is owned by HVHC, Inc., the parent company of DV.

77.    Visionworks reported an $880.1 million dollar gross revenue in 2014, up from its previously reported $784.8 gross revenue reported in 2013.

78.    Visionworks is the highest grossing single branded retail optical chain in the United States, and DV advertises on its website that, "Visionworks is the largest U.S. owned and operated optical company with over 650 stores and growing."

79.    Executives of DV have publically commented that the success of both DV and Visionworks are intertwined, and that, "the synergies between Visionworks and Davis Vision are the legs upon which the integrated company stands."  The synergy described refers to, at least in part, Davis Vision's exemption of Visionworks from the Mandatory Lab Policy that DV enforces against Visionwork's competitors.

80.    DV and Visionworks are legally distinct entities, operating in the vision benefits management and retail optometric services and goods dispensing market, respectively.

81.    Any claimed relationship between the entities would constitute a relationship by form, and not of substance, as each company engages in remarkably different industries that are in fact in competition with each other.

82.    DV and the more than 600 Visionworks retail locations do not constitute a single entity, but instead the relationship between the entities operates as a vehicle by which a group of competitors use to conduct ongoing and concerted restraint of trade activities.

83.    DV has exempted Visionworks from the Mandatory Policy, meaning a Visionworks location is allowed to manufacture ophthalmic lenses for DV Members (including on-site, one-hour lens manufacturing in small laboratories located inside most Visionworks) patronizing a Visionworks.  Virtually all of Visionworks' competitors for DV Members are,

however, subject to the Mandatory Lab Policy, and are forced to order ophthalmic lenses from the above described Pennsylvania or New York DV owned laboratories.

84.     The agreement between DV and Visionworks joins together separate economic actors, pursuing separate economic interests, that deprives the marketplace of independent centers of decision making, and therefore diversity of entrepreneurial interests.

85.     DV and Visionworks do not hold themselves out to DV Members as a single or joint enterprise with a unity of interests, and effectively conceals any relationship between DV and Visionworks from its Members.

86.     DV and its associated laboratories are constituted of separate and distinct executive officers, with separate and distinct corporate goals, and maintain distinct, competing interests.

87.     Visionworks employs two primary methodologies for manufacturing ophthalmic lenses for DV Members.  First, Visionworks owns two separate ophthalmic lens manufacturing facilities in the San Antonio, Texas area.  Second, most Visionworks retail locations each contain a small onsite conventional lens manufacturing station, typically in one of the back rooms.

88.     These Visionworks locations are granted an overwhelming market advantage over other Providers as part of a horizontal conspiracy with DV that operates as an unlawful restraint of trade against independent Providers.  These are as follows:

> a.     Visionworks can process lenses on site in one hour service.  A DV Member is therefore able to use their DV Member benefits for ophthalmic lens manufacturing at a Visionworks retail location and obtain a pair of fully fabricated conventional ophthalmic lenses in one hour.

b. Should that same DV Member go across the street to an independent, in-network DV Provider and ask for one hour ophthalmic lens fabrication services, they would be denied pursuant to the Mandatory Policy. That same Member's order would have to be fulfilled at the DV ophthalmic lens laboratories in either New York or Pennsylvania. The DV labs can take weeks to receive the frame from the independent retail Provider, fabricate the ophthalmic lenses, and then ship the lens back to the independent Provider.

c. Due to DV's enforcement of the Mandatory Policy against the independent Providers, DV Members are artificially funneled into Visionworks stores, an effort to exclude independent Providers directly from even retail competition. Because Visionworks owns its own ophthalmic lens production laboratories, both on-site at their retail locations and their superlabs in Texas, Petitioner's potential pool of customers is again unlawfully reduced.

d. Visionworks is a party to this conspiracy with DV to exclude other retail competitors from being able to compete with Visionworks. DV's use of the Mandatory Policy to obstruct these independent Providers' local ophthalmic lens manufacturers/suppliers conducts an unlawful restraint of trade, and is a *per se* violation of antitrust laws.

89.     DV also grants its Members additional benefits if they choose to patronize a Visionworks retail location over an independent Provider.

90.     In the Greater Chicago Area, City of Chicago employees are granted $50 in benefits towards the purchase of an eyeglass frame at an independent Provider. That same DV Member using those same benefits however can receive $110 towards eyeglass frames if they

use those benefits at a Visionworks location, however. There is no lawful business reason for DV to charge its Members more money for the same benefits for simply patronizing an independent Provider. This practice therefore constitutes price discrimination, an unlawful and anticompetitive business practice.

91.     DV also has a relationship with approximately 30 million "discount members", whereby DV extends these discount members benefits that can be used to discount prices at independent Provider locations. DV conducts direct marketing campaigns to these discount members, again driving them towards Visionworks locations. Because Visionworks uses its own ophthalmic lens manufacturing facilities, Petitioner is again deprived of business opportunities

## V.     THE RESULTING PRICE SQUEEZE/SUPPLY SQUEEZE ON COMPETING INDEPENDENT PROVIDERS BY THIS SYSTEM

92.     Independent Providers become further damaged in their ability to compete with Visionworks due to this system. As a result, more patients are funneled away from independent Providers and into Visionworks stores, making them again inaccessible to Petitioner.

93.     DV functions as a manufacturer, and is associated with the retail chain Visionworks. DV also has contracts with independent Providers allowing its product, vision insurance benefits, to be used in both Visionworks stores and independent Providers' stores.

94.     DV unlawfully favors its own associated Visionworks retail outlets by enacting both a "price squeeze" and a "supply squeeze" on Visionworks' competitors.

95.     DV favors its own associated retail stores, Visionworks, by exempting those stores from the Mandatory Policy. These Visionworks stores are able to use their on-site, inferior conventional technology ophthalmic lens laboratories where its competitors are unable to use their own or nearby independently owned ophthalmic lens laboratories. This is a supply

squeeze as the Mandatory Policy interferes with independent Providers ability to quickly provide its DV Member patients' ophthalmic lenses, while simultaneously empowering Visionworks to do so using its on-site, one hour lab services.

96.     DV also unlawfully favors its own associated retail stores, Visionworks, from a pricing perspective, by exempting it from the Mandatory Policy. Visionworks is able to conduct a sale of ophthalmic lenses using its own onsite labs, or its own primary production plants in Texas. Visionworks is therefore empowered to make use of a vertical integration model, reaping the economic benefits of such a business model. Independent Providers are, however, regulated to the wholly inadequate dispensing fees described below. This constitutes a price squeeze by DV on independent Providers.

97.     Additionally, DV grants at least some of its Members superior benefits rights in the form of higher payments towards frames if they choose to patronize a Visionworks location over an independent Provider. This again constitutes a price squeeze by DV on independent Providers, as well as price discrimination, as there is no lawful reason to favor Visionworks in the form of more attractive pricing.

98.     Providers can actually order technologically superior lenses from Petitioner at a lower price than DV Members are asked to pay as a copay for certain ophthalmic lens products, which would, even should the Provider place a 2.5 times markup at the retail sale to the DV Member, result in a less expensive, better quality ophthalmic lens to the DV Member, and more revenue to the Provider that is actually conducting the sale. The DV Mandatory Policy prevents this from occurring, damaging both the DV Member, the Provider, and destroying competition in the ophthalmic lens market.

