E-FILED
Tuesday, 23 August, 2016  04:35:35 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ACUITY OPTICAL LABORATORIES, LLC, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 14-cv-03231 |
| | ) | |
| DAVIS VISION, INC., | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Before the Court is Respondent Davis Vision, Inc.'s Motion for Summary Judgment (d/e 27) and Petitioner Acuity Optical Laboratories, LLC's Motion for Partial Summary Judgment (d/e 35). Respondent's Motion is GRANTED IN PART and DENIED IN PART WITH LEAVE TO REFILE AT THE CLOSE OF DISCOVERY and Petitioner's Motion is DENIED.  The Court finds that Davis Vision is entitled to summary judgment on Counts V, VI, and IX, and Acuity is not entitled to summary judgment on Count I because the Mandatory Lab Policy is neither a per se unlawful restraint on trade between Davis Vision and its competitors nor a per se unlawful

forced group boycott.  The Court further finds that Davis Vision is entitled to summary judgment on Counts III, IV, X, XI, and XIV because Acuity fails to state a claim upon which relief can be granted in those counts.  The Court further finds that Davis Vision is not entitled to summary judgment on Counts I, II, VII, VIII, XII, and XIII, and Acuity is not entitled to summary judgment on Count II because with further development of the record through discovery, reasonable issues of material fact may exist as to the merits of the claims.  However, Davis Vision may refile its motion for summary judgment on these counts once discovery has concluded.

## I.    **<u>BACKGROUND</u>**

Acuity Optical Laboratories, LLC of Illinois brings this suit against Davis Vision, Inc. of New York for damages and permanent injunctive relief.  Acuity claims that Davis Vision's Mandatory Lab Policy, a requirement that essentially all of Davis Vision's in-network providers agree to provide only Davis Vision manufactured lenses to Davis Vision members constitutes: (1) a per se unlawful horizontal conspiracy with providers under Section 1 of the Sherman Antitrust Act and Section 1 of the Illinois Antitrust Act

(Counts I and VI); (2) a per se unlawful collection of vertical agreements that, in reality, act as a horizontal forced group boycott among providers, orchestrated by Davis Vision, under Section 1 of the Sherman Antitrust Act, Section 3 of the Clayton Act, and Sections 1 and 4 of the Illinois Antitrust Act (Counts I, V, VI, and IV); (3) an otherwise unlawful conspiracy under Section 1 of the Sherman Antitrust Act and Section 2 of the Illinois Antitrust Act (Counts I and VII); (4) an illegal plan to monopolize under Section 2 of the Sherman Antitrust Act and Section 3 of the Illinois Antitrust Act (Counts II and VIII); (5) a per se unlawful tying arrangement under Sections 1 and 2 of the Sherman Antitrust Act (Count III); (6) an illegally compulsory provision within Davis Vision's provider agreement under the Illinois Insurance Code (Count X); (7) an unreasonable restriction on members' access to healthcare under the Illinois Insurance Code (Count XI); (8) tortious interference with Acuity's ability to enter into valid business relationships with providers (Count XII); and (9) an illegal restriction on members' right to choose where to purchase lenses under the Eyeglass Rule, 16 C.F.R. § 456 (Count XIV).  Acuity further claims that Davis Vision: (1) has engaged in illegal predatory pricing under section 2

of the Clayton Act (Count IV); and (2) has committed illegal misrepresentation under the Lanham Act (Count XII).

On August 25, 2015, about four months prior to the close of fact discovery, Davis Vision filed its motion for summary judgment (d/e 27). Acuity filed a combined response to Davis Vision's motion and Acuity's own motion for partial summary judgment (d/e 35). Responses and replies were subsequently filed. The Court heard oral arguments on the motions on April 11, 2016.

The following is a summary of the facts that the parties agree are undisputed:

a. **The Parties in this Action Are Acuity, a Lens Manufacturer and Davis Vision, a Vision Benefits Provider.**

Acuity Optical Laboratories, LLC is a manufacturer of eyeglass lenses and other ophthalmic goods ("lens manufacturer"), headquartered in Normal, Illinois. Day-to-day business operations of both Acuity and All About Eyes are run by Adam Rosengren. Initially, Acuity primarily sold eyeglass lenses ("lenses") only to its affiliated chain of retail stores, All About Eyes. However, in July 2011, after Acuity's lab was destroyed by an adjacent building's collapse, Acuity invested in new equipment and began selling lenses

to third-party opticians, optometrists, and retail outlets (together "providers").  Acuity conducts its third-party lens sales via an independent department within the company that operates under the name Identity Optical.  Identity Optical is managed by Peter Kimerling.

Acuity uses only state-of-the-art digital lens manufacturing technology, also known as "freeform," to manufacture lenses for the national market.  This technology allows Acuity to manufacture lenses that are superior to the lenses produced with conventional lens manufacturing technology.  Further, Acuity offers next-day-air shipping and regularly reduces prices on its lenses to acquire new business.

As of February 2015, Acuity had approximately 350 open customer accounts across the entire continental United States, mostly with optometrists.  Also, Acuity's affiliated retail store, All About Eyes, has agreements to produce lenses for several vision benefits companies.  The predominant vision benefits plan with which Acuity does business is EyeMed, as a result of EyeMed's coverage of State of Illinois employees and Acuity's presence in Illinois.

Davis Vision is a managed vision care company headquartered in San Antonio, Texas.  Davis Vision is wholly owned by HVHC, Inc. Davis Vision shares its headquarters with another wholly owned subsidiary of HVHC called Visionworks.  No physical separation exists between the Davis Vision's and Visionworks' headquarters. Visionworks operates a chain of retail vision care stores.  Davis Vision and Visionworks each own two laboratories that produce lenses.  John Kay, an HVHC employee, supervises all four labs. Along with sharing office space, Visionworks and Davis Vision also share information, such as budgeting forecasts and other financial information.

Davis Vision sells different forms of vision care plans to private employers, government employers, and other plan sponsors. Individual members receive Davis Vision's vision care benefits through an employer or sponsor.  Davis Vision has two types of members: discount plan members, who receive discounts on eye exams, glasses, contacts, and other goods; and funded plan members, who receive insurance coverage for their vision care. However, Davis Vision derives revenue primarily from the members

with funded plans, with little to no revenue coming from discount plan members.

Davis Vision contracts with providers for in-network status in Davis Vision's vision plans.  Davis Vision members receive benefits from their vision plans only when they go to these in-network providers for exams, lenses, and other services.  As a result, Davis Vision funded plan members rarely go to out-of-network providers for lenses.  However, if a funded plan member is prescribed a specific lens that Davis Vision does not produce, the member can and must obtain that product from an out-of-network provider, and the member does not receive any contribution from his or her Davis Vision plan.

As a part of Davis Vision's contract with most in-network providers, the provider must agree to Davis Vision's Mandatory Lab Policy.  The Mandatory Lab Policy requires that the provider uses lenses manufactured by one of Davis Vision's labs to fill any orders for lenses by a Davis Vision member.  Davis Vision's contracts with its employers and plan sponsors do not contain any such language regarding the Mandatory Lab Policy between Davis Vision and providers.  By extension, Davis Vision members are also unaware of

the policy.  The Mandatory Lab Policy has been a part of Davis

Vision's business model since the company was established in

1974.  For almost all providers, if the provider is not willing to

accept the Mandatory Lab Policy, Davis Vision will not contract with

that provider.  However, Visionworks, a lens retailer, along with five

other large lens retailers, including Costco and Walmart, are

exempted from the policy.

Davis Vision's funded members pay a co-pay for the lenses

obtained with their vision care benefits, rather than paying for the

lenses outright.  As a result, Davis Vision considers lenses to be a

cost of delivering benefits.  To limit this cost, Davis Vision

manufactures the lenses for use by its members.  Davis Vision

manufactures lenses only for this purpose and does not sell the

lenses it manufacturers to any third parties.  In fact, Davis Vision

does not even sell the lenses manufactured for its members to the

providers.  Rather, a Davis Vision member pays a co-pay to Davis

Vision for a pair of lenses and Davis Vision provides the lenses to

the provider, at no charge, for the provider to use in the member's

eyeglasses.  Then, Davis Vision pays the provider a dispersing fee.

According to Davis Vision, the Mandatory Lab Policy is a critical

element of its effort to control the cost of lenses for the benefit of its members.  Davis Vision produces only about 10% of its lenses using the same state-of-the-art "freeform/digital lens" technology as that employed by Acuity.

### b. The Parties Operate in Different Product Markets.

Davis Vision members constitute about 18 million of approximately 150.7 million vision plan participants in the United States.  Therefore, the Mandatory Lab Policy impacts fewer than 12% of all vision plan participants nationally.  Davis Vision produced approximately 2.3 million pairs of lenses in 2014.  More than 98 million pairs of lenses were produced nationally in 2014.  Therefore, Davis Vision's labs produced less than 2.4% of the total lenses made nationally in 2014.

Davis Vision's competition in the vision care benefits market includes other managed vision care companies and vision benefits providers, such as Avesis, VSP, EyeMed, Spectera, and Superior.  These competitors use different business models.  For example, VSP and EyeMed use a select network of independent laboratories that provide lenses for the vision benefits companies' members, sometimes referred to as the reimbursement model.  Spectera

utilizes a model similar to Davis Vision's in that Spectera has its own laboratories and produces lenses for some of its members.

Acuity argues that Davis Vision also competes with lens manufacturers like Acuity because Davis Vision manufactures lenses for its members in exchange for a co-pay.  All About Eyes and Visionworks, as retailers, are in competition with all other providers.

### c. **Geographically, Both Parties Compete in the National Market.**

Davis Vision sells vision benefits to the national market. Accordingly, if Davis Vision also sells lenses, as Acuity argues, Davis Vision sells lenses in the national market, as well.  Acuity, likewise, is a national lens-producing laboratory.