## VI.    DV's FREE RIDING ON INDEPENDENT PROVIDERS

99.    DV's Mandatory Policy enables it to conduct unfair and unlawful free-riding activities upon its independent in-network Providers.

100.    Independent in-network DV Providers are forced to pay the costs of a brick and mortar point of sale location, including base rent, common area maintenance, taxes, electric, water, employee salaries, and advertising.

101.    Independent in-network DV Providers also provide the professional eye care services necessary to produce a prescription for the fabrication and dispensing of ophthalmic lenses.

102.    DV free rides on these costs by using these independent Providers' places of business as a point of sale for ophthalmic lenses that the Providers are forced to order for DV Members from DV.  These Providers are forced to accept only a "dispensing fee" for providing the point of sale and the dispense on a pair of ophthalmic lenses manufactured by the DV ophthalmic lens laboratories.

103.    This dispensing fee is woefully inadequate to compensate the Provider for the actual value of its services to the DV Member.  A number of Providers have indicated recent requests to DV to raise this dispensing fee, only to be met with refusals.


## VII.    LOCK-IN

104.    DV is able to maintain market power, and in fact full monopoly power, over its Members ophthalmic lens manufacturing needs, by locking these Members into purchasing ophthalmic lenses from the DV labs via the Mandatory Policy.

105.    Market power in a derivative market can be inferred from uniqueness of the product or control of the product.

106.    Pursuant to the Mandatory Policy, DV exercises near total control over the ophthalmic lens manufacturing needs of its 18 million Members.  In order to use the vision insurance benefits that they pay for, these Members are therefore forced to purchase ophthalmic lenses from a sole, unique source, the DV ophthalmic lens production labs.

107.    DV Members typically receive their benefits from an employer or by being a member of a discernible group.

108.    DV Members have no choice or say as to who provides this group with vision insurance benefits.

109.    DV Members are never informed of the Mandatory Policy at the time they elect whether or not to accept vision services benefits, and are unaware that they can acquire technologically superior ophthalmic lenses cheaper on the open market from ophthalmic lens manufactures/suppliers like Petitioner.

110.    DV Members are also unaware that in order to have their ophthalmic lenses fabricated in the New York or Pennsylvania DV ophthalmic lens laboratories they will likely have to wait a longer than industry average time for these lenses to be provided.  These Members are also not told that they will not be able to use their DV Benefits to acquire one hour ophthalmic lenses unless they patronize a Visionworks retail store.

111.    The DV Members then eventually, at a later date, attempt to use these vision insurance benefits, and then learns about the *supra* market rate of the copays and the requirement that they must boycott third party lens suppliers.

112.     The Mandatory Policy thereby results in a higher price for technologically inferior ophthalmic lenses to the Member, who must typically wait a longer than industry average time to receive these ophthalmic lenses.  Should a pair of ophthalmic lenses need to be remade due to DV lab error, this wait time becomes hyper inflated.

113.     Exploitation of an aftermarket or derivative market considers the "package price" as a whole.  Therefore, when considering the true cost for ophthalmic lenses actually paid by DV Members, an analysis must include the monthly premiums paid by said Member, or paid on their behalf as part of their employment benefits.

114.     Based upon industry averages and City of Chicago Utilization Reviews available to Petitioner, less than half of DV Members actually use these benefits annually, meaning the profits derived from premiums collected by the remaining portion of DV Members who do not annually use their benefits become pure windfall profits to DV.

## VIII.   DV's LOW PRICING OF PREMIUMS CONSTITUTES PREDATORY PRICING AND DAMAGES COMPETITION IN THE MARKET

115.     DV is able to entice employers to choose to use DV as its vision benefits provider by offering what appear to be low premium prices for its Members.

116.     The true cost of these benefits are not apparent from the premium pricing however, and the upfront low costs of the premiums are misleading as to the actual cost a DV Member will actually pay in order to use their benefits.

117.     In the case of the City of Chicago's contract with DV, each DV Members' life under this policy is charged a $2.99 monthly premium.  This premium amount is grossly inadequate to cover the real potential cost of the coverage to DV.

118.     Because DV is able to acquire a monopoly over the resulting ophthalmic lens manufacturing of its Members as a byproduct of its Mandatory Policy, DV is able to both cover its losses and generate significant profits through conspiracy with third party Providers.

119.     Because DV premiums for vision benefits appear to be cheap, many consumer are enticed into purchasing these benefits from DV.

120.     DV's monopoly over the resulting ophthalmic lens manufacturing portion of the benefits is a consequence of this predatory pricing scheme, as consumers are induced into purchasing these benefits under the belief that they are cost effective.

121.     This predatory pricing scheme presents a barrier to entry by new ophthalmic lens manufacturers/suppliers as such a business must effectively launch a vision insurance company simultaneously, and enact the same unlawful exclusionary practices in order to compete with DV.

122.     This predatory pricing scheme drives competitors from the marketplace as it is impossible for competitors to compete with the initial "low cost" appearance of the vision benefits offered by DV.  Because these DV Members are later compelled to then order their ophthalmic lenses from a DV laboratory, independent ophthalmic lens laboratories never even get an opportunity to compete for this work.

123.     This predatory pricing scheme has in fact resulted in barriers to market entry and the destruction of DV's competitors in the ophthalmic lens manufacturing market.

124.     This predatory pricing scheme has in fact resulted in barriers to market entry and the destruction of business competitors to DV's associated retail stores, Visionworks.

125.     DV's predatory pricing scheme has a secondary benefit not typical to such schemes however.  Although the premiums may appear to be a low cost to the average consumer,

and below DV's actual cost, they still constitute an economically significant amount of revenue to DV in the aggregate. When taking into consideration that more than half of DV Members do not use their benefits annually, these premiums result in a complete windfall to DV. Therefore this strategy simultaneously destroys competition in all industries DV and its associated retail stores operate in, grants monopoly power to DV over 18 million Member's ophthalmic lens manufacturing orders, and in more than half of the instances on an annual basis, result in pure windfall profits to DV.

IX.     **DV WILLFULLY MAINTAINS ITS UNLAWFUL MARKET/MONOPOLY POWER BY PLAN AND DESIGN THROUGH THE USE OF ANTICOMPETITIVE EXCLUSIONARY CONTRACTS**

a.     **The Exclusory Provider Agreements and Their Unlawful Tying**

126.     DV has enacted the Mandatory Policy, a provision found within its Provider Agreements, that compels independent Providers to order all ophthalmic lenses for DV Members from the ophthalmic lens laboratories in New York and Pennsylvania owned by DV.

127.     DV has improperly and unlawfully tied the ability for Providers to enjoy the benefits of in-network status with DV with the Mandatory Policy requiring said Providers to order all ophthalmic lens sales for DV members from the DV ophthalmic lens manufacturing laboratories.

128.     DV's Mandatory Policy found in the Provider Agreements precludes Providers from even considering sending orders for the manufacture of ophthalmic lenses for DV Members to any lens laboratory other than the DV laboratories.

129.     Regardless of what third party ophthalmic lens manufacturing laboratories like Petitioner offer in the terms of price, quality, turn-around times, warranties, or customer service,

Providers are absolutely precluded from utilizing the manufacturing services from any ophthalmic lens laboratory for DV Members' ophthalmic lenses other than the DV laboratories.

130. DV adopted the Mandatory Policy in order to unlawfully prevent third parties from ever competing for its Members business, and to unlawfully increase its own profits by excluding competition and reducing output.