Acuity alleges, in its complaint, that the relevant geographic market is the Greater Chicago Area.  Of the Chicago-area providers who participate in managed care vision plans, less than one third are in-network with Davis Vision.  Many of these in-network providers also contract with other managed vision care plan companies aside from Davis Vision.  EyeMed has the largest presence of any vision benefits company in Chicago.

Acuity is currently pursuing business in the Chicago market, including a contract to become the laboratory of choice for a 22-store retail chain in the Chicago area. (The parties do not name the retail chain.) Acuity estimates that its sales to providers in the Chicago area comprise as much as 15 percent of its overall lens manufacturing sales and that this percentage has grown larger in the past two years.

### d. **Acuity Argues That the Mandatory Lab Policy Has Anticompetitive Effects on the Lens Market.**

In Acuity's combined response and motion for partial summary judgment, Acuity includes, as purportedly "undisputed facts," testimony from Acuity's executives, Mr. Rosengren and Mr. Kimerling, regarding the executives' second-hand knowledge and personal opinion of the anticompetitive effects of the Mandatory Lab Policy. Acuity claims that, because the record does not contain contradictory testimony, Mr. Adam Rosengren's and Mr. Peter Kimerling's testimonies are undisputed facts. Davis Vision, however, disputes these facts and further suggests that the testimony would not be admissible at trial on grounds of hearsay, speculation, or inadmissible layman opinion.

This testimony relied on by Acuity includes: (1) Mr. Kimerling's testimony that many providers want to order Acuity's superior lenses for Davis Vision members but cannot do so; (2) Mr. Kimerling's testimony that every one of his 359 accounts and other new accounts would immediately begin ordering lenses from Acuity for Davis Vision members if possible; (3) Mr. Kimerling's testimony on the damage caused by the Mandatory Lab Policy, as well as similar policies by other vision benefit companies; (4) Mr. Kimerling's testimony that a lab in Decatur was forced to shut down because of the Mandatory Lab Policy; (5) Mr. Kimerling's testimony that it has become difficult for new labs to enter the market because of restrictive manufacturing policies of companies like Davis Vision, EyeMed and VSP; (6) Mr. Kimerling's testimony that most potential provider accounts will not contract with additional labs because of administrative costs; (7) Mr. Kimerling's testimony that providers do not discuss problems concerning the Mandatory Lab Policy with Davis Vision because the providers are afraid that Davis Vision will eliminate them from the Davis Vision network; (8) Mr. Kimerling's testimony that many providers are aware that Davis Vision labs produce low-quality work and have slow turnaround

times; (9) Mr. Rosengren's testimony that providers do not want to be required to use Davis Vision labs; (10) Mr. Rosengren's testimony that Acuity competes with Davis Vision; and (11) Mr. Rosengren's testimony that Davis Vision members, considering premiums and copays, pay more for lenses than on the open market.

Additionally, Acuity claims that, because Davis Vision moved for summary judgment prior to the close of discovery, Acuity was deprived of a full opportunity to discover relevant evidence. Acuity further claims that, if provided a full opportunity at discovery, Acuity would produce, at least, the following additional evidence: (1) affidavits from providers stating that the providers would immediately contract with Acuity if the Mandatory Lab Policy were discontinued; (2) affidavits from providers about their preference to obtain lenses from manufacturers other than Davis Vision; and (3) definitive evidence that a new lens manufacturer cannot currently enter the lens market due to the restrictions of the Mandatory Lab Policy.

## II.   **LEGAL STANDARD**

Summary judgment is proper if the movant shows that no genuine dispute exists as to the material facts that entitle the

movant to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The
movant bears the initial responsibility of informing the court of the
basis for the motion and identifying the evidence that demonstrates
the absence of a genuine issue of material fact.  Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986).  No genuine issue of material fact
exists if no reasonable jury could find in favor of the nonmoving
party on the fact.  Brewer v. Bd. of Trs. of the Univ. of Ill., 479 F.3d
908, 915 (7th Cir. 2007).  When ruling on a motion for summary
judgment, the Court must consider the facts in the light most
favorable to the nonmoving party, drawing all reasonable inferences
in that party's favor.  Woodruff v. Mason, 542 F.3d 545, 550 (7th
Cir. 2008).

On cross-motions for summary judgment, the same standard
of review in Federal Rule of Civil Procedure 56 applies to each
movant.  See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co., 427 F.3d 1038,
1041 (7th Cir. 2005).  Cross-motions for summary judgment are
considered separately, and each party requesting summary
judgment must satisfy the above standard before judgment will be
granted in its favor.  See Tegtmeier v. Midwest Operating Eng'rs
Pension Trust Fund, 390 F.3d 1040, 1045 (7th Cir. 2004);

Santaella, 123 F.3d at 461.  Thus, the facts are construed in favor of the non-moving party, which differs depending on which motion is under consideration.  Tegtmeier, 390 F.3d at 1045.

Summary judgment should not be entered "until the party opposing the motion has had a fair opportunity to conduct such discovery as may be necessary to meet the factual basis of the motion."  Celotex, 477 U.S. at 326.  Fed.R.Civ.P. 56(d) provides relief for a party opposing a motion for summary judgment if the party can establish, through affidavits or declarations, that it "cannot present facts essential to justify its opposition."  "A party seeking the protection of [Rule 56(d)] must make a good faith showing" that that party cannot provide the needed evidence without more discovery.  Kalis v. Colgate-Palmolive Co, 231 F.3d 1049, 1058 n.5 (7th Cir. 2000) (quoting United States v. All Assets & Equip. of W. Side Bldg. Corp., 58 F.3d 1181, 1190 (7th Cir. 1995)).  "A court may disregard a failure to formally comply" with Rule 56(d)'s motion requirement if the opposing party otherwise "clearly sets out the justification" for a grant of additional time for discovery.  Pfeil v. Rogers, 757 F.2d 850, 856 (7th Cir. 1985).

### III.   **ANALYSIS**

To obtain civil damages under federal antitrust laws, Acuity must prove the following elements: (1) that Davis Vision had a duty recognized by the antitrust laws and that Davis Vision violated that duty; (2) that Acuity suffered an injury protected by the antitrust laws; and (3) that a direct link exists between Davis Vision's antitrust violation and Acuity's antitrust injury, *i.e.*, Acuity has antitrust standing.  See Greater Rockford Energy and Technology Corp. v. Shell Oil Co., 998 F.2d 391, 395 (7th Cir. 1993); 15 U.S.C. § 15.

Davis Vision argues that it is entitled summary judgment on all of Acuity's claims because Acuity has not proven any of the aforementioned elements on its federal antitrust claims (Counts I-V).  Specifically, Davis Vision first argues that Acuity cannot prove that Davis Vision has violated any recognized antitrust duty because: (1) Davis Vision's Mandatory Lab Policy does not constitute an illegal conspiracy in restraint of trade (Count I); (2) Davis Vision's Mandatory Lab Policy is not an attempt to create an illegal monopoly (Count II); (3) Acuity has not stated a claim for unlawful tying (Count III) or predatory pricing (Count IV); and (4)

Davis Vision's Mandatory Lab Policy does not constitute an illegal forced boycott (Count V). Davis Vision also argues that Acuity (1) cannot establish antitrust injury and (2) cannot establish antitrust standing. Davis Vision further argues that it is entitled to summary judgment on Acuity's state antitrust claims (Counts VI-IX), because Acuity's Illinois Antitrust Act claims are analyzed identically to Acuity's federal claims. Davis Vision also argues that it is entitled to summary judgment on Counts X, XI, and XIV because the relevant statute/regulation does not provide a private right of action for Acuity. Finally, Davis Vision argues that it is entitled to summary judgment on Counts XII and XIII because Acuity fails to state a claim for tortious interference with prospective business advantage or violation of the Lanham Act.

Acuity argues, however, that it is entitled to partial summary judgment on the issue of liability in Counts I and II because: (1) Davis Vision's Mandatory Lab Policy is a per se unlawful horizontal agreement in violation of Section 1 of the Sherman Antitrust Act (Count I); (2) lenses manufactured for Davis Vision members constitutes a viable antitrust market over which Davis Vision exercises unlawful market power in violation of Section 2 of the

Sherman Antitrust Act (Count II); and (3) Acuity has established antitrust injury and antitrust standing for those claims. Acuity next argues that the Court should, at least, deny Davis Vision's motion for summary judgment on all counts because reasonable disputes of material fact exist regarding the merit of each of Acuity's claims and regarding whether Acuity has established antitrust injury and antitrust standing. Third, Acuity argues that, if the Court does not presently find reasonable disputes of material fact sufficient to deny Davis Vision's motion for summary judgment, if given additional discovery, Acuity would provide sufficient evidence to produce a reasonable dispute of material fact on all counts.

Acuity has not filed a separate Rule 56(d) motion or provided affidavits but this Court may still grant Acuity relief under Rule 56(d) because Acuity has sufficiently alleged in its memorandum of law that it was denied the opportunity to conduct needed discovery because of Davis Vision's present motion for summary judgment. See Pfeil, 757 F.2d at 856 ("A court may disregard a failure to formally comply with Rule 56(f) if the opposing party's request…clearly sets out the justification."); Theotokatos v. Sara Lee Personal Products, 971 F.Supp 332, 344 (N.D. Ill. 1997) (citing Pfeil

and considering a party's request that the court allow additional
discovery in the party's response to summary judgment even
though a formal Rule 56(d) motion was not filed); <u>Toombs v. Martin</u>,
05-00104, 2005 WL 3501700, *1-2 (N.D. Ind. Dec. 19, 2005)
(waiving the affidavit/declaration requirement of Rule 56(d) when
the plaintiff sufficiently justified his need for additional discovery in
his motion).  Acuity has made the required "good faith showing"
that it cannot respond to some of Davis Vision's summary judgment
arguments because: (1) Acuity has identified the specific material
facts that it anticipates discovering; and (2) the inability to conduct
discovery is not a result of Acuity's failure to be diligent.  <u>See</u> <u>Kalis
v. Colgate-Palmolive Co.</u>, 231 F.3d 1049, 1058 n.5 (7th Cir. 2000).
Acuity had, in fact, served discovery requests on Davis Vision in
August 2015; however, Acuity then agreed to Davis Vision's request
that the parties stay discovery until Davis Vision's motion, which
argued primarily matters of law, was resolved.  <u>See</u> Ex. A and B to
Davis Vision's Surreply (d/e 47) at 11-14.