131. DV made the Mandatory Policy pervasive to nearly every Provider Agreement in order to establish a monopoly over DV Members' ophthalmic lens orders, and by design uses said Mandatory Policy to continue to unlawfully hold monopoly power over said market.

132. DV's ophthalmic lens laboratories did not earn or otherwise acquire monopoly power over DV Members by producing superior products, providing superior customer service, or performing any of the other typical market functions that earns consumer business. The DV laboratories were merely awarded such business as a byproduct of the unlawful exclusionary Provider Agreements containing the Mandatory Policy.

133. DV Members have not agreed, expressly or implicitly, to solely patronize the DV ophthalmic lens laboratories for their ophthalmic lenses purchases.

134. The resulting market effect is that DV and its laboratories may charge *supra* market prices for ophthalmic lenses, without the fear of losing business, due to any third party manufacturer's inability to compete for such business pursuant to the express provisions of the Mandatory Policy found in the exclusory Provider Agreements.

135. Such an arrangement offers no legitimate market or public benefit, and only operates to unlawfully award DV and its lens laboratories an unmerited monopoly over the ophthalmic lens demand of the DV Members.

136.    Such arrangement has produced substantial anticompetitive effects on the ophthalmic lens market, resulting in numerous independent ophthalmic lens laboratories being forced to shut down because of insufficient available business.  The Mandatory Policy also inhibits new potential ophthalmic lens laboratories from opening, as the potential ophthalmic lens sales are significantly limited by exclusionary contracts such as the Mandatory Policy.  This practice therefore acts as an unlawful barrier to market entry.

137.    Absent the Mandatory Policy, virtually all Providers would cease to use the DV ophthalmic lens laboratories for DV Members and would patronize Petitioner and other private ophthalmic lens laboratories that offer a wider catalogue of lens design choices, superior technology, cheaper prices, and the ability for the Provider to earn a reasonable profit.

### b.    DV's Coercion of Providers Into Acceptance of the Mandatory Policy Constitutes a Horizontal Price Fixing Conspiracy Amongst Competitors

138.    DV has improperly and unlawfully fixed the price of ophthalmic lens sales by conspiring with Providers in the relevant markets, thereby resulting in *supra* market prices for ophthalmic lenses in the relevant markets.

139.    DV does not risk losing any of this business despite this higher pricing due to its coercion of the Providers to require them to order ophthalmic lenses from DV's ophthalmic lens laboratories via the Mandatory Policy.  This practice constitutes a horizontal price fixing scheme as DV has a synergistic retail association with its sister company Visionworks, making independent Providers its *de facto* competitors.

140.    Petitioner does not allege that Providers desire to participate in this conspiracy.  In fact, the opposite appears to be true, and Providers desperately desire to be free of the Mandatory

Policy so that they may order ophthalmic lenses from sources outside of the DV ophthalmic lens laboratories. Unless Providers agree to the Mandatory Policy however, they are foreclosed access to DV's benefits network, resulting in their inability to access one of the largest vision benefits networks in the United States.

141.     Many Providers own and operate their own ophthalmic lens laboratories. Equipment for finishing an ophthalmic lens by cutting it into the proper shape to fit into a pair of eyeglass frames is relatively inexpensive, and many Providers own precisely such equipment.

142.     Absent the Mandatory Policy, many Providers would conduct portions of the lens manufacturing process for their own DV Member patients, resulting in increased profits for the Providers, and faster turn-around time for said lenses to DV Members.

143.     DV in fact grants its associated Visionworks retail locations this power by exempting these locations from the Mandatory Policy. The fact that DV exempts Visionworks from this policy is *prima facie* evidence that DV believes the Mandatory Policy to be a harmful business policy, as it does not desire its own associated retail stores to be subject to it.

144.     Many Providers desire to do business with independent ophthalmic lens laboratories in their region in order to take advantage of faster turn-around times such geographic proximity naturally grants. DV's ophthalmic lens laboratories are located in New York and Pennsylvania, resulting in significant delays before the lenses can be manufactured and shipped to Providers in the Midwest.

145.     Petitioner, on the other hand, offers faster shipping times to any location in the contiguous United States, a benefit afforded to it by its manufacturing headquarters being located in Central Illinois.

146.    DV's conspiracy with Providers results in a price fix above the typical market cost for ophthalmic lenses.  Because Providers must order ophthalmic lenses for DV Members from the DV laboratories, DV and its laboratories are free to set the price of ophthalmic lenses to whatever amount it desires without fear of loss of business.

147.    This scheme also results in a reduction of production output and a simultaneous increase in profit.  A normal ophthalmic lens production facility would seek to increase the amount of ophthalmic lenses manufactured in order to maximize revenue.  In this circumstance, it is more profitable for DV and its labs to reduce output of ophthalmic lenses by reducing their Members ability to purchase ophthalmic lenses to only once per year.

148.    DV enjoys substantial profit from the operation of this scheme, earning monopoly profits when a Member uses his or her benefits, and pure windfall profits when the more than 60% of the time its Members do not use their benefits in a given year.

149.    As indicated above, the real cost of a good to a locked in consumer requires a review of the package as a whole.  This package includes the payment of annual premiums by DV's Members, a co-pay by the Member for lenses at the time of sale, and a co-pay by the Member for eyeglass frames at the time of sale.  The resulting cost to the consumer is substantially higher than the typical market cost of a pair of eyeglasses.

150.    Typically, a Provider would be in competition with a vision benefits provider. The Provider would seek the maximum amount of reimbursement for ophthalmic lenses possible, and then seek a lower price on the open market with a third party ophthalmic lens manufacturer/supplier, or in the alternative, the Provider would seek to manufacture the ophthalmic lenses itself to maximize profit.  The vision benefits provider would likewise negotiate for the lowest price of reimbursement to said Provider.  Because this arrangement is a

conspiracy between competitors resulting in *supra* market prices for ophthalmic lenses, it constitutes a horizontal price fixing scheme, and therefore a *per se* violation of antitrust laws.

### c. **DV's Use of the Mandatory Lab Policy Forces DV Members to Pay a Higher Cost for Inferior Lenses Than They Would Receive From Petitioner and Similar Ophthalmic Lens Manufacturers/Suppliers.**

151. DV has improperly and unlawfully fixed the price of ophthalmic lens sales by conspiring with independent Providers to boycott third party ophthalmic lens manufacturers/suppliers and compel use of DV's ophthalmic lens laboratories. This conspiracy has resulted in *supra* market prices for ophthalmic lenses to DV Members in the relevant markets.

152. DV does not risk losing any of this business despite the higher pricing due to its Members being unable to select third party ophthalmic lens manufacturers to purchase from due to the Mandatory Policy found in the Provider Agreements.

153. The manufacture of ophthalmic lenses is a highly profitable portion of the optical industry. The purchase of digital freeform manufacturing technology, an investment Petitioner and a few other ophthalmic lens laboratories have made, allows for even greater profitability in the manufacture of ophthalmic lenses.

154. Digital freeform technology is drastically superior to the now dated "conventional" lens generation technology still be utilized to an overwhelming degree by DV's lens laboratories. Based upon the review of a document entitled "Progressive Addition (PAL) and Intermediate Lens Formulary", which describes all of the progressive lens choices available to DV members that DV's laboratories can manufacture, DV's laboratories only offer five fully

digital freeform designs (from Shamir Insight, Inc.), with the rest of the progressive lenses manufactured using dated conventional technology.