Further, Davis Vision does not refute Acuity's claim that
additional discovery is needed to resolve certain issues of fact.
Rather, Davis Vision argues that it is entitled to summary judgment

notwithstanding what additional discovery would reveal because the Court can find for Davis Vision without resolving the issues that Acuity claims require additional discovery.  Therefore, the Court finds that Acuity has provided sufficient information for the Court to determine whether additional discovery is needed and, therefore, that Acuity may defeat summary judgment at this point if the specific material facts that Acuity alleges it would produce through discovery would create a reasonable dispute of material fact.

Based on a review of the present record, the Court finds that Davis Vision is entitled to summary judgment on Counts III, IV, V, VI, IX, X, XI, and XIV.  Further, the Court finds that Acuity is not entitled to partial summary judgment on Counts I and II; however, Acuity has met its burden to postpone summary judgment under Fed.R.Civ.P. 56(d) on those counts, as well as Counts VII, VIII, XII and XIII.

## A. **Although the Mandatory Lab Policy Is Not a Per Se Unlawful Horizontal Agreement, Acuity Could Establish a Reasonable Dispute of Material Fact as to Whether the Policy Constitutes an Illegal Conspiracy (Count I).**

In Count I, Acuity claims that the Mandatory Lab Policy is an unlawful conspiracy in violation of Section 1 of the Sherman Act.

Acuity argues that it is entitled to summary judgment as to liability on Count I because Davis Vision' Mandatory Lab Policy is a per se unlawful horizontal agreement.  Davis Vision argues, however, that it is entitled to summary judgment on Count I because: (1) the Mandatory Lab Policy is not per se unlawful; and (2) Acuity's alleged relevant product market is not viable for antitrust purposes and, therefore, Acuity cannot prove the Mandatory Lab Policy unlawful under either the quick-look or Rule of Reason approach.  Davis Vision also argues that it is entitled to summary judgment on Count I because Acuity has not suffered an antitrust injury and Acuity does not have antitrust standing.

The Court finds that the Mandatory Lab Policy is not a per se unlawful horizontal agreement.  However, the Court finds that, with additional discovery, Acuity could produce a reasonable dispute of material fact as to: (1) whether the Mandatory Lab Policy is an otherwise unlawful conspiracy under Section 1; (2) whether Acuity has suffered an antitrust injury; and (3) whether Acuity has antitrust standing.  Therefore, neither party is entitled to summary judgment on Count I.

### 1. The Court uses one of three approaches to analyze a practice under Section 1 of the Sherman Act.

To prove a Section 1 violation, Acuity must establish a "contract, combination, or conspiracy" that results in an "unreasonable restraint of trade in a relevant market." Agnew v. National Collegiate Athletic Ass'n, 683 F.3d 328, 335 (7th Cir. 2012). The court uses one of three frameworks to analyze whether an unreasonable restraint of trade exists: (1) the per se approach; (2) the quick-look approach; or (3) the Rule of Reason.

When the alleged unlawful conspiracy is one of the types of agreements that courts have determined "always or almost always tend to restrict competition and decrease output," *e.g.*, price-fixing agreements, the Court may find, without any analysis, that the agreement per se violates Section 1 of the Sherman Act (the per se approach). NCAA v. Bd. of Regents, 468 U.S. 85, 100 (1984).

Alternatively, in cases where the per se analysis does not apply but the court can easily determine, without "elaborate industry analysis," that an agreement is anticompetitive, then the court may apply a quick-look approach. Agnew, 683 F.3d at 336 (quoting Bd. of Regents, 468 U.S. at 109) (when "no elaborate industry analysis

is required to demonstrate the anticompetitive character…of an agreement" courts use the "quick-look" approach).  Under the "quick-look" approach, the court shifts the burden to the defendant to provide a "legitimate justification[ ]" for the anticompetitive practice.  <u>Agnew</u>, 683 F.3d at 336.  If the Court does not find that the agreement is justified, then the Court may declare the agreement unlawful without further analysis.  <u>See</u> <u>id.</u>  If the Court does find that the agreement is justified, then the Court must use a Rule of Reason analysis.  <u>See</u> <u>id.</u>

All agreements that do not fit either of the first two categories or that pass the legitimate justification step of the quick-look approach are analyzed under the Rule of Reason.  <u>See</u> <u>id.</u> at 335-36. To prove that an agreement is an unlawful conspiracy under the Rule of Reason, a petitioner must prove that the agreement has (1) an anticompetitive effect (2) on a given product market (3) in a given geographic area.  <u>See</u> <u>id.</u> at 335; <u>see</u> <u>also</u> <u>Reifert v. S. Cent. Wis. MLS Corp.</u>, 450 F.3d 312, 321 (7th Cir. 2006).

**2. The Mandatory Lab Policy is not a per se unlawful horizontal restraint of trade under Section 1 of the Sherman Act.**

Acuity argues that Davis Vision has per se violated Section 1 of the Sherman Act because the Mandatory Lab Policy is a horizontal restraint of trade.  See Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007) ("horizontal agreements among competitors...to divide markets" are per se unlawful). *Horizontal* agreements are "restraints imposed by agreement between competitors," as opposed to *vertical* agreements, which are restraints "imposed by agreement between firms at different levels of distribution."  Bus. Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 730 (1988) (emphasis added).  Davis Vision, whether considered only a vision benefits provider (Davis Vision's view), or both a vision benefits provider *and* a lens manufacturer (Acuity's view), operates at a different level of distribution than the providers, which operate at the retail level.[1]  Therefore, the Mandatory Lab Policy, a provision of the in-network contract between Davis Vision and each provider, would typically be considered a vertical agreement.  See id. at 730.  However, Acuity presents two theories

---

[1] See Flow Chart, attached to this opinion as Exhibit A.  The information in the Flow Chart is collected from the undisputed facts included in the parties' briefs.

to suggest that the Court view the Mandatory Lab Policy as a
horizontal agreement.

   *a. The Mandatory Lab Policy is not a horizontal restraint of trade
   based on Davis Vision's relationship with Visionworks.*

   Acuity's first theory is that the Mandatory Lab Policy between
Davis Vision and providers is a horizontal agreement because Davis
Vision has a sister company, Visionworks, that competes with the
providers.  Acuity claims that this theory is supported by the
holdings of Copperweld Corp. v. Independence Tube Corp., 467 U.S.
752 (1984) and United States v. Grinnell, Corp., 384 U.S. 563
(1966).  However, neither case supports Acuity's theory.

   In Copperweld, the United States Supreme Court found that a
parent company and its subsidiary could not "conspire" under the
Sherman Act.  467 U.S. at 771.  The Court reasoned that, because
an unlawful antitrust conspiracy is the "joining of two *independent*
sources of economic power previously pursuing *separate* interests,"
a parent company and its subsidiary cannot be guilty of a
conspiracy" because their interests are *already unified*.  Id.
(emphasis added).  Essentially, the unity of interest between the
parent and subsidiary prevents a petitioner from satisfying the

"previously pursuing separate interests" element of a conspiracy. Courts have since extended this Copperweld reasoning and held that any two "sources of economic power" that have a "unity of interest" cannot be found to conspire for antitrust purposes or in other contexts.  See e.g., Century Oil Tool, Inc. v. Production Specialties, Inc., 737 F.2d 1316 (5th Cir. 1984) (finding that two companies under the same ownership shared a unity of interest and, therefore, could not conspire under the Sherman Act); American Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212 (4th Cir. 2004) (finding the same between a hospital and its peer review committee); see also Bucklew v. Hawkins, Ash, Baptie & Co., LLP, 329 F.3d 923 (7th Cir. 2003) (finding that a parent and a subsidiary cannot conspire under RICO).

Acuity asks this Court to extend the reasoning of Copperweld even further and find that: (1) Davis Vision has a unity of interest with Davis Vision's sister company, Visionworks; and (2) because of this unity of interest, any agreement between Visionworks' competitors and Davis Vision should be analyzed as an agreement among competitors.  That is, Acuity wants this Court to hold that Davis Vision competes with providers because Visionworks

competes with providers and, therefore, the Mandatory Lab Policy constitutes an illegal horizontal agreement between competitors (Davis Vision and providers).

However, in Copperweld, the Supreme Court explicitly stated that the Court was limiting its opinion to "the narrow issue squarely presented," *i.e.* whether a parent and subsidiary are capable of conspiring. Copperweld, 467 U.S. at 767. Further, the Supreme Court explicitly stated that the "unity of interest" holding applied only to "coordinated activity" of a parent and its subsidiary. Id. at 771. That is, commonly-owned companies have a unity of interest *only* when they are engaged in coordinated activity. For these reasons, courts have declined to extend the reasoning of Copperweld, as Acuity asks this Court to do here, to find increased antitrust liability based on commonality of ownership, in the absence of specific evidence of coordinated activity. See Michael v. Intracorp. Inc., 179 F.3d 847, 857 (10th Cir. 1999) (holding that a defendant company that reviewed insurance claims from insurance companies could not be found in horizontal conspiracy with insurance companies based on the defendant's relationship with its parent company and sister company that were insurance

companies, absent specific evidence of coordinated activity between
the defendant and either the parent or sister insurance company);
In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300, 341,
n.44 (3d. Cir. 2010) (declining to extend Copperweld to find that a
subsidiary is automatically liable for agreements made by its
parent); In re Florida Cement and Concrete Antitrust Litigation, 746
F.Supp.2d 1291, 1324 (S.D. Fl. 2010) (similarly finding that a
parent is not liable for the antitrust violations of its subsidiary).  In
fact, Acuity does not provide, nor can this Court identify *any* case
where a court has applied Copperweld as Acuity asks this Court to
do here.