155. Petitioner's laboratory offers the full digital lens catalogue offered by Shamir Insight, Inc. of Israel, as well as the full digital lens catalogue of Carl Zeiss Vision, Inc. of Germany, and the full digital lens catalogue of Indizen Optical Technologies, Inc. of Spain. Petitioner's own digital freeform catalogue of lens choices numbers more than twenty, including its own proprietary LifeScape® progressive lens. DV cannot adequately provide ophthalmic lenses to its Members with only its very limited selection.

156. DV controls the cost of the manufacture of ophthalmic lenses for its Members. Because DV is able to unlawfully control the cost of ophthalmic lenses, and reduce output, it is able to enjoy a significant profit margin. This is accomplished by totally excluding Petitioner and other ophthalmic lens suppliers from DV's 18 million Members. This margin includes copayment amounts made by its Members at the point of sale, and annual premiums which further exacerbates DV and its laboratories *supra* market ophthalmic lens prices.

157. A DV Member is forced to pay a cost considerably higher than market average for a pair of ophthalmic lenses due to the Mandatory Policy. Not only does a DV Member pay their annual premiums, but said Member must also pay co-pays for ophthalmic lenses and frames. If the DV Member selects higher performance lenses, or otherwise more expenses components to the ophthalmic lenses, the copayment prices increases, resulting in prices significantly higher than charged by Petitioner for the same products.

158. The resulting cost of premiums, plus co-pays, yields a cost for ophthalmic lenses higher than what the DV Member would otherwise pay on average on the open market if the

Providers were able to order ophthalmic lenses from a third party ophthalmic lens manufacturing laboratory like Petitioner.

159.    The cost of these ophthalmic lenses manufactured by the DV laboratories is considerably higher than market average for DV Members for another reason as well.  According to data published by Jobson Research, most consumers only utilize vision insurance benefits once every two years.  In years that DV Members do not use their benefits, they still pay premiums (or premiums are paid on their behalf by their employers), but without enjoying the benefit of using optical services.  When a DV Member only uses optical services every other year, as is the average for the industry, the price paid for a pair of ophthalmic lenses is significantly increased, because the DV Member was forced to pay two full years of premiums for the single pair of ophthalmic lenses.

160.    Typically, an ophthalmic lens laboratory would be in competition with a vision benefits provider as the benefits provider would seek to reimburse the manufacturer the least amount of money possible for the lenses, and the laboratory would seek the highest amount of reimbursement.  This is the competition element of business that should exist in order to protect consumers from *supra* market pricing.

161.    DV's use of the Mandatory Policy has excluded competition, resulting in its ability to reduce output and increase profit, the hallmark of a successful antitrust scheme.


    **d.**  **The Exclusionary Provider Agreements Operate as a Concerted Boycott of Petitioner's Business and Other Similar Ophthalmic Lens Suppliers**

162.    The Mandatory Policy found in the Provider Agreements operates as a concerted "Toys R Us" style boycott amongst competitors in the relevant markets.

163.    DV uses independent Providers as distributors for their product, vision insurance benefits.  DV requires the use of sufficient medical professionals to supply optometric services to its Members, but seeks to limit potential competition to the resulting derivative ophthalmic lens manufacturing/supply market for ophthalmic lenses.

164.    DV accomplishes this by forcing Providers to boycott ophthalmic lens manufacturers/suppliers like Petitioner for lenses for DV Members.  Should a Provider refuse to boycott Petitioner or businesses like Petitioner, DV will deny the Provider's request to enter the DV network, or will revoke said Provider's in-network DV status, thereby policing the conspiracy and punishing transgressors of the cartel's absolute rules.

165.    It is clearly against these independent Providers' interest to agree to the Mandatory Policy, and it is clearly a damaging policy in general, as DV has exempted its associated retail stores, Visionworks, from this policy.

166.    DV has forced the Mandatory Policy upon these independent Providers with a clear anticompetitive intent, and this anticompetitive goal has in fact been achieved.

167.    Because of the Mandatory Policy found in the Provider Agreements, virtually no third party ophthalmic lens manufacturers can produce lenses for DV Members, other than the DV laboratories.  Therefore the Mandatory Policy acts as, and has successfully resulted in, a total boycott of all of DV's manufacturing competitors.

### e.    The Exclusionary Provider Agreements Prevent New Market Entry

168.    Virtually no new ophthalmic lens manufacturers enter the market due to the stranglehold DV, and other vision benefits entities similar to DV, have on the production demand of their own members.

169.    Many privately owned ophthalmic lens laboratories have either been forced to close their doors, or to sell to larger market players*[3].  The result is a year over year net *decrease* in private competition in the ophthalmic lens market.  The primary reason for this decrease in competition is DV, and vision benefits companies like DV, acquiring monopoly power over production of the very product they are supposedly providing benefits for, and excluding potential competition via the Mandatory Policy in the Provider Agreements before the opportunity for third parties in the market to compete for this business even arises.

170.    As DV continues to grow its Member network, it will continue to unlawfully hedge out any competitors for the ophthalmic lens manufacturing demands of its Members, destroying private competition in the ophthalmic lens market.

### f.  The Exclusionary Provider Agreements Have Reduced Quality

171.    Because DV's ophthalmic lens laboratories are automatically awarded virtually all of DV's Members' lens manufacturing business, the DV labs do not face market pressure to outperform potential competitors by supplying superior products or services.  This lack of concern over potential competition has resulted in the following reduction in ophthalmic lens product quality and service quality:

a.    Slower Turn-Around Times.  Because DV Members are forced to use the DV laboratories located in New York or Pennsylvania, said Members face increased wait times on obtaining their glasses.  Because a Member must wait on his or her frame being ground shipped from the point of sale to these DV labs located in New York or Pennsylvania, the lenses must then be manufactured and assembled

---

[3] *The Towson Report indicates that the implementation of a sole sourcing lens program by a DV affiliate in 2004 caused the loss of 400 jobs, $18.4 million in average annual wages, and an annual decline in GRP in excess of $33 million dollars in the Maryland, Washington D.C., and Northern Virginia area alone.*

into those frames, and then ground shipped back to the point of sale, DV Members are deprived of the much faster turn-around time firms like Petitioner offer. Petitioner is capable of consistently producing far faster turnaround times than DV's laboratories in general.

b. Inferior Product Selection. Because DV laboratories do not possess the full spectrum of ophthalmic lens designs as described above, DV Members are forced to accept the products that the DV laboratories can manufacture, even if the Member desires other lens products, or the Member's doctor recommends a certain lens product not available from a DV laboratory. One such example is the industry leading ophthalmic lens designs of Carl Zeiss Vision, Inc. Because DV's laboratories are not enabled to manufacture Carl Zeiss Vision, Inc.'s digital freeform lens products, a DV Member is simply precluded from receiving any digital freeform lenses designed by Carl Zeiss Vision, Inc., a highly sought after product in the relevant markets.

c. Inferior Lens Technology Used. DV's laboratories produce minimal digitally surfaced, fully position of wear compensated, ophthalmic lenses. Most Progressive Addition Lenses, or simply progressive lenses, manufactured by the DV laboratories are manufactured using conventional technology, and are not position of wear compensated. All of Petitioner's ophthalmic lenses are digitally surfaced, and Petitioner can offer these lenses at a lower price than the copay prices DV Members are forced to pay for the inferior conventional technology that it primarily uses.

d.  Inferior Product Warranty.  Petitioner and many lens laboratories like Petitioner offer warranties on lens products superior to the warranties offered by DV. Because the DV laboratories are awarded manufacturing business irrespective to price, quality of work, quality or product, or quality of service, DV laboratories do not need to bend to consumer pressures to provide the optimum in customer service.  As such, DV laboratory remake and warranty policies are far more rigid than those offered by Petitioner and other privately owned ophthalmic lens laboratories.

g.  <u>**The Exclusionary Provider Agreements Lack Valid Business Justification**</u>

172.  There are no valid business justifications for DV's exclusionary Mandatory Policy found in the Provider Agreements.  DV does not achieve economy of scale efficiencies, nor do such Provider Agreements result in faster, superior, or in any way more beneficial results for DV Members.  DV's laboratory does not offer the full spectrum of digital freeform lens designs, and still manufactures many lens products using dated conventional technology.