For the same reasons, this Court finds that an agreement
between Davis Vision and competitors of Davis Vision's sister
company, Visionworks, should not be viewed as an agreement
between Davis Vision and its competitors, absent actual evidence
that the agreement constitutes coordinated activity by Davis Vision
and Visionworks.  Acuity argues that the agreement constitutes
coordinated activity because (1) Davis Vision and Visionworks share
a physical headquarters and (2) Visionworks may benefit from the
agreement.  However, as in Michael, Acuity's purported evidence of

coordinated activity is actually evidence of characteristics that are not atypical of sister companies, rather than proof of actual coordinated activity.  179 F.3d at 857, n.12 (petitioner must provide evidence of involvement by the sister company in the respondent's action or evidence that the respondent is "merely the alter ego" of its sister company).  The evidence in the record shows that the Mandatory Lab Policy is part of an agreement Davis Vision makes in its capacity as a vision care benefits provider, an industry in which Visionworks does not participate.  Acuity does not provide, or claim it would provide in discovery, any evidence that executives or employees of Visionworks actually participate in the creation or execution of the Mandatory Lab Policy agreements.  Therefore, the Court finds that the Mandatory Lab policy is not "coordinated activity" by Davis Vision and Visionworks.

Alternatively, Acuity argues that the holding of <u>Grinnell</u> supports Acuity's first theory: that Davis Vision competes at the retail level with providers because Visionworks competes at the retail level with providers.  In Grinnell, however, the United States Supreme Court dealt with whether four commonly owned companies, all at the same level of distribution, competed in the

same product market because of the similarity of the products that the companies manufactured.  384 U.S. 563.  The Supreme Court held that a parent company that offered fire sprinkler systems operated in the same market as three majority-owned subsidiaries that provided burglary and fire-protection services, burglary services, and fire-protection services, respectively, because all four companies *offered essentially the same product*: a "central station service under which hazard-detecting devices installed on the protected premises automatically transmit an electric signal to a central station."  Id. at 571.  In short, Grinnell states that companies that offer essentially the same product operate in the same product market.  In this case, however, Acuity is not making the argument made in Grinnell, that is, that Davis Vision and Visionworks operate in the same product market.  In fact, both parties already agree that Davis Vision and Visionworks both operate in the lens market.  Here, Acuity is making the same argument as it attempted to do under Copperweld, that the Court should look at Davis Vision as a competitor at the retail level in the lens market—even though Davis Vision is not actually a retail seller of lenses—because Visionworks, a company with the same owners

as Davis Vision is a retail seller of lenses.  Grinnell's holding

regarding the similarity of the products that companies sold does

nothing to support Acuity's argument.

As a result, this Court finds that the Mandatory Lab Policy is

not a per se unlawful horizontal agreement based on Davis Vision's

relationship with Visionworks.

b. *The Mandatory Lab Policy is not a collection of vertical
   agreements that, in reality, operates as a* per se *unlawful forced
   group boycott, orchestrated by Davis Vision.*

Acuity's second theory is that, even if Davis Vision does not

operate at the same level of distribution as the providers, the

Mandatory Lab Policy, between Davis Vision and the providers,

constitutes a collection of vertical agreements that, in reality,

operates as a horizontal agreement among providers to boycott

third-party lens manufacturers, such as Acuity.  However, the

Court finds that facts do not support Acuity's second theory.

Typically, a vertical agreement, like the Mandatory Lab Policy,

will not be found per se unlawful under Section 1 of the Sherman

Act unless it includes an agreement to fix prices.  See Miles

Distributors, Inc. v. Specialty Const. Brands, Inc., 476 F.3d 442,

450 (7th Cir. 2007) ("[A] vertical restraint is not illegal per se unless

it includes some agreement on price or price levels.").  Moreover, the Mandatory Lab Policy is a "vertical exclusive distributorship" (a contract to receive a certain product from a single distributor) and such a vertical agreement is "presumptively legal."  Republic Tobacco Co. v. North Atlantic Trading Co., Inc., 381 F.3d 717, 736 (7th Cir. 2004).  However, courts have found in some cases that a collection of individual vertical exclusive distributorship agreements can be viewed as a horizontal agreement.  Specifically, when a respondent who competes at one level of product distribution makes vertical exclusive distributorship agreements with competitors at a different level of product distribution, the "collection" of the vertical agreements together may comprise a per se unlawful horizontal forced group boycott, with the respondent "in the center as the ringmaster."  See Toys "R" Us, Inc. v. F.T.C., 221 F.3d 928 (7th Cir. 2000) (affirming FTC finding of a per se antitrust violation under Section 1 where a group of toy manufacturers all vertically agreed with retailer Toys "R" Us to boycott other retailers); Interstate Circuit v. United States, 306 U.S. 208 (1939) (finding a Section 1 violation where a group of movie distributors all vertically agreed with first run movie theaters to implement minimum-price

and no-double-feature restrictions on subsequent run movie
theaters for certain movies).

However, for the Court to find the collection of vertical
agreements to be per se unlawful under this ringmaster theory,
Acuity must show through direct or circumstantial evidence that
the providers were acting in conspiracy with one another rather
than acting independently.  See Toys, 221 F.3d at 934 (horizontal
agreements may be proved by "either direct or circumstantial
evidence").  That is, Acuity must prove that the individual providers'
agreements with Davis Vision are not simply parallel action or tacit
collusion.  See In re Text Messaging Antitrust Litig., 782 F.3d 867,
879 (7th Cir. 2015) ("Tacit collusion, also known as conscious
parallelism, does not violate Section 1 of the Sherman Act.").  To
meet this burden, Acuity must present evidence that "tends to
exclude the possibility" that the providers acted independently
because "antitrust law limits the range of permissible inferences
from ambiguous evidence."  Matsushita Elec. Indus. Co., LTD. et al.
v. Zenith Radio Corp., 475 U.S. 574, 588 (1986); see also Toys, 221
F.3d 935-36 (finding conspiracy based on direct evidence that the
toy manufacturers agreed only after assurance that their

competitors would also agree, as well as evidence that: (1) the
agreements were an abrupt shift in the manufacturers' operations;
(2) the agreements deprived the manufactures of profitable sales
outlets; and (3) the manufacturers wanted to use other retailers but
feared defying Toys "R" Us); Interstate, 306 U.S. at 221 (inferring
conspiracy from the substance and manner of the proposed
agreement, the substantial unanimity of action by the movie
distributors, and refusal of the defendants to call witnesses with
information about the agreements).

Acuity first argues that the Mandatory Lab Policy itself is
direct evidence of conspiracy because the industry is aware of how
the policy functions.  However, such tacit collusion or conscious
parallelism alone is not proof of a conspiracy.  See Text Messaging,
782 F.3d at 879.  Acuity further argues that the circumstantial
evidence in this case parallels that identified in Toys and Interstate
and, therefore, proves Acuity's boycott claim.[2]  Specifically, Acuity

---

[2] Acuity argues that the evidence supports these contentions; however, Acuity's
evidence regarding the actions and opinions of the providers is actually
inadmissible second-hand testimony given by Acuity's executives.  See Gunville
v. Walker, 583 F.3d 979, 985 (7th Cir. 2009) (a party cannot rely on
inadmissible hearsay to oppose summary judgment).  However, Acuity claims
that, if given more discovery, it will produce affidavits from providers to support
the testimony of Acuity's executives.

argues that this Court should infer a conspiracy because: (1) the providers agree to the Mandatory Lab Policy and subsequently refrain from complaining about the policy only because, otherwise, they could not be in-network with Davis Vision; (2) some providers usually manufacture their own lenses and may not do so under the Mandatory Lab Policy; and (3) providers are forced to act against their interests by subjecting customers to inferior products and longer turn-around times that come with the use of Davis Vision labs.  However, this evidence does not support a finding that the providers conspired with each other.

First, Acuity's assertion that a provider agrees to the Mandatory Lab Policy because the provider could not otherwise become in-network with Davis Vision is actually evidence that the providers acted independently, not in conspiracy.  The provider enters into the Mandatory Lab Policy because the provider wants to be in-network with Davis Vision.  The provider wants to be in-network with Davis Vision because, through Davis Vision, the provider gains access to the additional customers that come with in-network status.  For this reason, the provider is willing to sacrifice its ability to choose the lens manufacturer that it uses for

Davis Vision customers.  Therefore, the provider is clearly acting in its own interest in increasing business.

Second, Acuity's other purported evidence does not, as Acuity claims it does, parallel the evidence Acuity cited from Toys, which showed that the toy manufacturers were acting contrary to their interests.  The agreements that the toy manufacturers entered into in Toys limited those toy manufacturers' access to customers because the toy manufacturers could no longer access the customers of certain toy stores that they agreed to boycott.  In this case, a provider's agreement to the Mandatory Lab Policy allows the provider access to new additional customers without taking away from current business.  The provider simply does not otherwise have access to the 99% of Davis Vision members who obtain lenses from in-network providers.  Even though a provider may not be enamored with the procedure for filling Davis Vision members' orders, having more customers is in the provider's pecuniary interest.