173.  DV Members are actually forced to pay *supra* market prices for ophthalmic lenses manufactured by a DV laboratory, as cheaper prices are available on the open market.  When the context of use of benefits for the purchase of lenses generally occurs only every two years is introduced to the equation, then the costs of such lenses effectively doubles above an already *supra* market price.

<u>**COUNT I**</u>
<u>**SECTION I OF THE SHERMAN ANTITRUST ACT**</u>
<u>**ILLEGAL RESTRAINT OF TRADE**</u>

174.    Petitioner realleges and incorporates by reference paragraphs 1-173 of this Petition as paragraphs 1-174 of this Count I.

175.    The Provider Agreements containing the Mandatory Policy executed between DV and Providers constitute a conspiracy between DV and those Providers to restrain trade.  These Providers do not wish to engage in this conspiracy, but are forced to due to the Mandatory Policy.

176.    DV's Mandatory Policy constitutes a forced boycott of all third party manufacturers, and functions as an organized and designed conspiracy by contract to restrain trade.

177.    The above alleged conspiracy result in *supra* market pricing of ophthalmic lenses in the relevant markets.

178.    The above alleged conspiracy results in Petitioner, and all other independent ophthalmic lens manufacturers/suppliers, from being totally precluded from even an opportunity to compete in the DV Members ophthalmic lens demand manufacturing market.

179.    Petitioner, and similarly situated firms, have experienced significant financial damages as a result.  Such firms are being culled from the marketplace because of the Mandatory Policy, and few if any new firms are able to even enter the market and enrich competition.

180.    Both the market and consumers are damaged by DV's monopolistic and exclusionary practices, as such practices result in inferior products and services being forced upon the market and consumers, without their choice to consider alternate vendors.  DV's anticompetitive practices have allowed its laboratories to reduce output and increase profits without fear of loss of business.

181.    DV's practices constitute a *per se* violation of federal antitrust laws.

182.     DV maintains monopoly power/market power in the relevant markets.

183.     DV has monopoly power/market power over DV Members' ophthalmic lens demand, and controls the manufacturing of nearly 100% of all such lenses. Such a market, that being the lens market for the 18 million fully insured Members of DV's network, constitutes a distinct and unique market in and of itself, irrespective of any geographic boundary.

184.     The manufacturing of ophthalmic lenses constitutes a trade involving a product that crosses state lines, and has a substantial effect on interstate commerce.

185.     DV's Mandatory Policy is a facially anticompetitive practice that would fail a rule of reason economic analysis because of the reasons alleged above.


## COUNT II
## SECTION II OF THE SHERMAN ANTITRUST ACT
## ILLEGAL MONOPOLIZING OF TRADE

186.     Petitioner realleges and incorporates by reference paragraphs 1-185 of Count I as paragraphs 1-186 of this Count II.

187.     The DV Mandatory Policy constitutes an organized plan or design to monopolize the manufacturing demand for 18 million DV Members' ophthalmic lens demand.

188.     DV forces Providers to accept the exclusionary provisions of the Mandatory Policy found in the Provider Agreements, resulting in a conspiracy to monopolize such above referenced lens business. DV's laboratories would not obtain this manufacturing business outside of these unlawful exclusionary contracts.

189.     DV has designed this scheme in order to effectuate this monopolistic plan and design, resulting in DV and its laboratories gaining a trade monopoly over its Members ophthalmic lens demand in the relevant markets, as DV holds the sole right to manufacture

ophthalmic lenses for an economically significant portion of the ophthalmic lens users in the United States.

190.    DV has succeeded in gaining this monopoly, and in the alternative, poses a dangerous probability of achieving this monopoly if relief is not granted.

191.    DV's Mandatory Policy is a facially anticompetitive practice that would fail a rule of reason economic analysis because of the reasons alleged above.


**COUNT III**
**SECTION I & II OF THE SHERMAN ANTITRUST ACT**
**TYING AGREEMENTS**


192.    Petitioner realleges and incorporates by reference paragraphs 1-191 of Count II as paragraphs 1-192 of this Count III.

193.    Providers in the relevant markets strongly desire the ability to attract optical customers by offering the acceptance of Davis Vision benefits.  Without this ability, Providers in the relevant markets will be effectively precluded from doing business with the 18 million fully insured Members of DV, and the remaining 30 million discount members of DV.

194.    DV refuses to allow Providers access to its benefits network unless the Provider executes a Provider Agreement containing the Mandatory Policy.

195.    This agreement between DV and the Providers constitutes a horizontal price fixing conspiracy between competitors.

196.    The "in-network" status is the tying product.

197.    The requirement to purchase ophthalmic lenses from DV laboratories is the tied product.

198.     Providers would strongly prefer to use local manufacturers in order to obtain more favorable prices, customer service, lens design choices, and faster turn-around times.  Without the Mandatory Policy, Providers would purchase ophthalmic lenses elsewhere in the market on more favorable terms, better benefiting DV Members in a significant capacity by allowing competition into the industry.

199.     DV's monopolistic control over the market demand for all DV Members' ophthalmic lens manufacturing business is significant and economically sufficient to allow DV to restrain free competition in the ophthalmic lens manufacturing market in the relevant markets for its 18 million fully insured Members.

200.     The Mandatory Policy is not desirable to Providers, and is against their interest to agree to.  DV's exemption of its associated retail company Visionworks is evidence that DV believes that the Mandatory Policy is at least unhelpful to the optical retail sales industry.

201.     The tying scheme affects a substantial amount of interstate commerce as all of DV's affiliated manufacturing laboratories are located in New York and Pennsylvania.

202.     DV has economic interest in the sale of the ophthalmic lenses, and profits off of the typing agreements found in the Provider Agreements in the following capacities:

   a.   By exercising a monopoly over DV Members' ophthalmic lens manufacturing demands, DV is never required to reimburse third party manufacturers at a reasonable market price; and

   b.   DV's laboratories are awarded monopoly power/market power over DV Members' ophthalmic lens demand, resulting in guaranteed *supra* market profits to DV, without any necessity to actually earn business via normal modes of competition.

c.  DV's laboratories actually increase DV's profitability as DV Members are forced to pay additional co-pay monies, in addition to their premiums, for many ophthalmic lenses.  DV therefore generates additional income from such lens sales, in addition to ensuring that it never has to pay out claims to a third party manufacturer by disallowing any such competition via the Mandatory Policy.

d.  DV limits the opportunities for its Members to acquire ophthalmic lenses, reducing its output and increasing its profitability without fear of losing business.