Further, in Toys, the manufacturers agreements with Toys "R" Us impacted the manufacturers business with *all customers*.  In the present case, however, a provider's agreement to the Mandatory Lab

Policy only impacts the new Davis Vision customers brought in by the agreement.  The Mandatory Lab Policy creates no contractual obligation for the provider when dealing with the provider's other customers.  Accordingly, a provider who: (1) prefers to produce its own lenses; or (2) prefers to use an alternative lens manufacturer, can continue to do so for all non-Davis Vision member customers. In fact, a provider could not obtain lenses for its other customers from Davis Vision because Davis Vision will not provide lenses for consumers who do not have a Davis Vision plan.

Because Acuity's evidence would not allow a reasonable jury to find that the providers are conspiring, and Acuity does not claim that it will produce such evidence with more discovery, the Court finds that the providers' vertical agreements with Davis Vision do not constitute a horizontal conspiracy among providers to boycott Acuity and other lens manufacturers.  Therefore, the Mandatory Lab Policy is not a per se unlawful horizontal agreement.

**3. With additional discovery, Acuity could establish a reasonable dispute of material fact as to whether the Mandatory Lab Policy violates Section 1 of the Sherman Act under the quick-look or Rule of Reason approach.**

Because the Mandatory Lab Policy is not a per se violation of Section 1 of the Sherman Act, the Court must analyze Acuity's claim under one of the other two approaches described above: the quick-look approach or the Rule of Reason.  Davis Vision argues that, regardless which approach the Court uses, Acuity does not meet the threshold burden of identifying a viable antitrust product market.  Acuity, however, argues that the Court should find that "lenses manufactured for Davis Vision members" is a viable antitrust market because: (1) it is a viable product market under the general rule of reasonable interchangeability; (2) it is a viable submarket under Methodist Health Services Corp. v. OSF Healthcare System; or (3) it is a viable single-brand derivative submarket, under Newcal Industries, Inc. v. IKON Office Solution.

The Court finds that Acuity alleged market is not a viable product market under the general rule of reasonable interchangeability and is not a viable single-brand derivative market under Newcal.  However, the Court finds that, although Acuity has not yet carried its burden to win summary judgment, Acuity could, with additional discovery, establish a reasonable dispute of material

fact as to whether its alleged market is a viable submarket under
Methodist.

    *a. Under either remaining approach, Acuity must allege a viable antitrust product market.*

For a Section 1 claim analyzed under either the quick-look approach or the Rule of Reason, a petitioner is required to identify a relevant product market that is affected by the allegedly anticompetitive practice.  See Agnew, 683 F.3d at 337 (the quick-look allows a petitioner to forego a showing of "market power" but does not "dispense[ ]" with the petitioner's burden to show "the existence of a relevant market").

In a Rule of Reason analysis, a precise market definition is required for the petitioner to be able to demonstrate that a defendant wields sufficient market power to establish an unlawful conspiracy.  Agnew, 683 F.3d at 337.  Under the quick-look approach, the petitioner may forgo a strict showing of market power and, therefore, does not need to *specifically* define the parameters of the market.  Nevertheless, the petitioner still has the burden to identify the "rough contours" of the market, including, at least the relevant *product* market, so that a court can determine whether the

respondent's actions have anticompetitive effects on that market.

See Republic Tobacco, 381 F.3d at 738.  After all, the purpose of the Sherman Act is to protect competition in the commercial arena. Therefore, without a commercial market to analyze, the restrictions of the Sherman Act are not implicated.  See Id. at 738 ("Economic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market."); Agnew, 683 F.3d at 337 (the existence of a commercial market is what implicates the Sherman Act in the first place).

> b. *Acuity's alleged product market, lenses manufactured for Davis Vision members, does not satisfy the general rule of reasonable interchangeability because the lenses manufactured for Davis Vision members are interchangeable with other lenses.*

Generally, a relevant product market for antitrust purposes is defined by "the reasonable interchangeability of the products and the cross-elasticity of demand for those products."  Int'l Equip. Trading, Ltd. v. AB Sciex LLC, 13-1129, 2013 WL 4599903, *3 (N.D. Ill. 2013).  Interchangeability is based on the "unique attributes" of the products that allow them to be substituted for one another but make them difficult to replace with a product from outside the market.  See id.  Perceived differences in quality or a buyer's

preference for a specific brand do not render one product non-interchangeable with another.  See e.g., Hack v. President & Fellows of Yale College, 237 F.3d 81, 86-87 (2d. Cir. 2000) (finding a Yale education to be interchangeable with other schools), Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d. Cir. 1997) (finding Domino's-approved pizza ingredients to be interchangeable with non-approved ingredients).  Accordingly, a petitioner's alleged market must contain "all interchangeable substitute products," in order for a court to determine whether anticompetitive effects actually exist.  Failure to allege a proper market results in a failed claim.  See Queen City, 124 F.3d at 436 (holding that, even at the preliminary motion to dismiss stage, if a petitioner's proposed relevant product market "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in [its] favor, the relevant market is legally insufficient"); see also Int'l Equip. Trading, Ltd., 2013 WL 4599903 at *3 (granting a motion to dismiss on the grounds that the plaintiff failed to properly allege a product market containing all interchangeable substitutes).

Acuity's alleged product market is not all lenses but, rather, only those lenses manufactured for Davis Vision members.  Such a market would ordinarily not be found viable under the general rule because it narrows the market based not on the product but based on the purchaser.  See Rohlfing v. Manor Care, Inc., 172 F.R.D. 330, 345 (N.D. Ill. 1997) ("it is improper to define a market simply by identifying a group of consumers who have purchased a given product").  However, a market narrowed in this fashion can be legally viable if the products made for the particular consumer are not reasonably interchangeable with products made for other consumers.  See Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 482 (1992) (finding that only replacement copy machine parts made for owners of Kodak copy machines was a legally viable market because replacement parts made for owners of other copy machines did not work in Kodak copy machines); Int'l Equip. Trading, Ltd., 2013 WL 4599903 at *4 ("When a complaint limits the relevant market to a single brand, franchise, institution, or comparable entity," the petitioner must show that the product cannot be substituted with entity's products.) (internal quotations omitted).  In this case, however, Acuity does not even attempt to

argue that Davis Vision lenses are not interchangeable with non-Davis Vision lenses.  In fact, Acuity wants to manufacture lenses for use by Davis Vision members, essentially admitting that Davis Vision's lenses and Acuity's lenses are interchangeable substitutes.  However, the analysis does not end here.

> c. *With additional discovery, Acuity could establish a*
> *reasonable dispute of material fact as to whether lenses*
> *made for Davis Vision customers is a viable antitrust product*
> *submarket.*

In some cases, a "well-defined submarket" may also be a legally viable product market for antitrust purposes.  See Methodist Health Services Corp. v. OSF Healthcare System, 15-1054, 2015 WL 1399229, *6 (C.D. Ill. March 25, 2015) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).  To analyze whether a submarket is appropriately "well-defined," courts examine "'such practical indicia' as (i) industry or public recognition of the submarket as a separate economic entity, (ii) the product's peculiar characteristics and uses, (iii) unique production facilities, (iv) distinct customers, (v) distinct prices, (vi) sensitivity to price changes, and (vii) specialized vendors" (known as the practical indicia test).  Id.  Acuity argues that Davis Vision benefits members

comprise a viable submarket, as a matter of law.  This Court cannot find, as a matter of law, that Acuity's alleged market is a viable submarket; however, the Court finds that, given additional time for discovery, Acuity could establish a reasonable dispute as to whether its alleged market is a viable antitrust submarket.

Generally, courts have found that a submarket comprised of a subgroup of buyers of one product fails the practical indicia test because the buyers in the submarket are reasonably interchangeable with the other buyers in the market.  See Campfield v. State Farm Mut. Auto Ins. Co., 532 F.3d 1111, 1119 (10th Cir. 2008) ("When there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate the buyers' market share."); Little Rock Cardiology Clinic PA v. Baptist Health, 591 F.3d 591 (8th Cir. 2009) (plaintiff could not narrow market to only commercial health insurance payers of hospital services because government payers are interchangeable), Marion Healthcare LLC v. Southern Illinois Healthcare, 12-0871, 2013 WL 4510168 (S.D. Ill. Aug. 26, 2013) (same); Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 66 (1st Cir.

2004) (market was all retail pharmaceutical sales rather than only "health care financed or insurance reimbursed pharmaceutical products" because retail sales not fitting those categories were reasonably interchangeable); Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494 (3d. Cir. 1998) (finding the same when plaintiff alleged a market of only pharmaceutical sales to HMO members).

However, courts have made an exception to this general rule when access to a particular submarket of buyers is "critical" to an industry member's "survivability." See Methodist, 2015 WL 1399229 at *6-7. For example, courts have found that a subgroup of buyers is viable as an antitrust market when: (1) the subgroup is comprised of particularly high-profit buyers; or (2) there is an "inelastic difference in price" between products sold to two different groups of buyers. See United States v. Archer-Daniels-Midland Co., 866 F.2d 242, 246 (8th Cir. 1988) (finding two separate product markets for normally interchangeable products because government price support raised the price of one product to an artificially high level); Methodist, 2015 WL 1399229 at *6-7 (allowing a submarket of only hospital services for privately-insured

customers and not government-insured customers because the reimbursement rate from private insurers was so much higher as to render access to that market imperative).