203.  DV's Mandatory Policy is a facially anticompetitive practice that would fail a rule of reason economic analysis because of the reasons alleged above.

**COUNT IV**
**SECTION II OF THE SHERMAN ANTITRUST ACT**
**PREDATORY PRICING**

204.  Petitioner realleges and incorporates by reference paragraphs 1-203 of Count III as paragraphs 1-204 of this Count IV.

205.  DV has formulated a clear goal to monopolize the ophthalmic lens manufacturing demand of its 18 million Members by forcing Providers to execute the Mandatory Policy as a condition precedent to said Provider's access to the Davis Vision Network.

206.  DV prices its premiums to its Members at a predatorily low rate in order to induce DV's employer clients to agree to take DV on as its vision benefits provider.

207.  This predatory pricing results in ophthalmic lens manufacturers/suppliers and Providers being unable to compete with what appears to be low premiums for vision insurance benefits.

208.    These predatorily low prices charged by DV for these premiums are far below the actual cost of the benefits provided by DV, including eye care services and ophthalmic lens manufacture.

209.    DV has a dangerous probability of recouping these below cost sales in *supra* market prices charged by the ophthalmic lens sales in the relevant markets that it is automatically awarded via the Mandatory Policy found in the Provider Agreements.

210.    DV has succeeded in gaining a monopoly over the ophthalmic lens manufacturing for its Members, and in the alternative, poses a dangerous probability of achieving this monopoly due to its predatory pricing if relief is not granted.

211.    DV's predatory pricing is a facially anticompetitive practice that would fail a rule of reason economic analysis because of the reasons alleged above.


**COUNT V**
**SECTION III OF THE CLAYTON ANTITRUST ACT**
**AGREED BOYCOTT**

212.    Petitioner realleges and incorporates by reference paragraphs 1-211 of Count IV as paragraphs 1-212 of this Count V.

213.    DV requires Providers to execute Provider Agreements containing the Mandatory Policy in order to gain "in-network" status with DV.

214.    The Mandatory Policy requires that Providers boycott any and all third party ophthalmic lens manufacturers/suppliers, and requires all ophthalmic lens orders to be placed with the DV laboratories.

215.    The Mandatory Policy substantially lessens competition in the relevant markets, creating a monopoly over DV Members' ophthalmic lens demand in favor of DV.

216.　　Ophthalmic lenses constitute goods as defined by the Clayton Act.

217.　　Providers would purchase ophthalmic lenses from Petitioner and other firms similarly situated to Petitioner absent the Mandatory Policy requiring Providers to boycott all non DV affiliated manufacturing competition.

218.　　An organized boycott is a facially anticompetitive practice that constitutes a *per se* violation of antitrust laws.

219.　　DV's mandated boycott of all third party ophthalmic lens manufacturers/suppliers for its 18 million DV Members is a facially anticompetitive practice that would fail a rule of reason economic analysis because of the reasons alleged above.


## COUNT VI
## SECTION 10/3(1) OF THE ILLINOIS ANTITRUST ACT
## RESTRAINT OF TRADE

220.　　Petitioner realleges and incorporates by reference paragraphs 1-219 of Count V as paragraphs 1-220 of this Count VI.

221.　　The Provider Agreements containing the Mandatory Policy unlawfully restrain trade and commerce within the State of Illinois by automatically awarding DV Members' ophthalmic lens manufacturing to DV's own laboratories.

222.　　DV conspires with Illinois Providers to fix, control, and maintain the price of ophthalmic lenses in the relevant markets.

223.　　DV conspires with Illinois Providers to control, limit, and boycott the manufacture of ophthalmic lenses for DV Members in the relevant markets by any laboratory other than the DV laboratories.

224.     DV has established, or is attempting to establish, monopoly power/market power over a substantial part of the ophthalmic lens manufacturing trade of the State of Illinois, by excluding ophthalmic lens manufacturing competition for DV Members, and by controlling, fixing, and maintaining prices in the ophthalmic lens trade.

225.     The Provider Agreements have the effect of hampering growth of commerce and industry in the State of Illinois as it requires all ophthalmic lens manufacturing for DV Members to be conducted outside of the State of Illinois, unlawfully prohibits and restrains trade in the ophthalmic lens manufacturing industry in Illinois, and constitutes an unlawful monopolistic practice that damages for-profit pursuits in the Illinois ophthalmic lens manufacturing industry.

226.     This practice constitutes a facially anticompetitive act that is a *per se* violation of antitrust laws.  Additionally, such a practice would fail a rule of reason analysis.


## COUNT VII
## SECTION 10/3(2) OF THE ILLINOIS ANTITRUST ACT
## RESTRAINT OF TRADE

227.     Petitioner realleges and incorporates by reference paragraphs 1-226 of Count VI as paragraphs 1-227 of this Count VII.

228.     The Provider Agreements between DV and Illinois Providers containing the Mandatory Policy excludes any and all competition for DV members ophthalmic lens manufacturing demand, automatically awarding such business to a DV affiliated out of state ophthalmic lens laboratory, and constitutes an unreasonable restraint of trade or commerce.

229.     This practice constitutes a facially anticompetitive act that is a *per se* violation of antitrust laws.  Additionally, such a practice would fail a rule of reason analysis.

## COUNT VIII
## SECTION 10/3(3) OF THE ILLINOIS ANTITRUST ACT
## RESTRAINT OF TRADE

230.    Petitioner realleges and incorporates by reference paragraphs 1-229 of Count VII as paragraphs 1-230 of this Count VIII.

231.    DV's Mandatory Policy found in the Provider Agreements establishes monopoly power/ market power over a substantial portion of the ophthalmic lens trade of Illinois by excluding all competition for its Members' ophthalmic lens demands.

232.    DV's Mandatory Policy found in the Provider Agreements establishes monopoly power/ market power over a substantial portion of the ophthalmic lens trade of Illinois by controlling, fixing, and maintaining prices in that trade.

233.    This practice constitutes a facially anticompetitive act that is a *per se* violation of antitrust laws.  Additionally, such a practice would fail a rule of reason analysis.

## COUNT IX
## SECTION 10/3(4) OF THE ILLINOIS ANTITRUST ACT
## RESTRAINT OF TRADE

234.    Petitioner realleges and incorporates by reference paragraphs 1-233 of Count VIII as paragraphs 1-234 of this Count IX.

235.    The Mandatory Policy found in the Provider Agreements constitutes an express contractual provision totally prohibiting Illinois Providers from purchasing ophthalmic lens goods from any other ophthalmic lens laboratory.

236.    The Mandatory Policy totally destroys competition for DV Members' ophthalmic lens manufacturing demand, and automatically awards such business to a the DV laboratories

located outside of the State of Illinois, creating a monopoly in favor of DV and its own laboratories.

237.     This practice constitutes a facially anticompetitive act that is a *per se* violation of antitrust laws.  Additionally, such a practice would fail a rule of reason analysis.


## COUNT X
## SECTION 215 ILCS 5/364.2
## ILLINOIS INSURANCE CODE

238.     Petitioner realleges and incorporates by reference paragraphs 1-237 of Count IX as paragraphs 1-238 of this Count X.

239.     The Provider Agreements containing the Mandatory Policy are uniform, and apply to every DV Members' order of ophthalmic lenses, regardless of quantity ordered or the dollar amount of that order.