Acuity argues that its alleged market fits this exception. Specifically, Acuity argues that its market parallels a market previously approved by another court in this District.  <u>See</u> <u>Methodist</u>, 2015 WL 1399229.  In <u>Methodist</u>, the court found, when ruling on a motion for judgment on the pleadings, that a submarket consisting of healthcare provided to privately insured patients but not government-insured patients was viable for antitrust purposes. <u>See</u> <u>id.</u>  The court found the submarket viable because plaintiff had alleged, and the defendant had admitted, that "access to privately insured patients is critical to a health-care provider's long-term sustainability" due to the low prices mandated for government-payers.  <u>Id.</u> at *7.  Here, Davis Vision has not made such an admission.  Further, Acuity's alleged market is even narrower than the market of privately insured patients found viable in <u>Methodist</u>. Still, under the reasoning employed in <u>Methodist</u>, Acuity can survive summary judgment if Acuity can provide evidence sufficient to show a reasonable dispute of material fact as to whether access

to its alleged market of Davis Vision members is "critical" to survival in the lens market.

Acuity first claims that it has exceeded its burden and already proven as a matter of law that access to Davis Vision members is critical to survival in the lens market. To support this claim, Acuity points to: (1) testimony from Davis Vision's Scott Hamey that access to members of managed care vision benefits plans (of which Davis Vision is one) is critical to Visionworks' survival; (2) the Towson Report, a report on the "likely economic impacts" of a previously proposed plan by CareFirst BlueCross BlueShield to institute a mandatory lab policy for all eyeglass and contact lenses in Maryland, Washington D.C., and Northern Virginia; (3) Acuity's Peter Kimerling's testimony that the number of optical labs in the United States in 2014 was less than half of the number in 2001; and (4) Kimerling's "estimation" that only 10-20% of the total lens market is available to Acuity. See Ex. C to Davis Vision's Mot. Summ.J. (d/e 27-2) at 196-97 (Hamey's testimony); Ex. 9 to Acuity's Response to Davis Vision's Mot. Summ.J. (d/e 35-9) (Towson Report); Ex. C to Davis Vision's Mot. Summ.J. (d/e 27-2) at 99, 120 (Kimerling's testimony). Alternatively, Acuity argues that,

given more discovery, Acuity "will present overwhelming evidence of a new [lens manufacturer's] inability to enter the market due to the barrier presented by the Mandatory Lab Policy" and, therefore, this Court should not grant summary judgment to Davis Vision on Count I.  Acuity's Reply (d/e 43) at 15.

The evidence cited by Acuity does not, as Acuity claims, prove at a matter of law that access to Davis Vision members is critical to the survival of a lens manufacturer.  Nor does such evidence establish a reasonable issue of material fact based on the present record.  However, the Court finds that the evidence Acuity claims it would obtain in discovery would create a reasonable dispute of material fact as to whether access to Davis Vision members is critical for survival in the lens manufacturing market.  Based on the present record, a reasonable jury could not find that access to Davis Vision customers is critical for lens manufacturers.  First, Mr. Hamey's testimony that access to Davis Vision members is critical to Visionworks is not relevant to the issue at hand because Visionworks is a lens retailer, not a lens manufacturer.

Second, the Towson Report is not relevant to the actual effects of the Mandatory Lab Policy because it is a speculative report that

attempted to project the impact of a mandatory lab policy that had

been proposed by a different benefits company, under different

circumstances, in the specific geographic area of Maryland,

Washington, D.C., and Northern Virginia.  Blue Cross Blue Shield

was considering implementing a policy that required all of its

providers to obtain eyeglass lenses, contact lenses, and other goods

from a single manufacturer.  Providers that worked with Blue Cross

Blue Shield were previously either manufacturing goods for

members themselves or acquiring the goods from the manufacturer

of their choice.  Now, the providers were going to be required to

*change* to using a single laboratory.  The Towson Report made

projections about how the providers *having to change* their current

business practices would generally affect the economy in the

geographic region.  As the Court has already discussed, Davis

Vision does not require any providers to change their current

business practices.  Still, the report could possibly be relevant to a

Rule of Reason analysis of the anti-competitive effects of the

Mandatory Lab Policy.  However, the projections, which concern a

different insurer in a different market, are not probative of whether

a lens manufacture cannot survive without access to Davis Vision members, specifically.

Third, although Mr. Kimerling's testimony about the number of lens manufacturers currently operating compared to the number of lens manufacturers operating in 2001 is evidence with some value, that value is negligible without more evidence suggesting that the Mandatory Lab Policy is the cause of the difference in the number of labs.  Finally, Mr. Kimerling's testimony regarding the percentage of the entire lens market that is available to Acuity does not prove that access to Davis Vision members is critical to *all* lens manufacturers.  Mr. Kimerling did not testify that the percentage of the lens market available to Acuity is the same percentage of the lens market available to other manufacturers.  Further, Davis Vision members consume fewer than 2.4% of the total lenses produced nationwide.  Therefore, even without access to Davis Vision members, Acuity would have access to over 97% of the market.  Mr. Kimerling did not testify that Acuity's inability to access the other 97% of the market is caused by the Mandatory Lab Policy.

Further, the additional evidence in the record does not suggest that access to Davis Vision customers is critical to survival in the lens manufacturing market.  Davis Vision is one of many vision plans available to eyeglass wearers and, therefore, Davis Vision members are one of many groups of consumers available to lens manufacturers.  Again, Davis Vision members make up only about 12% of vision plan members nationwide and consume less than 2.4% of total lenses produced nationwide.  Therefore, a lens manufacturer still has access to 88% of vision plan members and over 97% of consumers of lenses.  Further, Acuity does not present any evidence that the profit that a lens manufacturer can obtain from sales to Davis Vision members differs in any way from the profit that a lens manufacturer can obtain from sales to the other 97% of consumers.

However, the evidence that Acuity claims it can provide in discovery, "evidence of a new [lens manufacturer's] inability to enter the market due to the barrier presented by the Mandatory Lab Policy" is substantially probative of a lens manufacturer's need to access Davis Vision members.  Acuity's Reply (d/e 43) at 15.  Such evidence, when combined with the evidence currently in the record,

could enable a reasonable jury to find for Acuity on the issue.
Therefore, Davis Vision is not entitled to summary judgment on
Count I.

> d.  *"Lenses manufactured for Davis Vision members" is not a
> viable single-brand derivative submarket under <u>Newcal</u>.*

Acuity alternatively argues that Acuity's alleged market is
viable because lenses manufactured for Davis Vision members is a
viable single-brand, derivative submarket created by the Mandatory
Lab Policy.  If Acuity's alleged market is viable under this theory,
Acuity could be awarded summary judgment on the issue without
having to produce the additional evidence cited earlier.  However,
Acuity's alleged market is not viable under this theory.

Courts have found that a single-brand derivative submarket
may be viable for antitrust purposes.  <u>See</u> <u>Kodak</u>, 504 U.S. at 480-
82 (finding that Kodak-only copy machine repair parts and Kodak-
only copy machine repair contracts were legally cognizable
derivative submarkets); <u>Newcal Industries, Inc. v. IKON Office
Solution</u>, 513 F.3d 1038 (9th Cir. 2008) (finding that the market of
copy machine service contracts for IKON copy machine lessees was
a properly alleged derivative submarket).

Such a viable derivative submarket requires a petitioner to properly identify three separate markets.  The petitioner must begin by identifying a viable antitrust product market, deemed the primary market.  Then, the petitioner must identify a proper derivative market within that primary market.  See Newcal, 513 F.3d at 1051 (the finding of a derivative submarket is conditioned upon the existence of a "wholly derivative" market).  Finally, the petitioner must identify a submarket within the derivative market.  Acuity does not identify a "wholly derivative" market.

A wholly derivative market is a market that is created only because of the existence of the primary market, *i.e.*, the market would not exist without the primary market.  See Kodak, 504 U.S. at 480-82 (finding that copy machine repair parts and copy machine repair contracts were legally cognizable derivative markets because they would not exist if the primary market of copy machines did not exist).  In this case, Acuity's alleged primary market is vision benefits plans and Acuity's alleged derivative market is lenses.  Acuity's alleged derivative market is not a "wholly derivative" market because the market for lenses would exist even if vision benefits plans did not exist.  Therefore, Acuity's alleged

market is not a viable single brand derivative submarket.[3]  As a result, Acuity still must prove that its alleged market is viable under Methodist to avoid summary judgment.

### 4. A genuine issue of material fact exists as to whether Acuity has established an antitrust injury and antitrust standing.

Davis Vision briefly argues that, even if Acuity's alleged product market is viable, Davis Vision is still entitled to summary judgment on Acuity's conspiracy claim in Count I because Acuity lacks antitrust injury and antitrust standing.  However, the Court finds that Acuity could establish both antitrust injury and antitrust standing, based on the facts that Acuity has specifically identified that it will uncover in discovery.

### a. A reasonable dispute of material fact exists as to whether Acuity has established an antitrust injury.

An antitrust injury is "injury of the type the antitrust laws were intended to prevent that flows from that which makes defendants' acts unlawful."  Atl. Richfield Co. v. USA Petroleum Co.,

---

[3] Even if Acuity did identify a proper derivative market, the finding of a derivative submarket is still subject to the practical indicia, discussed in the previous section.  See Newcal, 513 F.3d at 1051 ("in considering the legal validity" of a contractually-created, single-brand, derivative submarket, the court must also determine whether the submarket qualifies as a submarket "under the Brown Shoe standard").

495 U.S. 328, 334 (1990).  To prove antitrust injury, a petitioner must show both "injury to [it]self" and "injury to the market."  <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1107 (7th Cir. 1984).  Davis Vision argues that Acuity has established neither type of injury.  However, Davis Vision incorrectly identifies Acuity's purported injury to both itself and the market as solely higher prices.  First, Acuity's claims that it is injured because it loses profits due to an inability to compete in the market.  Second, Acuity claims that Davis Vision members are injured because the lack of competition in the market allows Davis Vision to provide members with low-quality products and poor service at higher prices.  Both of these purported injuries flow directly from the decrease in competition caused by Davis Vision's alleged violation.  Davis Vision does not even attempt to point to any evidence that forecloses the possibility of these purported injuries.  Further, Acuity alleges that it will definitively prove these injuries through additional discovery.