240.     Providers are required to submit to the Mandatory Policy in order to obtain in-network status with DV.  Providers would not otherwise agree to the Mandatory Policy.

241.     This Mandatory Policy is unlawfully compulsory, and violates the prohibition contained in 215 ILCS 5/364.2.

242.     The Mandatory Policy harms the citizens of Illinois and businesses in Illinois.


## COUNT XI
## SECTION 215 ILCS 5/370i(a)
## ILLINOIS INSURANCE CODE

243.     Petitioner realleges and incorporates by reference paragraphs 1-242 of Count X as paragraphs 1-243 of this Count XI.

244. The Mandatory Policy contains terms and conditions that unreasonably restricts DV Members access to healthcare by:

    a. Causing DV Members to wait extended periods of time due to DV's ophthalmic lens manufacturing laboratories being located in other states; and

    b. Causing DV Members to be saddled with inferior warranties and remake policies that are otherwise available on the open market; and

    c. Causing DV Members, as well as Illinois Providers, to be forced to deal with the inferior customer service levels of DV's laboratory. As all work is mandated to be sent to DV's lab, they have no incentive to please their market and offer superior levels of customer service.

    d. Causing DV Members to be forced to select from a commercially unreasonably limited amount of digital freeform lens products, restricting patients' right to sufficient access of healthcare.

## COUNT XII
## TORTIOUS INTERFERENCE
## WITH A PROSPECTIVE BUSINESS ADVANTAGE

245. Petitioner realleges and incorporates by reference paragraphs 1-244 of Count XI as paragraphs 1-245 of this Count XII.

246. Petitioner has a reasonable expectation of entering into a valid business relationship with a number of Providers for the manufacture of ophthalmic lenses. A significant number of Providers have in fact informed Petitioner that they wish to do business with Petitioner, but may not due so due to the Mandatory Policy.

247. DV is aware that many Providers would prefer to do business with ophthalmic lens manufacturers who utilize digital lens manufacturing technology, and that offer a wide variety of digital lens designs like Petitioner does.

248. Petitioner currently has a market advantage over it competition by being in possession of this digital lens technology. This technology will become industry standard in the near future, destroying Petitioner's market advantage.

249. DV has enacted the Mandatory Policy solely to interfere with the Providers desire to do business with digital ophthalmic lens laboratories, and to award its own laboratories a monopoly on ophthalmic lens manufacturing for DV Members.

250. Petitioner is damaged in the following ways:

    a. Petitioner is totally precluded from even competing for DV Members' ophthalmic lens manufacturing business. This seriously damages Petitioner's ability to compete nationally, as DV has an advertised member network of 55 million Members, with 18 million of those Members being fully insured lives that DV holds an ophthalmic lens manufacturing monopoly over.

    b. Providers are reticent to even allow Petitioner to perform non DV related ophthalmic lens manufacturing because of policies like the Mandatory Policy. Because DV's Mandatory Policy requires the Provider to use DV's laboratories, Providers are reticent to use multiple laboratories as it adds to the complexity of daily business, as said Providers are forced to keep track of orders from multiple lens laboratories.

## COUNT XIII
## LANHAM ACT SECTION 15 U.S.C. §1125
## FALSE DESCRIPTION

251.     Petitioner realleges and incorporates by reference paragraphs 1-250 of Count XII as paragraphs 1-251 of this COUNT XIII.

252.     DV's use of the Mandatory Policy is purposefully and willfully kept secret from its Members, and exists only in third party Provider Agreements.

253.     DV's misleading of its Members as to the existence of the Mandatory Policy is a willful act regarding a good or service made in the stream of commerce.

254.     This willful act is designed to deceive or confuse its Members as to the origin of the ophthalmic lens products the Members will ultimately purchase as a part of their vision benefits package.

255.     Furthermore, this willful act misrepresents the nature of the vision benefits package offered by DV as it does not disclose the mandatory use of the DV lab for all ophthalmic lens purchases by its Members.

256.     Petitioner is damaged by this willful deceit as it consumers elect to do business with DV and purchase their vision benefits from DV under false pretenses, only to be later foreclosed form the opportunity to purchase ophthalmic lenses from Petitioner.


## COUNT XIV
## 16 C.F.R. Part 456 (EYEGLASS RULE)

257.     Petitioner realleges and incorporates by reference paragraphs 1-256 of Count XIII as paragraphs 1-257 of this COUNT XIV.

258.     The United States has previously recognized the danger of a Provider optometrist performing an eye exam on a patient and refusing to release the prescription to said patient.  The passage of 16 C.F.R. Part 456, colloquially known as the Eyeglass Rule, requires that

optometrists release a patient's prescription to said patient so that the patient can be free to choose where he or she purchases ophthalmic lenses.

259. Refusal to release said prescription is deemed an unfair business practice under 16 C.F.R. Part 456.2.

260. The Mandatory Policy forces DV Members to purchase ophthalmic lenses from the DV laboratories, removing a DV Member's rights under the Eyeglass Rule to choose where to purchase their ophthalmic lenses.

261. Because the Mandatory Policy interferes with a patient's right to choose where they purchase ophthalmic lenses, it must be declared a deceptive business practice, and ruled unenforceable.


**COUNT XV**
**DECLARATORY JUDGMENT ACT**
**AND SPECIFIC ALLEGATIONS SUPPORTING**
**PERMANENT INJUNCTION**

262. Petitioner realleges and incorporates by reference paragraphs 1-261 of Count XIV as paragraphs 1-262 of this COUNT XV.

263. Petitioner requests that this Court declare that the Mandatory Policy provision found in the Provider Agreements to be void as illegal, and stricken from the Provider Agreements. By declaring the Mandatory Policy unlawful and striking it from the Provider Agreements, the Court will be returning the parties to the *status quo*, the last peaceable uncontested status prior to this suit. The *status quo* was the time prior to DV's implementation of the Mandatory Policy on Providers, whereby Providers could choose to work with whatever reasonable ophthalmic lens laboratory they believed best suited their patients' medical needs.

264.     Petitioner further requests that the Court declare that the Provider Agreements remain otherwise intact, thereby preserving the Providers in-network rights with DV.

265.     Petitioner, and ophthalmic lenses manufacturing/supplying firms similarly situated to Petitioner, continue to lose business opportunities they would otherwise capture on a daily basis.  Many Providers strongly desire to work with Petitioner, and other privately owned ophthalmic lens manufacturing firms, but are totally precluded from doing so by the Provider Agreements.

266.     The Mandatory Policy is causing irreparable damages to Petitioner and similarly situated firms, forcing such businesses into closing their doors, or even bankruptcy, on a consistent and systematic basis.  No adequate remedy to cure this violation of Petitioner's rights exist at law, and this issue constitutes a *bona fide* justiciable and substantial controversy.

267.     The Mandatory Policy is causing irreparable damage to DV Members by forcing them to purchase ophthalmic goods from the DV laboratories at a *supra* market price.

268.     By declaring the Mandatory Policy void and allowing competition to enter the ophthalmic lens market for the 18 million DV Members, this matter will be settled immediately, and will prevent future litigation from the dozens of other ophthalmic lens manufacturers/suppliers who are now contemplating suit against DV.

269.     By issuing an injunction with the terms requested in the Prayer for Relief, the Court will be allowing the natural market forces to infiltrate DV's Member benefits network, and Petitioner and firms similarly situated will be able to capture business that the Providers already seek to give them, thereby providing better products and services to meet DV Members' healthcare needs.