Davis Vision also argues that any injury to Acuity is too speculative because Acuity does not compete in Davis Vision's market, vision benefits plans.  However, Acuity argues that Davis Vision's violation injures the lens market, where Acuity does

compete, not the vision benefits market.  Therefore, Davis Vision is

not entitled to summary judgment based on a failure to establish

antitrust injury.

   b. *A reasonable dispute of material fact exists as to whether*
      *Acuity has antitrust standing.*

   Davis Vision also briefly argues that Acuity does not have

antitrust standing.  Antitrust standing assures that the petitioner is

the party "who can most effectively vindicate the purposes of

antitrust laws."  Kochert v. Greater Lafayette Health Servs., Inc.,

463 F.3d 710, 718 (7th Cir. 2006).  Six factors determine whether a

petitioner has antitrust standing: "(1) the causal connection

between the alleged antitrust violation and the harm to the plaintiff;

(2) [i]mproper motive; (3) [w]hether the injury [is] of a type that

Congress sought to redress with the antitrust laws; (4) [t]he

directness between the injury and the market restraint; (5) [t]he

speculative nature of the damages; (6) [t]he risk of duplicate

recoveries or complex damages apportionment."  Id. at 718.  Davis

Vision argues that none of the first five factors are in Acuity's favor.

However, Davis Vision's argument amounts merely to conclusory

statements and a repeat of its arguments regarding antitrust injury.

The Court finds that a genuine issue of material fact still exists as to whether Acuity can satisfy standing.  First, this Court has already found, when analyzing injury, that the harm alleged by Acuity is: (1) a type of harm that the antitrust laws were intended to remedy; (2) causally connected to the alleged antitrust violation; and (3) directly linked to the alleged market restraint.  Second, Acuity claims that with more discovery, it can definitively prove lost profits based on its exclusion from the market.  Such evidence would eliminate any concern about the speculative nature of Acuity's damages.  Third, Acuity claims that it can prove, with more discovery, that Davis Vision uses the marketing power it gains from the Mandatory Lab Policy to eliminate competition so that Davis Vision can provide its members with lower-quality lenses and poor service at high prices.  A jury could reasonably find that such a motive, which harms consumers in the market, is improper. Therefore, the Court finds that Davis Vision is not entitled to summary judgment based on a failure to establish antitrust standing.

### B. <u>The Court's Earlier Rulings Are Dispositive on Counts II, V, VI, VIII, VIII, and IX.</u>

*1. Neither party is entitled to summary judgment on Count II because the same reasonable dispute exists as to whether Acuity has alleged a viable product market.*

In Count II, Acuity claims that the Mandatory Lab Policy violates Section 2 of the Sherman Act because the policy constitutes an organized plan to create a monopoly.  To prove this claim, Acuity must prove two elements: (1) the possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  See Grinnell, 384 U.S. at 570-71.  Davis Vision argues that it is entitled to summary judgment on this claim because Acuity does not allege a viable relevant product market, as is required to prove the first element.  Acuity, on the other hand, argues that it has proven both elements as a matter of law.  The Court held, supra Part.A.3.c, that a reasonable dispute of material fact exists as to whether Acuity has alleged a viable product market.  Therefore, neither party is entitled to summary judgment on Count II.

*2. Davis Vision is entitled to summary judgment on Count V because Acuity's claim of an illegal boycott under Section 3 of the Clayton Act is judged by the same standard as Acuity's*

*claim of a* per se *unlawful forced group boycott under Section 1 of the Sherman Act.*

In Count V, Acuity claims that the Mandatory Lab Policy constitutes an illegal boycott under Section 3 of the Clayton Act. An alleged boycott under Section 3 of the Clayton Act is analyzed identically to an alleged per se unlawful horizontal forced group boycott under Section 1 of the Sherman Act. See Tire Sales Corp. v. Cities Service Oil Co., 637 F.2d 467, 474-75 (7th Cir. 1980) (using the identical analysis for a group boycott under Section 1 of the Sherman Act and Section 3 of the Clayton Act). The Court previously found as a matter of law that the Mandatory Lab Policy did not constitute an illegal boycott when analyzing the policy for the purposes of Acuity's claim under Section 1 of the Sherman Act. Accordingly, the Mandatory Lab Policy does not constitute an illegal boycott under Section 3 of the Clayton Act. Therefore, Davis Vision is entitled to summary judgment on Count V.

3. *Davis Vision is entitled to summary judgment on Counts VI and XI but not on Counts VII and VIII because Acuity's claims under the Illinois Antitrust Act are judged by the same standards as its parallel federal claims.*

In Counts VI, VII, VIII, and IX, Acuity claims that Davis Vision has violated subsections (1), (2), (3), and (4) of the Illinois Antitrust

Act, respectively.  Davis Vision argues that it is entitled to summary

judgment on these claims.  However, the parties agree that Acuity's

claims under the Illinois Antitrust Act parallel Acuity's claims under

Section 1 and 2 of the Sherman Act and Section 3 of the Clayton

Act.  Therefore, the Court's rulings on Acuity's state antitrust

claims must follow the Court's rulings on Acuity's federal claims.

Specifically, claims under Section 1 of the Illinois Act parallel per se

unlawful claims under Section 1 of the Sherman Act; claims under

Section 2 of the Illinois Act parallel non-per se unlawful claims

under Section 1 of the Sherman Act; claims under Section 3 of the

Illinois Act parallel claims under Section 2 of the Sherman Act; and

claims under Section 4 of the Illinois Act parallel claims under

Section 3 of the Clayton Act.  See Kling v. St. Paul Fire & Marine

Ins. Co., 626 F.Supp. 1285, 1292 (C.D. Ill. 1986) (citing the

"similarity which exists in the interpretation of the Illinois Antitrust

Act and the Sherman Act" when applying the same standard to

claims brought under subsections (1), (2), and (3) of the Illinois Act

as Sections 1 and 2 of the Sherman Act); but see Int'l Test and

Balance, Inc. v. Associated Air and Balance Council, 14 F.Supp.2d

1033, 1040 (N.D. Ill. 1998) (clarifying that, unlike the Sherman Act,

the Illinois Act splits the conspiracy provision into per se unlawful conspiracies under subsection (1) and non per se unlawful conspiracies under subsection (2)); see also Maywood Sportservice, Inc. v. Maywood Park Trotting Assoc., 14 Ill. App. 3d 141, 151 (1st Dist. 1973) (finding that "[t]he language in section 3 of the Clayton Act is substantially identical" to that of Section 4 of the Illinois Act); 15 U.S.C. § 14 (Section 3 of the Clayton Act) and 740 ILCS 10/3(4) (Section 4 of the Illinois Act) (still containing essentially identical language).  As a result, the parties make no additional arguments on these claims.

Accordingly, Davis Vision is entitled to summary judgment on Counts VI and IX (claims under Sections 1 and 4 of the Illinois Act), based on this Courts earlier reasoning supra Part III.A.2.b. and Part III.B.2.; and Davis Vision is not entitled to summary judgment on Counts VII and VIII (claims under 740 ILCS 10/3 (2) and (3)), based on this Court's earlier reasoning supra Part III.A.3 and Part III.B.1.

### C. **Davis Vision Is Entitled to Summary Judgment on Counts III, IV, X, XI, and XIV Because Acuity Fails to State a Claim Upon Which Relief Can Be Granted.**

In Counts III, IV, X, XI, and XIV, Acuity fails to state a claim upon which relief can be granted.  Therefore, Davis Vision is

entitled to summary judgment on these counts.  See Reed v.
Hanlon, 06-cv-1761, 2008 WL 696981, *4 (S.D. Ind. March 13,
2008) (granting summary judgment to defendant on certain counts
because plaintiff failed to state a claim upon which relief could be
granted); Class v. New Jersey Life Ins. Co., 746 F.Supp. 776, 780
(N.D. Ill. 1990) (same); Lane v. Molinar, S89-77, 1990 WL 610887,
*3 (N.D. Ind. Jan. 19, 1990) (same).

1. *Acuity fails to state a claim that the Mandatory Lab Policy
   constitutes unlawful tying under federal antitrust law (Count
   III).*

Davis Vision is entitled to summary judgment on Acuity's
Count III tying claim because Acuity fails to state a tying claim.
Tying is the use of market power in one product market (the tying
market) to exercise unlawful market power over another product
market (the tied market).  In order to state a tying claim, a
petitioner must satisfy four elements: (1) the tying arrangement is
between two distinct products or services; (2) the respondent has
sufficient economic power in the tying market to appreciably
restrain free competition in the market for the tied product; (3)
interstate commerce is affected; and (4) the tying seller has an

economic interest in the sales of the tied seller.  Reifert v. South Cent. Wisconsin MLS Corp., 450 F.3d 312, 316 (7th Cir. 2006).

Acuity alleges that Davis Vision unlawfully ties in-network status with Davis Vision to the purchase of lenses from Davis Vision labs.  However, Acuity does not state a tying claim for two reasons: (1) in-network status is not a distinct product that is bought and sold in the market place; and (2) unlike in Acuity's conspiracy claim, Acuity does not allege direct harm to itself based on the tying and, therefore, cannot establish antitrust injury or antitrust standing for its tying claim.