270.     Petitioner is likely to prevail on the merits of the permanent injunction.  DV's unlawful business practices constitute a horizontal price fixing scheme involving multiple parties in one contractually bound conspiracy between distinct legal entities that results in a *supra market* commodity price, solely benefitting DV.  DV has exempted its own affiliated retail optical stores, Visionworks, from the harmful Mandatory Policy providing clear evidence that this is a damaging policy that harms competition.

271.     DV's business practices constitute a *per se* violation of American and Illinois antitrust business practices, meaning little to no economic analysis need even take place.  At worst, the *quick look* analysis should be employed here, which again heavily favors Petitioner.

272.     As DV holds monopoly power over the ophthalmic lens manufacturing needs of 18 million of its Members, even a rule of reason market analysis must find that such staggering numbers is sufficient to meet market power/ monopoly power tests.

273.     DV will continue to make substantial profits without forcing Providers to order ophthalmic lenses from its laboratories.  Petitioner, and firms similarly situated, will be allowed to compete on the open market for the business of their trade, a right that they currently possess under numerous state and federal laws; a right that is being trampled upon by DV's unlawful anticompetitive business practices.

274.     It is in the public's benefit for permanent injunctive relief to be granted.  DV Members are unaware that they are being forced to purchase ophthalmic lenses from their own vision benefits company, and that their medical services and medical product selection is limited to whatever DV's laboratories decide to offer.  By opening up DV's laboratory network, their Members will have immediate access to the full spectrum of healthcare services and products they are already overpaying for.

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioner humbly requests that this Honorable Court:

1. Schedule a hearing for Declaratory Judgment, and declare:

   a. The Mandatory Policy is an unlawful contractual term, constituting a criminal and civil violation of the relevant federal statutes, and is therefore void from enforcement or operation;

   b. DV's use of the Mandatory Policy in its Provider Agreements constitutes a conspiracy by contract that results in horizontal price fixing, allowing DV to set prices at a *supra* market rate, for which DV benefits.

   c. The Mandatory Policy be stricken from every Provider Agreement in the United States;

   d. That Providers have a right to conduct business with suppliers of their choice, and that an insurance company cannot exclude competition by forcing its own members to purchase covered goods from said insurance company's own manufacturing facilities;

   e. DV's use of the Mandatory Policy in its Provider Agreements constitutes a *per se* violation of American and Illinois anticompetition laws.

f. DV's use of the Mandatory Policy in its Provider Agreements constitutes a violation of the Illinois Insurance Code.

g. That the Provider Agreements are otherwise lawful, and that DV must reimburse Providers for claims made for the purchase of ophthalmic lenses fabricated by third party ophthalmic lens manufacturers/suppliers.

2. Schedule a hearing for permanent injunctive relief, and in light of the irreparable harm to Petitioner and firms in a similar situation to Petitioner, and Petitioner's lack of an alternative remedy at law, the Court to issue a permanent injunction:

a. Directing DV to cease and desist enforcement of the Mandatory Policy found in the Provider Agreements;

b. Directing DV to send written notice to all Providers in its network informing said Providers that the Mandatory Policy has been stricken from their Provider Agreements.

c. Directing DV to include a reimbursement schedule, with reimbursement fees consistent with market averages, for payment DV will make to Providers for all ophthalmic lens manufacturing costs, including lens fees, coating fees, frame fees, and materials fees.

d. Directing DV to immediate effectuate an online billing mechanism allowing Providers the ability to bill DV for claims.

e. Preventing DV from dropping any Provider, or otherwise interfering with said Providers ability to use, accept, or otherwise take advantage of DV's member benefits network, during the pendency of this action.

f. Directing DV to permanently open its network to the market, allowing third party ophthalmic lens laboratories to compete for DV members' ophthalmic lens demand.

g. Directing DV to develop a robust third party laboratory network, including multiple ophthalmic lens manufacturing firms for Providers to choose to order from, with Petitioner being admitted as the first independent laboratory in said network.

3. Award Petitioner the following damages:

a. Compensatory damages recognizing the significant amount of business Petitioner has lost due to DV's anticompetitive practices.

b. Treble compensatory damages.

c. Attorney's fees and costs of suit, including all costs of third party professionals.

d.  Any other relief this Honorable Court deems necessary

or appropriate.


**JURY DEMAND**

Petitioner respectfully demands TRIAL BY JURY on all issues presented in this Petition that are

triable as such, found in all Counts of this Petition.

Respectfully submitted on June 24, 2015.


/s/ NICHOLAS T. WILLIAMS
Attorney for Petitioner/Lead Counsel
Chief Staff Counsel
Illinois Bar #6297966
2221 W. College Ave.
Normal, IL 61761
P:  (618) 698-5625
F:  (312) 244-3272
n.williams@hwholdings.com

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**Springfield Division**

ACUITY OPTICAL      )
LABORATORIES, LLC    )
             )
     Petitioner,   )
             )  Case No: 14-cv-3231
   vs.        )
             )
DAVIS VISION, INC.     )
             )
     Defendant.  )
_____

**PETITIONER'S DISCLOSURE STATEMENT**
**AND CERTIFICATE OF INTERESTED PARTIES**

Pursuant to the Federal Rules of Civil Procedure, Petitioner Acuity Optical Laboratories, LLC ("Petitioner"), by and through its undersigned counsel, hereby provides the following corporate disclosures and list of any and all known persons, associated persons, firms, partnerships and/or corporations that have a financial interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to the parties:

1. **Affiliated Entities of Petitioner**. Petitioner is a closely held, Member owned, limited liability company organized under Illinois law. The following entities are affiliated with Petitioner:

 a. **HW Holdings, LLC of Illinois**

 b. **HHCW Properties, LLC of Illinois**

2. **Public Holdings.** Petitioner is not publically traded, nor is any affiliated entity.

**3. Other Interested Parties.** The following additional parties are known to have

interest in this case:

    **a.**  Nicholas T. Williams, Counsel for Petitioner

    **b.**  All named Defendants/Respondents

    **c.**  Reed Smith, Counsel for Defendants/Respondents

/s/ NICHOLAS T. WILLIAMS
Attorney for Petitioner/Lead Counsel
Chief Staff Counsel
Illinois Bar #6297966
2221 W. College Ave.
Normal, IL 61761
P:  (618) 698-5625
F:  (312) 244-3272
n.williams@hwholdings.com

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**Springfield Division**

| | | |
|---|---|---|
| ACUITY OPTICAL | ) | |
| LABORATORIES, LLC | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No: 14-cv-3231 |
| vs. | ) | |
| | ) | |
| DAVIS VISION, INC. | ) | |
| | ) | |
| Defendant. | ) | |

_____

**AFFIDAVIT OF DAMAGES**

I, Nicholas T. Williams, attorney for the Petitioner, do declare and swear under oath that based on my understanding of the Petitioner's damages received as a result of Respondent's conduct, the damages in this case are greater than Fifty Thousand and No/100 Dollars ($50,000.00).

/s/ NICHOLAS T. WILLIAMS
**Attorney for Petitioner/Lead Counsel**
**Chief Staff Counsel**
**Illinois Bar #6297966**
**2221 W. College Ave.**
**Normal, IL 61761**
**P: (618) 698-5625**
**F: (312) 244-3272**
**n.williams@hwholdings.com**