Acuity does not state a tying claim because in-network status is not a product market.  In-network status is not a product that is produced and distributed in a competitive market.  Rather, in-network status is a status obtained by a provider by contracting with Davis Vision.  See Bendr v. Southland Corp., 749 F.2d 1205, 1215 (6th Cir. 1984) (a contractual obligation is not a product).  Based on the record, the only limitation on a provider's ability to contract with Davis Vision is Davis Vision's requirement that the provider agree to the Mandatory Lab Policy and the other terms of the provider agreement.  Acuity does not provide, or claim that it

will be able to provide, any evidence that Davis Vision's contractual
obligation to include a provider in the Davis Vision network is
gained as a result of competition with other providers or that Davis
Vision is unable to increase the size of its network to take in
whatever providers desire to join.  See Ad-Vantage Telephone
Directory Consultants, Inc. v. GTE Directors Corp., 849 F.2d 1336,
1345 (11th Cir.) (Yellow Pages advertisement space was not a
competitive product market because Yellow Pages would increase
the size of its book to accommodate all advertisements).  Because
Acuity does not allege that Davis Vision's bargaining power comes
from market power in a product market, Acuity does not state a
tying claim.

Further, Acuity alleges that the harm resulting from the
alleged tying violation—unlike the harm alleged in the context of
Acuity's previous federal claims—is Davis Vision's ability to exploit
Davis Vision members by charging higher prices without needing to
provide top-quality products and service and Davis Vision's ability
to exploit providers by offering below-market reimbursements while
failing to provide top-quality products and service.  However,
neither of these harms affects Acuity.  As the Court stated supra

Part III.b.3., Acuity must show a direct injury to itself in order to establish antitrust injury and antitrust standing, which are necessary prerequisites to bringing an antitrust claim. <u>See</u> <u>Car Carriers</u>, 745 F.2d at 1107 (to allege antitrust injury, a petitioner must allege both "injury to [it]self" and "injury to the market"); <u>Kochert</u>, 463 F.3d at 718 (to allege standing, a petitioner must show a causal link between the violation and the harm suffered by the petitioner). Therefore, Acuity does not state a tying claim for this additional reason.

> 2. *Acuity does not state a claim that Davis Vision engages in predatory pricing claim under Section 2 of the Clayton Act (Count IV).*

Davis Vision is entitled to summary judgment on Acuity's Count IV predatory pricing claim because Acuity does not state a predatory pricing claim. To state a predatory pricing claim, a petitioner must show: (1) that the respondent has sold products below cost, *i.e.*, at a predatory price; and (2) that, as a result, the respondent's competition has exited the market, or imminently will exit from market, allowing the respondent to, then, charge monopoly prices in that market. Acuity alleges that Davis Vision charges predatory prices for vision benefits premiums and, as a

result, can charge monopoly prices in the lens market.  Acuity's claim fails because Acuity does not even allege that Davis Vision's competitors in the vision benefits plan market have exited the market or will exit the market as a result of Davis Vision's low premiums.  As a result, even if Acuity proves its allegations, Acuity would not be entitled to relief on this claim.  Therefore, Davis Vision is entitled to summary judgment on Count IV.

3. *Davis Vision is entitled to summary judgment on Counts X, XI, and XIV because Acuity has no private right of action under 215 ILCS 5/364.2, 215 ILCS 5/370i(a), or 16 C.F.R. 456/2(a).*

Davis Vision is entitled to summary judgment on three of Acuity's additional claims because the statutes/regulations under which Acuity brings the claims do not create a private right of action for Acuity: Count X and XI, alleging violations of the Illinois Insurance Code (Purchase of ophthalmic good or services, 215 ILCS 5/364.2, and Polices, agreements, or arrangements with incentives or limits on reimbursement authorized, 5/370i(a)); and Count XIV, alleging a violation of a Federal Trade Commission regulation called the Eyeglass Rule.

First, Acuity does not have a private right of action under Section 364.2 or Section 370i(a) of the Illinois Insurance Code

because the Code does not provide a private right of action for violations of those provisions.  <u>See</u> Policies Issued in Violation of Article—Penalty, 215 ILCS 5/370 (providing only for a civil penalties imposed by the Director).  While some statutes imply a private right of action, no Illinois court has ever found such a private right of action to be implied by 215 ILCS 5/364.2 or 5/370i.  This Court will not imply a private right of action that has not been previously recognized by the Illinois Courts.  Further, the finding of an implied private right of action is only appropriate if: "(1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purposes of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute." <u>Metzger</u> <u>v. DaRosa</u>, 209 Ill.2d 30, 36 (Ill. 2004).  In both of Acuity's claims under the Illinois Insurance Code, Acuity is not a member of the class whose benefit the statute was enacted and Acuity's injury is not one the statute was designed to prevent.  Therefore, no private action is implied for Acuity.

Acuity attempts to bring a claim under the "Purchase of ophthalmic goods or services" provision of the Illinois Insurance Code.  This provision prohibits an insurer from requiring a provider, as a condition of joining the insurer's network, to purchase ophthalmic goods or services "in a quantity or dollar amount in excess of the quantity or dollar amount an enrollee purchases under the terms of the policy.  See 215 ILCS 5/364.2.  Acuity's allegations may mirror the prohibition's language; however, providers, not lens manufacturers like Acuity, are clearly the class for whose benefit the statute was enacted and the class whose injury the statute was enacted to remedy.

Acuity also attempts to bring a claim under the "Policies, agreements or arrangements with incentives or limits on reimbursement authorized" provision of the Illinois Insurance Code. This provision prohibits an insurer from including a condition or term in a policy or contract that unreasonably restricts an insured's access to healthcare.  See 215 ILCS 5/370i(a).  Again, Acuity's allegations may mirror the language of the statute; however, the protected class includes only those who enter into insurance contracts with an insurer.  This Court does not imply a private

cause of action for lens manufacturers.  Therefore, Davis Vision is entitled to summary judgment on Counts X and XI.

Similarly, Acuity's claim under the Eyeglass Rule fails because the Eyeglass Rule, a regulation requiring eye doctors to provide patients with their prescription, does not create a private right of action for Acuity.  <u>See</u> 16 C.F.R. 456/2(a).  Acuity admits that it does not have a cause of action under this regulation and that it only included the claim to "illustrate to the Court that the dangers inherent in a doctor's ability to exercise monopolistic control over the manufacturing decisions of its patients has been the cause for targeted federal rule making in the past."  Pet. Resp. to Respondent's Mot. Summ.J and Pet. Mot. for Partial Summ.J (d/e 30) at 65.  Accordingly, Davis Vision is entitled to summary judgment on Count XIV, as well.

### D. **<u>Davis Vision Is Not Entitled to Summary Judgment on Counts XII and XIII.</u>**

Acuity makes two final claims: (1) tortious interference with prospective business advantage under Illinois common law; and (2) violation of the Lanham Act (15 U.S.C.A. § 1125).  Davis Vision

seeks summary judgment on these counts, but both parties include only a few sentences in argument on these claims in their briefs.

In Count XII, Acuity claims that the Mandatory Lab Policy tortiously interferes with Acuity's prospective business advantage. To prove a claim for tortious interference with prospective business advantage, a petitioner must show: (1) the petitioner had a reasonable expectation of entering into a valid business relationship; (2) the respondent was aware of petitioner's expectancy; (3) the respondent purposefully or intentionally interfered with the petitioner's expectancy; and (4) damages resulted from the interference.  See Cromeens, Holloman, Sibert, Inc. v. AB Volvo, 349 F.3d 376, 398 (7th Cir. 2003).  Davis Vision argues that Acuity has no claim because Acuity's expectation of entering into a business relationship with providers is only aspirational.  However, as this Court has noted, Acuity has alleged that, if given time for discovery, Acuity will produce affidavits from providers conclusively showing that such providers would contract with Acuity if the Mandatory Lab Policy did not exist.  Therefore, Davis Vision is not entitled to summary judgment on that ground.

In Count XIII, Acuity claims that Davis Vision violates the Lanham Act because Davis Vision intentionally keeps information about the Mandatory Lab Policy from Davis Vision sponsors and members, thereby misleading consumers about the origin of Davis Vision's lenses.  To prove a claim of this nature under the Lanham Act, the petitioner must show: (1) the respondent uses in commerce a word, term, name, symbol, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, (2) that is likely to cause confusion, mistake, or deception as to the origin of the respondent's goods or services.  See 15 U.S.C. 1125(a)(1)(A).  Davis Vision argues that Acuity does not state a claim because: (1) Acuity and Davis Vision are not competitors; and (2) Acuity does not even allege that Davis Vision made misrepresentations in commercial promotion. However, Davis Vision's argument refers to alternative claims that can be made under the Lanham Act.  The claim Acuity brings does not require that Acuity compete with Davis Vision or that Davis Vision have made misrepresentations in commercial advertising or promotion.  See 15 U.S.C.A. § 1125 (subsection (1)(B) requires that the "false or misleading representation of fact" be made in

"commercial advertising or promotion" and subsection (1)(A) and (B) both *permit* claims for misrepresentations about a competitor but subsection (1)(A) also allows claims for any use of false or misleading information "in connection with any goods or services" or "in commerce."). Therefore, Davis Vision is not entitled to summary judgment these grounds.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, it is HEREBY ORDERED that Davis Vision's Motion for Summary Judgment (d/e 27) is GRANTED IN PART and DENIED IN PART. Davis Vision's motion for summary judgment is GRANTED as to Counts III, IV, V, VI, IX, X, XI, and XIV and DENIED WITH LEAVE TO REFILE THE MOTION AT THE CLOSE OF DISCOVERY as to Counts I, II, VII, VIII, XII, and XIII. Acuity's Motion for Partial Summary Judgment (d/e 35) is DENIED.

This case is REFERRED to U.S. Magistrate Judge Tom Schanzle-Haskins for a status conference on how discovery shall proceed.

IT IS SO ORDERED.

ENTER:  August 23, 2016

FOR THE COURT:          <u>s/ Sue E. Myerscough</u>
                        SUE E. MYERSCOUGH
                        UNITED STATES DISTRICT JUDGE

## EXHIBIT A

